J. Leah Castella (SBN 205990)
E-mail: lcastella@bwslaw.com
Benjamin L. Stock (SBN 208774)
E-mail: bstock@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
1901 Harrison Street, Suite 900
Oakland, CA 94612-3501
Tel: 510.273.8780    Fax: 510.839.9104

Attorneys for Defendant
CITY OF EMERYVILLE

FILING FEE EXEMPT PURSUANT TO
GOVERNMENT CODE § 6103

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION, a California nonprofit mutual benefit corporation,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF EMERYVILLE, a California municipal corporation,<br><br>Defendant. | Case No. 3:16-cv-06660-JST<br><br>**NOTICE OF ERRATA TO DECLARATION OF WEI-LING HUBER IN SUPPORT OF CITY OF EMERYVILLE'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (Document No. 28-1)**<br><br>**Date: March 23, 2017**<br>**Time: 2:00 p.m.**<br>**Place: Courtroom 9 – 19th Floor** |

**TO THE COURT AND TO ALL PARTIES AND COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that CITY OF EMERYVILLE files this Notice of Errata with respect to the Declaration of Wei-Ling Huber in Support of City of Emeryville's Opposition to Motion for Preliminary Injunction (Document No. 28-1) which inadvertently excluded the Exhibits referenced in the Declaration. Attached to this Errata is Wei-Ling Huber's Declaration, which includes the previously omitted Exhibits.

Dated: February 28, 2017

BURKE, WILLIAMS & SORENSEN, LLP


By: _/s/ J. Leah Castella_____
    J. Leah Castella
    Benjamin L. Stock
    Attorneys for Defendant
    CITY OF EMERYVILLE

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
OAKLAND

OAK #4811-2254-8804 v1      - 1 -      NOTICE OF ERRATA TO ATTACH
EXHIBITS 3:16-CV-06660-JST

1  McCRACKEN, STEMERMAN &
2  HOLSBERRY, LLP
   Paul L. More, SBN 228589
3  pmore@msh.law
   595 Market Street, Suite 800
4  San Francisco, CA 94105
   Tel:  (415) 597-7200
5  Fax:  (415) 597-7201
6
   *Attorneys for UNITE HERE LOCAL 2850*
7
8           IN THE UNITED STATES DISTRICT COURT
9          FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11
12  CALIFORNIA RESTAURANT          )  Case No: 3:16-cv-06660-JST
    ASSOCIATION, a California nonprofit )
13  mutual corporation,            )
                                   )  **DECLARATION OF WEI-LING HUBER**
14                                 )  **IN SUPPORT OF CITY OF**
             Plaintiff,            )  **EMERYVILLE'S OPPOSITION TO**
15                                 )  **MOTION FOR PRELIMINARY**
        v.                         )  **INJUNCTION**
16                                 )
                                   )
17  CITY OF EMERYVILLE, a California )
    municipal corporation,         )  Date: March 23, 2017
18                                 )  Time: 2:00 p.m.
             Defendant.            )  Location: Courtroom 9 - 19th Floor
19                                 )  Hon. Jon S. Tigar
                                   )
20                                 )
                                   )
21                                 )
22
23
24
25
26
27
28

                            1

I, Wei-Ling Huber, declare:

1. I am the President of UNITE HERE Local 2850 ("Local 2850" or the "Union"). I have personal knowledge of the facts stated herein, and could testify to those facts under oath if called upon to do so.

2. Local 2850 is a labor union that represents over 2,500 workers in the hotel, restaurant, food-service, casino, and banquet industries in the East Bay, some 200 of whom work in the City of Emeryville. Of these, I estimate that approximately 600 are employees who rely on tips and service charge disbursements as part of their compensation.

3. Local 2850 has long advocated for local legislation to support the just compensation of workers in the hospitality industry, including the members it represents. Local 2850 has lobbied for living-wage and minimum-wage laws in Berkeley, Oakland, Emeryville, and other East Bay cities for nearly two decades. The Union believes that protective legislation is a necessary complement to organizing for union representation and collective bargaining agreements.

4. Local 2850 has advocated for laws protecting tipped workers' entitlement to mandatory service charges in East Bay cities.

5. Local 2850 was a founding member and a member of the steering committee of the Lift Up Oakland coalition, which was formed in 2013 to campaign for an increase in the Oakland Minimum Wage. The coalition wrote and gathered signatures for the ballot measure that became Measure FF on the November 2014 ballot, and then campaigned for Measure FF's passage. Local 2850 was involved in all of these stages, including helping to draft the measure. The service-charge language that became Section 5.92.040 of the Oakland Municipal Code was included in the measure because of Local 2850's advocacy. Members and staff of Local 2850 gathered signatures for the measure in the spring of 2014 and helped turn out voters to pass the measure in the fall. Local 2850 also donated to the Political Action Committee that was formed to campaign for Measure FF.

2

6.      After the passage of Measure FF, the Lift Up Oakland coalition, including Local 2850, began working with members of the Emeryville City Council to pass a local minimum-wage ordinance. Local 2850 and other members of the coalition successfully advocated that the service charge protection language be modeled on the Oakland language.

7.      While the Oakland and Emeryville minimum wage campaigns were in progress, Local 2850 was also involved in an ongoing effort to raise the minimum wage in Berkeley. Members and staff of Local 2850 attended numerous meetings of the City Council and the Commission on Labor to advocate for passage of Berkeley minimum wage ordinance, and I communicated extensively with members of the Commission on Labor by email and in public meetings to advocate for service charge language modeled on the Oakland language. Although the Berkeley City Council passed a minimum wage ordinance in 2014, it did not go far enough to satisfy the members of the Lift Up Oakland coalition. Among other weaknesses, it did not include a service-charge protection provision.

8.      After the passage of the Emeryville minimum wage, Local 2850 remained involved in a campaign to pass a stronger minimum-wage ordinance in Berkeley. At the urging of Local 2850, the coalition continued to advocate for a service-charge protection modeled on the Oakland language. The coalition gathered signatures to place a minimum wage measure on the November 2016 ballot, and the City Council voted to place a competing measure on the ballot. The coalition's ballot measure included a service charge protection provision modeled on the Oakland ordinance, and the City Council version included a weaker provision. When negotiations took place to arrive at a compromise measure that would be passed by the City Council, Local 2850 successfully advocated for strong service-charge protection language to be included. The City Council passed the negotiated compromise in August 2016, and both ballot measures failed.

9. Local 2850 has advocated for service-charge protection like that in the Emeryville, Oakland, and Berkeley minimum-wage laws because it has learned first-hand from tipped workers that their compensation often declines when their employers use a "service-charge" model and divert part or all of the service charges to management. Obviously, customers who see that a "service charge" is being added to their bill are less likely to leave an additional tip, because they believe that they are already paying gratuity in the form of the service charge.

10. Legislative protection of workers' right to service charges is important because restaurants and other hospitality businesses frequently divert gratuities and service charges to management. One Ford Foundation and University of California study of Bay Area restaurants by Restaurant Opportunities Centers United found that "[w]orkers reported extensive misappropriation of gratuities and service charges." According to this study, fifteen percent of surveyed tipped workers in Bay Area restaurants reported that management took a share of their tips. Restaurant Opportunities Centers United, BEHIND THE KITCHEN DOOR: THE PROMISE OF OPPORTUNITY IN THE SAN FRANCISCO AND OAKLAND BAY AREA RESTAURANT INDUSTRY, (New York, NY: ROC United, 2016) ("Behind the Kitchen Door"), available at: http://www.rocunited.org/wp2015b/wpcontent/ uploads/2016/06/BKD_ BayArea_Report_LR.pdf. A copy of the study is attached to this declaration as Exhibit 1.

11. Restaurants' and hotels' adoption of service charges is also a means of avoiding the minimum-wage obligations that cities such as Emeryville have imposed. In every city minimum-wage ordinance with which I am familiar—and under the State of California's minimum-wage law—there is no "tip credit" allowed against minimum wages and there is no "lower-tier" wage rate for tipped classifications. When the minimum wage goes up to reflect the high cost of living in Bay area cities, restaurants have an incentive to move to a service-charge model and use some of the service charge to pay for the minimum-wage increase (rather

4

than remitting that amount entirely to servers and other service workers as a reflection of the gratuity that is being replaced by the service charge). In this way, hotels and restaurants are able to avoid having to increase their menu prices, and can use the amounts that customers would paid as gratuity (but are now paying in the form of service charges) as a credit against minimum wages, something they could not do if the service workers received gratuity directly from the customers.

12. Enjoining Emeryville's service-charge protections would cause considerable harm to restaurant and hotel workers in the City. I know from over two decades of working with service workers in the restaurant and hotel industries that many tipped employees are a paycheck or two from dire financial circumstances, including the loss of homes and apartments. Tipped employees like restaurant and banquet servers, in-room dining servers, and hotel porters rely on gratuity and service charges to make up for the fact that their hours are often inconsistent and seasonal. The Behind the Kitchen Door study reference above found that fully 22% of surveyed tipped employees had earnings that were less than the poverty line. A national study, conducted by Berkeley economist Sylvia Allegretto for the Economic Policy Institute, found that while the poverty rate of non-tipped workers is 6.5 percent nationally, tipped workers have a poverty rate of 12.8 percent. A true and correct copy of that report is attached to this declaration as Exhibit 2.

13. Based on my bargaining with hotels and restaurants in cities that have increased the minimum wage, I believe that some, and perhaps many, hotels and restaurants in Emeryville will seek to switch to a service-charge model in order to defray the cost of minimum-wage increases if the City's Ordinance is enjoined. If managers use a portion of these service charges to pay for the minimum-wage increase and there is no corresponding increase in gratuity left by customers, then bartenders, waiters and other tipped classifications will see a decrease in their take-home pay.

5

14.     As a close observer of the hotel and restaurant industries for more than two decades, and having bargained many collective-bargaining agreements with provisions addressing the levying and distribution of service charges, I am familiar with the way in which hotels and restaurants typically levy and distribute service charges.

15.     In hotel banquet departments, service charges are normally added as a separate line item on the banquet event order ("BEO") that serves as an invoice for the event. If the event is a large one, the group booking the banquet will have a master account with the hotel. When the event has concluded, the hotel will settle the account with the group or its meeting planner, and the group will pay a lump sum to settle the entire account, including the service charge portion of the bill. Service workers (such as banquet bartenders and waiters) are paid their portion of the service charge as part of their next payroll check, where the amount is listed separately and subject to the same tax withholdings as are other kinds of wages.

16.     Similarly, in the restaurant industry, where "service charges" or "automatic gratuity" is imposed, it is added to customers' as a separate line item. Customers pay this amount as part of the lump sum that settles their entire bill. Customers typically pay by credit card, meaning that the credit-card bank pays the restaurant the lump sum (and the customer later repays the credit-card bank). The waiter's or bartender's portion of the service charge or automatic gratuity is included in their next paycheck, with the appropriate withholdings made.

17.     I do not know of any hotel or restaurant that holds the "service-charge" portion of the bill paid by their customers in a separate account or trust fund to hold for payment to workers in the ensuing pay period. No hotel or restaurant with which I have collectively bargained has ever suggested such a practice, although the Union bargains regularly over the creation of joint employer-union trust funds.

18.     Instead, in my experience, employers in the hotel and restaurant industry treat service-charge payments as they would any other business revenue,

6

but track the amounts that must be paid to the service workers who worked the event or table, and remit the appropriate amounts as wages in the ensuing pay period.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 21st day of February, 2017 at Oakland, California.

_____

Wei-Ling Huber

DECLARATION OF WEI-LING HUBER                    Case No.  3:16-cv-06660-JST

**- EXHIBIT 1 -**

# Behind the Kitchen Door:
## The Promise of Opportunity in the San Francisco and Oakland Bay Area Restaurant Industry



 

BY: the Restaurant Opportunities Centers of the Bay Area,
the Restaurant Opportunities Centers United,
and the Bay Area Restaurant Industry Coalition

June 2016

FUNDING PROVIDED BY:
Abelard Foundation West
Ford Foundation
Rosenberg Foundation
University of California
Y & H Soda Foundation

# Behind the Kitchen Door:

The Promise of Opportunity in the San Francisco and Oakland Bay Area Restaurant Industry

 

BY: **the Restaurant Opportunities Centers of the Bay Area,
the Restaurant Opportunities Centers United,
and the Bay Area Restaurant Industry Coalition**

**June 2016**

FUNDING PROVIDED BY:
**Abelard Foundation West
Ford Foundation
Rosenberg Foundation
University of California
Y & H Soda Foundation**

# Behind the Kitchen Door:

The Promise of Opportunity in the San Francisco and Oakland Bay Area Restaurant Industry

| | |
|---|---|
| EXECUTIVE SUMMARY | 1 |
| **I. INTRODUCTION AND METHODOLOGY** | **9** |
| **II. OVERVIEW OF THE RESTAURANT INDUSTRY IN THE BAY AREA** | **11** |
| **III. WORKER PERSPECTIVES** | **17** |
| EARNINGS AND BENEFITS | 17 |
| EARNINGS | 17 |
| TIPPED WORKERS | 18 |
| HOUSING | 20 |
| BENEFITS | 23 |
| SICK LEAVE | 24 |
| WORKING CONDITIONS | 27 |
| SCHEDULING | 27 |
| WAGE THEFT | 27 |
| HEALTH AND SAFETY | 29 |
| UNFAIR APPLICATION OF DISCIPLINE | 29 |
| MOBILITY WITHIN THE INDUSTRY | 31 |
| OPPORTUNITIES FOR ADVANCEMENT | 31 |
| OCCUPATIONAL SEGREGATION | 31 |
| DISCRIMINATION IN HIRING, PROMOTION, AND TRAINING | 33 |
| **IV. EMPLOYER PERSPECTIVES** | **35** |
| **V. CONCLUSION AND POLICY RECOMMENDATIONS** | **39** |
| APPENDIX | 42 |
| ACKNOWLEDGMENTS | 43 |
| NOTES | 44 |



# Executive Summary

*B*ehind the Kitchen Door: The Promise of Opportunity in the San Francisco and Oakland Bay Area Restaurant Industry is one of the most comprehensive research analyses of the restaurant industry in the Bay Area. The report draws on 525 worker surveys, 41 structured interviews with restaurant workers in the Bay Area, and 20 structured interviews with employers, along with other industry and government data. The Bay Area is a laboratory for progressive policies, and our study was inspired by the need for an analysis of the impact of trail-blazing policies enacted in the region to improve earnings and working conditions for low-wage workers, as well as the need to survey the range of other workplace issues critical to the lives of thousands of restaurant workers.

Through examining industry and government data alongside worker surveys and interviews our study demonstrates that while the industry holds great prospects as a result of positive steps taken by legislators and high-road employers, many restaurant jobs in the Bay Area remain low-road jobs characterized by few benefits, low wages, and poor workplace conditions. Our survey instrument captured a range of problems with restaurant working conditions related to the availability of benefits, hiring and promotion practices, workplace discrimination, and job-specific training opportunities. In particular, we found that occupational segregation, wage violations including misappropriation of tips and service charges, and inadequate access to housing were all severe and had a disproportionate impact on workers of color.

## A VIBRANT AND GROWING INDUSTRY

The Bay Area is home to a resilient and growing restaurant industry. The industry includes more than 177,807 workers in 10,618 establishments.[1] Over the last decade, the industry has grown to over 9.5% of the local economy (see Figure ES1),[2] contributing to the region's reputation as a tourism, hospitality, and entertainment destination, and generating over $10.3 billion in revenue and $905 million in sales tax for the state and local economy.[3] However, the benefits of this growth have not been equally shared.

FIGURE ES1

**FOOD SERVICES AND DRINKING PLACE JOBS IN THE BAY AS A PERCENTAGE OF TOTAL PRIVATE SECTOR JOBS**
In the last decade, restaurants have grown in importance as a percentage of the Bay Area region's economy.



Source: Bureau of Labor Statistics, Quarterly Census of Employment and Wages, 2004-2014.

1

## A GROWING PROMISE

San Francisco has been at the forefront of the movement to raise working standards through progressive legislation. It was among the first cities to adopt a $15 minimum wage, secure scheduling for workers, paid sick leave, wage theft protection, and ban the box legislation. This movement has found echoes regionally in Berkeley, Oakland, Emeryville, and San Jose, making the region one of the more attractive labor markets for workers and progressive employers in the country. However, our study has surfaced enforcement gaps and areas where progressive legislation needs to be expanded to respond to the needs of restaurant workers. The Bay Area holds much promise for restaurant workers, but in many instances that promise has been denied.

**Our key findings include:**

### HIGH ROAD



> *"[Due to high wages] we haven't had to hire anyone in the kitchen for 7 years."*
> —OWNER, fine dining restaurant, 25 years experience

- Interviews with employers in the Bay Area confirm that regional progressive legislation facilitates a restaurant industry where businesses compete on the basis of quality food and service, not by squeezing workers livelihoods.

- Employers reported low employee turnover and high productivity as a result of living wages and access to benefits.

- Many Bay Area employers lack formalized hiring, training, and promotion practices, and as a result, have reinforced occupational segregation in the restaurant industry.

### HOUSING

- The Bay Area has among the highest rents in the country;[4] restaurant workers' lower purchasing power strongly affects how and where they live. A typical restaurant worker would need to work 107 hours per week to afford a home.[5] In order to afford that rent, a worker would need an hourly wage of $30.48 in Oakland and $39.65 in San Francisco, CA. More than 95% of our survey respondents earned less than that amount.

- Restaurant workers in the Bay Area are paying on average $689 per month in rent, and must commute significant distances from lower-income areas with more affordable rents and sharing housing costs by living with more people. The average restaurant worker in the Bay Area lives in an apartment or home with 4 total residents, and 78.7% of restaurant workers do not work and live in the same city.

- Gentrification is also a concern. Workers of color pay higher rents, $695 per rent on average and live in homes with over three other roommates, compared to $664 for white workers who live with over two other roommates.

## OCCUPATIONAL SEGREGATION

*"I mean, diverse, but segregated, you know? Like always, the cooks are Mexican and the bussers are Mexican. You know, one of them is black… I guess it's diverse, but like at probably every restaurant the cooks are Mexican, and the Back-of-House is Mexican, and the Front-of-House is white."* —BARTENDER

- Extensive occupational segregation exists in California and around the country,[6] and this pattern is reflected in the Bay Area. This has an impact on wages that workers are able to earn. Workers of color experience a $6.12 wage disparity compared to white workers, and women experience a $3.34 wage disparity compared to men in fine dining occupations (see Table ES2). This race pay gap is the largest we have found around the country.

- According to government data, white workers are more likely to work in the higher paying Front-of-the-House occupations, such as bartenders and servers, than workers of color, who are more likely to work in the Back-of-the-House (see Table ES1).[7]

- Over half of bartenders are white, despite white workers being less than a quarter of the restaurant workforce overall.

- Although women make up the vast majority of servers and bartenders, including servers in fine dining, they are dramatically underrepresented among bartenders in fine dining. Women surveyed made up 66.7% of all full service restaurant servers, and 85.7% of servers in fine dining, but only 22.8% of full service restaurant bartenders, and were not represented among bartenders in fine dining.

EXECUTIVE SUMMARY

| TABLE ES1 | | |
|---|---|---|
| **WHITE WORKERS DISPROPORTIONATELY OCCUPY BARTENDER & SERVER POSITIONS** | | |
| | White Workers | Workers of Color |
| Bartenders | 55% | 45% |
| Servers | 35% | 65% |
| Total | 26% | 74% |

Source: American Community Survey, 2011-2014.

## WAGES AND MEAGER BENEFITS

*"I don't have health insurance. I also don't have any dental, or eye, or anything like that… one time I couldn't come into work because I was sick and they told me I had to get a doctor's note. So I came into work sick, got all my coworkers sick, just because I couldn't afford to pay a doctor just for [a] note, because I couldn't afford health insurance, you know."* —SERVER

- Restaurant worker wages are above the industry average in part due to the progressive wage legislation in the region. However, great wage disparities still exist for workers based on race and gender, and workers of color, in particular, appear to be denied access to the industry's most lucrative occupations (see Table ES2). As a result, workers of color in fine dining experience a $6 wage differential compared to white workers, among the largest race pay gaps in the country.

- A significant majority of restaurant workers do not receive workplace benefits such as employer-provided health coverage (82%). Although the percent that do have health insurance through an employer is higher than in other regions of the country, 52% report not having any form of

| TABLE ES2 | | | | |
|---|---|---|---|---|
| **MEDIAN WAGES IN THE BAY AREA'S RESTAURANTS** Wages are adjusted to 2016 by accounting for minimum wage increases in the region | | | | |
| | Men | Women | White | People of Color |
| All | $15.76 | $14.55 | $14.25 | $15.05 |
| Fine Dining | $19.66 | $16.32 | $22.44 | $16.32 |
| Tipped Occupations | $19.34 | $17.50 | $18.15 | $17.69 |
| Limited Service | $13.25 | $12.88 | $13.00 | $12.88 |

Source: Bay Area Restaurant Industry Coalition survey data.

health insurance coverage which is also higher than in other regions. Twenty percent report having gone to the emergency room without being able to pay in the past year, nearly twice the rate we found in Seattle.

• Despite promising steps to raise wages for low-wage restaurant workers, 20% reported earning poverty wages (below the wage required for a full-time, full-year worker to support a family of three as defined by the Department of Labor's Lower Living Standard Income Level. (See Table ES3).

## WAGE LAW VIOLATIONS

*"There was shadiness going on… they were taking certain things off your check, or would cut off times. So on my clock, hours would have a time sheet and I would try to match up the time sheet with my clock out slips so it would show what time you clocked in and the time you clocked out. So, it didn't match up… I actually questioned my manager who was the one doing this. And she gave me a hard time saying, well, don't you get a lot of breaks, and this and that." —SERVER*

• Workers reported extensive misappropriation of gratuities and service charges. Fifteen percent of tipped workers of color reported that management takes a share of their tips, compared to 13% of white tipped workers, and 14% overall.

FIGURE ES2

**ACCESS TO PAID SICK DAYS AND THE CYCLE OF CONTAGION**
The Bay Area is one of the few regions of the country where workers are ensured a paid sick leave benefit by both state and city law, meaning that if they or a close family member falls ill they can take the day off without fear of retribution or losing a day's wages. However, about half of all workers in San Francisco are denied this benefit, with negative consequences for both restaurant workers and the public.
Source: Bay Area Restaurant Industry Coalition survey data.



**Of workers that worked sick, what were the reasons?**

I couldn't afford to take the day off without pay
**73.2%**

I couldn't get shift covered
**58.6%**

I was concerned I would be fired or penalized
**38.6%**

**Workers Lacking Paid Sick Days**
**73.2%**

**Worked Sick**
**62.7%**

**Of workers that worked sick, what were the consequences?**

I coughed or sneezed while handling food
**63.8%**

I got other workers sick
**40.6%**

My illness lasted longer
**30.5%**

Unable to complete necessary tasks at work
**28.9%**

- 56.8% of Back-of-the-House workers in the Bay Area reported that they received supplemental income from tips, and that Back-of-the-House workers who received tips earned $18.72 compared to $12.55 earned by Back-of-the-House workers who did not receive tips.

- Service charges and tip pools that included Back-of-the-House workers helped balance income disparities between the Front and Back-of-the-House, but also created the potential for abuse as some employers used service charges to compensate supervisors, managers, owners, or to meet other business expenses.

- 25% of restaurant workers in the Bay Area report having worked off the clock without pay in the past 12 months.

- 33% report that they are not paid 1.5 times the normal wage when they work over 8 hours in a day or over 40 hours in a week in violation of California and federal labor laws.

- 11% of workers reported earning less than the minimum wage.

- Despite laws that require paid sick leave, only 27% of restaurant workers in San Francisco reported having access to paid sick days (see Figure ES2). This compared to only 6% of restaurant workers in other cities in the region that lacked access to paid sick days at the time of the survey.



## SCHEDULING

> *"It varies a lot… The schedules are very uncertain. Um, just depending on how many employees they have at a given time. Since they've been short-staffed lately I've been working like 30-35 a week, but before that it was only 10-15. So, I never know, how much it's gonna be"*
> —SERVER

- 26% of tipped restaurant workers experience frequent changes in their schedule, and an additional 50% of tipped workers sometimes experience changes in their schedule, compared to 16% and 43% of restaurant workers that do not receive tips. The majority of tipped workers are effectively expected to be on-call by their employers.

- 30% of tipped restaurant workers and 51% of restaurant workers that do not receive tips are never asked for their input when schedules are made or changed.

- 33% of tipped workers reported that their schedule was recently cut to under 30 hours per week, compared to 7% of restaurant workers that do not receive tips.

## THE BAY AREA RESTAURANT WORKERS BY THE NUMBERS

### WAGES EARNED

| | |
|---|---|
| 13.5% | 2014 Less Than Minimum Wage \| <MW ($8–$10.74) |
| 26.4% | Below Poverty Wage (DOL LLSIL) \| MW – $11.92 |
| 53.9% | Low Wage \| $11.93 – $40.61 |
| 6.1% | Livable Wage \| $40.61 and higher |
| 10.9% | 2016 Less Than Minimum Wage \| <$10.84 |
| 8.9% | Below Poverty Wage (DOL LLSIL) \| $10.85 – $12.37 |
| 78.5% | Low Wage \| $12.38 – $42.17 |
| 1.6% | Livable Wage \| $42.18 and higher |

### JOB BENEFITS AND HEALTH REPORTED

| | |
|---|---|
| 82.1% | Employer does not provide health insurance |
| 51.7% | Do not have any health insurance coverage |
| 19.8% | Gone to emergency room without being able to pay |
| 73.2% | Do not get paid sick days (San Francisco) |
| 88.4% | Do not get paid vacation days |
| 62.7% | Have worked when sick (San Francisco) |

### RAISES AND PROMOTIONS REPORTED

| | |
|---|---|
| 26.7% | Received a raise in last year |
| 21.6% | Passed over for a promotion, raise, or given worse shifts |
| 57.3% | Did not move up in position from last job to current job |
| 54.4% | Did not receive on-going training needed to be promoted |

### EMPLOYMENT LAW VIOLATIONS REPORTED

| | |
|---|---|
| 32.7% | Experienced overtime wage violations |
| 10.9% | Experienced minimum wage violations |
| 46.0% | Earned at or below the minimum wage |
| 25.2% | Worked off the clock without pay |
| 13.6% | Not paid on time |
| 13.8% | Management took share of tips |
| 18.9% | Worked more than 8 hours straight without a paid break |
| 36.4% | Required to pay for all or a portion of uniforms |

### HEALTH AND SAFETY VIOLATIONS REPORTED

| | |
|---|---|
| 19.2% | Unsafely hot in the kitchen |
| 33.4% | Fire hazards in the restaurant |
| 19.2% | Missing mats on the floor to prevent slipping |
| 18.3% | Missing guards on cutting machines |
| 28.8% | Done something that put own safety at risk |
| 24.6% | Did not receive instruction or training about workplace safety |

### WORKPLACE INJURIES REPORTED

| | |
|---|---|
| 38.7% | Burned while on the job |
| 37.8% | Cut while on the job |
| 12.6% | Slipped and injured while on the job |
| 44.5% | Came into contact with toxic chemicals on the job |
| 23.6% | Chronic pain caused or worsened by the job |

### WORKPLACE PRACTICES REPORTED

| | |
|---|---|
| 91.4% | Worked when the restaurant was understaffed |
| 84.7% | Performed several jobs at once |
| 38.6% | Experienced verbal abuse from supervisors |
| 46.6% | Performed a job not trained for |
| 29.3% | Done something due to time pressures that might have harmed the health and safety of customers |

Wages earned were adjusted to 2016 by accounting for minimum wage increases in the region.
Source: Bay Area Restaurant Industry Coalition survey data.

## PROMOTIONS AND TRAINING

*"You really only get a raise when you kind of move up the chain, as far as positions." —HOSTESS*

• 73% of restaurant workers did not receive a raise in the last year, 22% reported they were passed over for a promotion, raise, or given worse shifts, 57% did not move up in position from their last restaurant job to their current one, and 54% do not receive ongoing job training (see Table ES3).

• Workers of color are less likely to receive a raise or promotion than white workers. 78% of workers of color did not receive a raise, and 60% did not move up in position from their last restaurant job to their current one.

## HEALTH AND SAFETY HAZARDS

*"We don't get any, like, sick time at all. I have worked while I was sick, even though when you are working in the food industry it is illegal to be at a restaurant depending on the type of illness you have because you are working around food. Sometimes you just have to work because you can't find someone to cover your shift." —BARISTA*

• 91% of workers we spoke with have worked when their restaurant was understaffed.

• 28.8% reported doing something that put their own safety at risk.

• 29.3% have done something due to time pressure that might have harmed the health and safety of customers.

• 33% of restaurant workers report that their workplace has fire hazards, 56% in Back-of-the-House. 39% of workers surveyed have been burned while on the job, 43% in Back-of-the-House, and 42.5% have been cut on the job, 44% in Front-of-the-House.



## KEY POLICY RECOMMENDATIONS

1. Address racial segregation in the industry through a combination of policies and programs that increase worker training and certification in livable wage job skills, push and train employers to desegregate their restaurants, and engage consumers in supporting restaurants that desegregate.

2. Mandate transparent, formalized hiring, promotion, and training processes that make a clear and fair ladder for workers to advance to higher-wage positions.

3. Increase awareness and understanding of local labor laws though deepening and extending collaborations with community groups that train workers so that they know their rights and can organize to realize them.

4. Strengthen and extend existing progressive legislation to facilitate greater access to healthcare and scheduling rights among all restaurant workers in the Bay Area.

5. Ensure workers have a voice in ownership and control over gratuities and service charges left on their behalf.



# Introduction and Methodology

The San Francisco Bay Area of Northern California, encompassing the five counties in the San Francisco-Oakland-Hayward Metropolitan Statistical Area, hereafter referred to as "the Bay", is one of the largest metropolitan areas in the country, and has a world-renowned restaurant scene, fueled by organic farmers and chefs.[8] The Bay is also a national leader in progressive legislation to improve working conditions for low-wage workers. San Francisco was one of the first cities to take steps towards a $15 minimum wage, and voters in Oakland recently voted to rapidly raise wages to $12 and adopt paid sick days. Although the region has adopted progressive labor standards, it is also one of the most expensive regions of the country to live. Many restaurant workers continue to earn poverty-level wages that don't keep up with the exorbitant costs for rent in the area. Many more restaurant workers have jobs that offer very limited benefits, few advancement opportunities, and expose them to unhealthy, unsafe, and at times illegal workplace conditions as a recent sweep of labor law compliance by the DOL has shown.[9]

Through integrating 525 in-person worker surveys with interviews and analysis of government data, we have assembled the most comprehensive picture of the state of the Bay's restaurant industry to date. Our research reveals that while there have been important steps made towards improving working conditions in the Bay's restaurant industry, major gaps and areas for advancement remain. Many employers continue to take the low road to profitability. Our worker surveys and interviews illustrate the impact this approach has had on people's lives. Our primary research — interviews and surveys with restaurant workers coupled with government and industry statistics, provide the first comprehensive look at working conditions in the Bay Area's restaurant industry. The result is a unique overview of the characteristics of workers in the industry, their wages, benefits, and working environment.

## METHODOLOGY

### INTERVIEW METHODOLOGY

In order to obtain a holistic picture of the daily lives of restaurant workers and to gain detailed information about the nature of working conditions, in-depth, open-ended, one-on-one interviews were conducted with 41 workers. Additionally, we collected 20 interviews with employers. For both sets of interviews, an interview guide was used to structure interviews and ensure that all interviews covered the same general topics, but workers and employers were also given the space to discuss issues and lead the conversation in directions that they considered relevant or important. Interviewers were trained in how to use the guide to conduct structured, open-ended interviews. The interviews were recorded and analyzed using Dedoose software.

***TERMS USED IN THIS REPORT***

***Front of the House*** and ***Back of the House*** refer to restaurant industry terms for the placement and function of workers in a restaurant setting. Front of the house generally refers to those interacting with customers in the front of the restaurant including wait staff, bussers and runners. Back of the house workers generally refers to kitchen staff including chefs, cooks, food preparation staff, dishwashers, and cleaners.

***High road*** and ***low road*** are industry terms referring to opposing business strategies for achieving productivity and profitability. In this report, the former is used to denote employer practices that involve investing in workers by paying livable wages, providing comprehensive benefits, opportunities for career advancement, and safe workplace conditions as means to maximize productivity. The results are often reduced turnover as well as better quality food and service. The latter refers to strategies that involve chronic understaffing, failing to provide benefits, pushing workers to cut corners, and violating labor, employment and health and safety standards. Low-road practices are not simply illegal practices — they are employment practices, such as providing low wages and little or no access to benefits, that are not sustainable for workers and their families, and that have a long-term negative impact on both consumers and employers.

## SURVEY METHODLOGY

The survey was administered from May 2013 to July 2014 by staff, members, and volunteers from the Restaurant Opportunities Center of the Bay Area (ROC – the Bay Area), a community-based organization with significant contacts among restaurant workers and access to workplaces in the industry. A total of 525 surveys were conducted face-to-face with workers in the Metropolitan Statistical Areas encompassing San Francisco, Oakland, and San Jose. The bulk of the surveys were conducted in the San Francisco-Oakland-Hayward Metropolitan Statistical Area encompassing Alameda, Contra Costa, Marin, San Francisco, and San Mateo counties, also known as the San Francisco Bay Area, along with 40 surveys that were gathered in San Jose. Therefore, unless otherwise specified, the Bay Area refers to the San Francisco-Oakland-Haywood Metropolitan Statistical Area. The sample consisted entirely of workers currently employed in the restaurant industry, with 50% of respondents with three years of experience or more in the industry. We sought to capture a wide range of experiences in each of the three main segments of the industry — fine dining, casual dining, and quick serve.

The sample was stratified to ensure that the workers interviewed were as representative as possible by gender, race, age, and segment, with an oversample in fine dining. Because there is no government data source listing individual restaurant workers and how to contact them, it is impossible to conduct a strictly random sample of this industry. Thus, we conducted a sample survey consisting of quotas of workers that agreed to be surveyed within target quotas based on segment, age, gender, and race/ethnicity derived from census analysis. We oversampled full service restaurants because limited service restaurants are far more often chains with less variation. We used the American Community Survey and Bureau of Labor Statistics industry data to identify the demographic quotas as well as proportions of Back-of-the-House and Front-of-the-House staff within full-service and limited service establishments.

To create a diverse sample, we limited the number of surveys to two per restaurant establishment. As with all methods, our sampling methodology has strengths and limitations. The strength of our outreach methodology is that it allowed us to include populations of workers typically underrepresented in the Census. In addition, in-person surveys lead to high question-specific response rates. To add to the rigor of the survey administration, we weighted the data according to proportions of Front and Back-of-the-House workers within full-service and limited service restaurants to appropriately reflect the actual distribution of positions in the industry. Resulting statistics were analyzed using Intercooled Stata 10 statistical data analysis software. Results from this survey refer to the weighted figures unless otherwise stated.

## WAGE METHODOLOGY

Due to annual increases in wages in the San Francisco Bay Area, and steeper increases to the minimum wage in the cities of Oakland and San Francisco, we normalized wage data across the survey population to 2016 based on year to year percentage increases to base wages according to the increases in each city's minimum wage in 2014, 2015, and 2016 when applicable based on the date the survey was conducted and date of increase to the minimum wage (see Table 6). A total of ten wage outliers that were greater than three standard deviations from the mean were removed from analysis. Due to the average tenure, fine dining oversample, and wage increases within the Bay Area, the median wage is higher for our sample than the overall wages recorded by employers in the Bay Area, yet provides a vivid view of the changes taking place in the Bay Area restaurant industry.

# Overview of the Restaurant Industry in the Bay Area

In the Bay, the robust restaurant industry is a source of significant public pride as well as a key driver of success in the local economy. Renowned across the world for both its ethnic diversity, culinary innovations, and commitment to slow (sustainable, local, and organic) food, the Bay's restaurant industry has shown consistent growth over the last decade. Between 2004 and 2014, the number of food service and drinking establishments in the Bay Area has increased 21 percent, from 8,773 to 10,618.[10] In 2012, the Bay Area restaurants generated $10.3 billion in revenue, accounting for an estimated $776 million in sales tax for the state and over $129 million for the local economy.[11] Moreover, the area's restaurant industry has added importance as a key node in the regional tourism and hospitality sectors, attracting visitors and increasing the amount of dollars entering the local economy (see Figure 1).

In order to assemble a comprehensive analysis of the issues faced by restaurant workers in the Bay Area, we collected 525 worker surveys and conducted 41 in-depth interviews with workers over an 8-month period. This primary research is supplemented with analyses of industry and government data and reviews of existing academic literature. The Bay Area's growing restaurant industry includes more than 177,807 workers in 10,618 establishments, which contribute to the region's tourism, hospitality, and entertainment sectors. Bay Area restaurant workers comprise 9.5% of the total local private sector employment.[12] Our survey research found that nearly 20% of Bay Area restaurant workers are paid an hourly wage that would not support a family of three above the poverty level in the Bay.

**FIGURE 1**

## SIX LARGEST PRIVATE SECTOR EMPLOYERS IN THE BAY AREA
The restaurant industry is the fourth largest private sector employer in the Bay Area.



- ◆ PROFESSIONAL & BUSINESS SERVICES
- ■ TRADE, TRANSPORTATION & UTILITIES
- ▲ EDUCATION & HEALTH SERVICES
- ✕ RESTAURANT
- ✳ MANUFACTURING
- ● INFORMATION

Source: Bureau of Labor Statistics, Quarterly Census of Employment and Wages, 2004-2014.

As shown throughout the report, wages and working conditions vary markedly between position and industry segment.

## SEGMENT

The North American Industry Classification System (NAICS) categorizes the restaurant industry ("Food Services and Drinking Places") into four segments: full-service restaurants, which have table service where the consumer orders from a menu at a table; limited-service restaurants, which have no table service; special food services, which provide services such as catering; and drinking places, which serve drinks but not food.[13] The restaurant categories used in this report align with the NAICS categories, with the addition of a distinction within full-service between 'fine dining' and 'casual restaurants.' Distinguishing between these two categories is critical to our analysis because job quality, employer practices, and patterns for ethnic and racial employment and occupational segregation differ across the two segments. The categories used in this report are as follows:

1 **FINE DINING** includes full-service restaurants commonly referred to as "upscale" restaurants. The typical dining tab per person is above $40.

2 **CASUAL RESTAURANTS,** also described as 'casual dining' or 'family style' restaurants, are moderately priced full-service restaurants. They include franchise or chain restaurants, such as Olive Garden or Applebee's, as well as independently owned establishments.

3 **QUICK SERVE,** limited service restaurants, serve food without table service. Examples include 'fast food' restaurants like McDonald's, or 'fast casual' restaurants, like Chipotle, that may have higher prices and cater to different clientele.

4 **BARS AND OTHER** includes catering, and bars that do not serve food.

## POSITION

Jobs in the restaurant industry generally fall into one of three basic categories, each corresponding to different levels of compensation, potential for mobility, access to training, workplace conditions, and other indicators of job quality:

1 **MANAGERS AND SUPERVISORS, INCLUDING CHEFS.**

2 **FRONT-OF-THE-HOUSE POSITIONS,** including all staff that has direct contact with customers, such as servers, bartenders, hosts, and bussers.

3 **BACK-OF-THE-HOUSE POSITIONS,** or those that do not involve direct contact with customers, but are essential to a restaurant's functions, such as dishwashers and cooks. Many quick service employees work a combined back of the house and front of the house position. Quick serve jobs are categorized as Back-of-the-House in this study because wages and working conditions in them are similar to those in Back-of-the-House jobs.

## HOW MANY JOBS?

The restaurant industry is the fifth largest private sector employer in the Bay. In 2015, according to the Bureau of Labor Statistics, the Bay Area restaurant industry employed over 177,807 workers, 9.5% of all private sector employees.[14]

Since 2005, the Bay Area restaurant industry's share of private sector employment has risen from 7.5% to 9.5% (see Figure 2).[15] While industry employment dipped during the Great Recession in 2009 and 2010, it has since rebounded and continued its growth trajectory.



**FIGURE 2**

**FOOD SERVICES AND DRINKING PLACE JOBS IN THE BAY AS A PERCENTAGE OF TOTAL PRIVATE SECTOR JOBS**
In the last decade, restaurants have grown in importance as a percentage of the Bay Area region's economy.

Source: Bureau of Labor Statistics, Quarterly Census of Employment and Wages, 2004-2014.

## WHAT ARE THE CHARACTERISTICS OF THE WORKFORCE?

Most jobs in the restaurant industry do not require formal education, with the exception of chefs and sommeliers (wine stewards). There is no formalized training or universally accepted certification for most restaurant jobs; instead most employees obtain job skills during on-site training. Back-of-the-House workers, often working in hot, cramped spaces, must be able to fill orders in a timely fashion in a high-pressure environment. Front-of-the-House staff and other employees who interact with customers need strong interpersonal skills, time and task management skills, and a working knowledge of food preparation and presentation.

Census data shows that the Bay Area restaurant industry is generally younger, has a greater representation of workers of color, with a higher proportion of foreign-born workers and workers without a college degree than the overall workforce (see Table 1). Some key statistics include:

### GENDER
Women make up 44% of the industry's overall workforce, but comprise 52% of the industry's tipped restaurant occupations, and 59% of servers. In contrast, women make up 47% of the region's overall workforce.[16]

### AGE
Bay Area restaurant workers are younger on average than the overall labor force of the city, but the industry is an important source of jobs for workers in all age brackets. The median age of restaurant employees is 33 compared to 41 in the overall work force. Twenty six percent of

TABLE 1

**DEMOGRAPHIC PROFILE OF THE BAY AREA'S
RESTAURANT WORKERS VS. ALL WORKERS**

| | | RESTAURANT WORKERS | ALL WORKERS IN THE BAY AREA |
|---|---|---|---|
| GENDER | Male | 55.9% | 53.2% |
| | Female | 44.1% | 46.8% |
| TIPPED OCCUPATIONS | Male | 47.9% | 46.5% |
| | Female | 52.1% | 53.5% |
| SERVERS | Male | 41.5% | |
| | Female | 58.5% | |
| AGE | 16-24 | 25.9% | 9.5% |
| | 25-44 | 47.0% | 47.5% |
| | 45-64 | 24.7% | 38.3% |
| | 65 and older | 2.5% | 4.8% |
| RACE/ETHNICITY | White | 26.1% | 44.7% |
| | Black | 4.3% | 6.1% |
| | Asian | 25.1% | 25.2% |
| | Latino | 41.1% | 20.5% |
| | Other | 3.5% | 3.5% |
| NATIVITY | Citizen | 73.0% | 83.8% |
| | Not a citizen | 37.0% | 16.2% |
| | Birth citizen | 46.2% | 63.9% |
| | Foreign born | 54.9% | 37.6% |
| PLACE OF BIRTH | U.S. | 45.1% | 62.4% |
| | Latin America | 30.9% | 12.1% |
| | Europe | 1.9% | 3.7% |
| | Asia | 21.4% | 19.8% |
| | Africa | 0.3% | 0.8% |
| | Other | 0.4% | 1.2% |
| YEARS IN THE U.S. | Born in the U.S. | 44.9% | 62.1% |
| | 0-5 years | 9.0% | 3.9% |
| | 6-10 years | 11.7% | 5.0% |
| | 11-15 years | 11.7% | 6.1% |
| | 16-20 years | 5.7% | 4.9% |
| | 21 or more | 17.0% | 18.1% |
| ABILITY TO SPEAK ENGLISH | Speaks only English | 39.2% | 59.2% |
| | Speaks very well | 19.3% | 23.4% |
| | Speaks well | 15.4% | 9.6% |
| | Speaks, but not well | 18.2% | 6.0% |
| | Does not speak English | 8.0% | 1.7% |
| EDUCATION | Less than high school degree | 23.4% | 7.4% |
| | High School Degree | 36.1% | 21.3% |
| | Some college | 27.0% | 22.3% |
| | Bachelor's degree and higher | 13.6% | 49.0% |

Source: ROC United analysis of American Community Survey (2011-2014). Ruggles, Steven, Alexander J. Trent, Genadek Katie, Goeken Ronald, Schroeder Matthew B., and Soebek Matthew, *Integrated Public Use Microdata Series: Version 5.0 [Machine-readable database]*, (Minneapolis: Minnesota Population Center, 2010).

restaurant industry workers are between the ages of 16 and 24, close to three times the rate of all Bay Area workers in the same age category, and the share of workers between the ages of 45 and 64 is 25%, or about two thirds of the 38% among all workers. However, in both the restaurant industry and the broader economy nearly half of all workers, 47%, are between the ages of 25 to 44 in both the restaurant industry and the overall economy.[17]

## RACE

Approximately 74% of the restaurant labor force is comprised of Blacks, Asians, Latinos, and other workers of color, compared to 55% among all Bay Area workers. Latino workers comprise the largest single group by race or ethnicity, at 41%, compared to 21% among the total workforce. Asians represent 25% of the industry in both restaurants and overall.[18] Black workers are slightly underrepresented in the restaurant industry, but are overrepresented in fast food occupations and food servers outside of restaurants, and earn the absolute lowest wages.[19] In total, the restaurant industry provides greater opportunities for workers of color than the rest of the economy, but as shown in chapter three, tends to segregate them in the lower earning segments of the industry.

## FOREIGN BORN

In the Bay Area 55% of workers employed in the restaurant industry are foreign born, compared to 38% in the total workforce.[20]

## EDUCATION

The restaurant industry provides greater opportunities for workers without extensive education, 60% have a high school degree or less compared to 29% among all Bay Area workers. Similarly, the restaurant industry provides greater opportunities for workers without a college Bachelor's degree, 87% do not have a B.A., compared to 51% among all workers. However, 41% of all restaurant workers still have at least some amount of college education.[21]

# WHAT DO THE JOBS PAY?

While the Bay Area restaurant industry employment has grown in the past decade, wages in the region have not kept pace. According to the Bureau of Labor Statistics' Occupational Employment Statistics survey of employers, in 2015, the median hourly wage for a worker in the San Francisco-Oakland-Hayward restaurant industry was $11.62 per hour, compared to a $24.19 median wage per hour for all occupations.[22] The average annual salary was $27,840 in the restaurant industry, less than half the average salary of $66,900 among all occupations. As seen in Table 2, in the greater Bay Area, the median hourly wage for food preparation and serving related occupations of $11.62 per hour is only 48% of the median wage for all the Bay Area Metro Area occupations ($24.19).[23] Moreover, over two-thirds of the workers in the restaurant industry, 71%, are employed in positions that earn an hourly median wage below $12.37, the 2016 poverty wage needed to reach a low standard of living for a family of three in the metropolitan Bay Area if a person works full-time, full-year (2,080 hours; see Chapter IV).[24] Our survey data of restaurant workers in the Bay Area found a $12.95 median wage, with 39.9% of workers earning below the poverty wage at the time the survey was conducted.

**TABLE 2**

**MEDIAN AND AVERAGE WAGES FOR RESTAURANT OCCUPATIONS IN THE BAY AREA'S SAN FRANCISCO-OAKLAND-HAYWARD METROPOLITAN REGION**

| OCC_CODE | OCC_TITLE | H Median | A Median | H Average | A Average |
|---|---|---|---|---|---|
| 00-0000 | All Occupations | $24.19 | $50,310 | $32.16 | $66,900 |
| 35-0000 | Food Preparation and Serving Related Occupations | $11.62 | $43,710 | $13.38 | $27,840 |
| 35-1011 | Chefs and Head Cooks | $21.01 | $36,670 | $22.87 | $47,570 |
| 35-1012 | First-Line Supervisors of Food Preparation and Serving Workers | | | | |
| | | $17.63 | $21,840 | $19.55 | $40,650 |
| 35-2011 | Cooks, Fast Food | $10.50 | $32,520 | $11.03 | $22,940 |
| 35-2012 | Cooks, Institution and Cafeteria | $15.63 | $26,760 | $17.52 | $36,450 |
| 35-2014 | Cooks, Restaurant | $12.87 | $26,460 | $13.57 | $28,220 |
| 35-2015 | Cooks, Short Order | $12.72 | $31,760 | $13.50 | $28,080 |
| 35-2019 | Cooks, All Other | $15.27 | $23,070 | $15.82 | $32,900 |
| 35-2021 | Food Preparation Workers | $11.09 | $27,030 | $11.82 | $24,600 |
| 35-3011 | Bartenders | $12.99 | $22,130 | $15.18 | $31,570 |
| 35-3021 | Combined Food Preparation and Serving Workers, Including Fast Food | | | | |
| | | $10.64 | $22,820 | $11.37 | $23,640 |
| 35-3022 | Counter Attendants, Cafeteria, Food Concession, and Coffee Shop | | | | |
| | | $10.97 | $25,120 | $11.83 | $24,610 |
| 35-3031 | Waiters and Waitresses | $12.08 | $27,900 | $14.35 | $29,850 |
| 35-3041 | Food Servers, Nonrestaurant | $13.41 | $22,320 | $15.64 | $32,530 |
| 35-9011 | Dining Room and Cafeteria Attendants and Bartender Helpers | | | | |
| | | $10.73 | $22,010 | $11.98 | $24,930 |
| 35-9021 | Dishwashers | $10.58 | $20,790 | $11.34 | $23,590 |
| 35-9031 | Hosts and Hostesses, Restaurant, Lounge, and Coffee Shop | | | | |
| | | $10.00 | $27,860 | $11.47 | $23,850 |
| 35-9099 | Food Preparation and Serving Related Workers, All Other | | | | |
| | | $13.39 | $43,710 | $13.68 | $28,450 |

Source: Bureau of Labor Statistics, Occupational Employment Statistics, 2015

## ECONOMIC DYNAMISM OR DANGEROUSLY LOW STANDARDS FOR BAY AREA JOBS?

The data presented in this chapter demonstrate the robust growth of the restaurant industry in the Bay Area and its centrality to the city's economic life and recovery from the Great Recession. However, they also call attention to the fact that the growth of the restaurant industry has meant that a growing number of Bay Area jobs do not support a family. The patterns observed in Bay Area restaurant industry are part of an unsettling broader dynamic in the U.S. labor market of growing inequality with economic growth centered on low-wage service occupations.



# Worker Perspectives

## EARNINGS AND BENEFITS

### EARNINGS

As a whole, our survey of workers in the Bay area found a higher median wage for restaurant workers than found in other regions of the country after adjusting all wages to 2016 wage increases. However, despite positive steps taken in the Bay Area towards raising the minimum wage, our survey indicates that many workers continue to struggle with low wages. The median wage of restaurant workers surveyed was $15.17. As seen in Table 3, nearly 20% were paid below the Department of Labor's 2016 poverty rate for the Bay Area of $12.37 for a family of three.[25] Reflecting the dynamics of low-wage employment, our research found that nearly 24% resort to working more than one job to make ends meet, and a fourth of these work three or more jobs.

In our survey, men earned a median of $15.76 and women a median of $14.50 per hour. This gap in earnings based on gender was widest in fine dining where men earned a median wage of $19.66 compared to $16.32 for women. Restaurant workers in fine dining establishments also reported the widest gap in earnings between white workers and workers of color, who earned median wages of $22.44 and $16.32 respectively, a difference of $6.12 per hour (see Table 4). This race wage gap is the highest we have found around the country, nearly twice as high as the $3.41 race wage gap in fine dining in Houston and approaching three times as high as the $2.53 race wage gap in Seattle.[27,28] As a product of pervasive occupational segregation within the industry and between its segments, workers of color are disproportionately excluded from the top earning Front-of-the-House occupations, while men and white workers earn the highest wages.

When examining across all restaurants, we see white men earning the highest median wages at $15.35 per hour, white women $14.18 per hour, men of color earn $15.05 per hour, and women of color earn $15.17 per hour. Similarly, examining all tipped workers, white men earn the highest median wages at $19.22 per hour, white women earn $16.82 per hour, and men of color earn $17.13 per hour. However, we did find a discrepancy with tipped wages earned by women of color, who earned $17.69 per hour, and this was driven primarily by workers of color in the Back-of-the-House that receive tips. Women of color in the Back-of-the-House that received tips reported median earnings nearly $5 higher than women of color that did not receive tips. This finding merits greater study due to the smaller sample size for these two

TABLE 3

**WAGES EARNED BY RESTAURANT WORKERS IN THE BAY AREA**[26]

| | |
|---|---|
| Less Than Minimum Wage < $10.84 | **10.9%** |
| Below Poverty Line $10.85 – $12.37 | **8.9%** |
| Low Wage $12.38 – $26.51 | **71.6%** |
| Over 150% of Poverty $26.52 – $42.17 | **6.9%** |
| Living Wage $42.18 and higher | **1.6%** |

Source: Bay Area Restaurant Industry Coalition survey data.

## DATA SHOW RESTAURANT INDUSTRY IS BOOMING IN THE BAY AREA

California recently became the first state, followed shortly by New York, to adopt $15 minimum wage legislation.[29] Unlike the minimum wage in New York, however, California does not have a subminimum wage excluding hundreds of thousands of tipped workers.[30] California was nudged forward, in part, by wage increases in the Bay Area. The city of Emeryville has the highest minimum wage in the country, currently $14.82, followed closely by San Francisco ($13), Oakland ($12.55), and Berkeley ($12.53; see Table 6).[31] In the aftermath of these historic victories in California, which now seem almost routine, industry backed public relations firms have attempted to scare the rest of the country into a panic around every restaurant closure the area has experienced. According to figures from the Bureau of Labor Statistics and the Small Business Administration, one in four restaurants close or change in ownership annually around the country, similar to the cross-industry average for new businesses.[32] In fact, employment in the restaurant industry in the Bay area has grown from close to 8% of the total private sector workforce a decade ago to nearly 10% of the total private sector today (see Figure 2).[33]

groups, and the fact that a large sample of respondents of color marked 'other' and refused to specify a specific racial category, combined with recent court decisions barring sharing of tips with the Back-of-the-House. The wage gap nearly flattens for limited service, or fast food workers, who reported median earnings of $12.88, with variations of less than a dollar by race and gender.

## TIPPED WORKERS

California is one of just seven states that have eliminated the subminimum wage system. Accordingly, tipped restaurant workers experience far less of the worst aspects of the two-tiered wage system such as high rates of poverty and sexual harassment (see Figure 3) — industry factors that are pervasive in states that maintain subminimum wages for tipped workers.[34] The recent minimum wage increases in California and multiple cities in the Bay Area were a victory for all restaurant workers (see Table 6), but some will enjoy those gains faster than others.

Fifty five percent of our tipped survey respondents, 67% of servers, and 45% of bartenders surveyed were women, and 22% earned below the poverty line. Tipped workers reported experiencing the most erratic schedules of any group in our sample. Seventy six percent of tipped respondents reported that their schedules change frequently or sometimes (see Table 5), compared to 59% of restaurant workers that do not receive tips. If we look specifically at Front-of-the-House and Back-of-the-House, the percentage with erratic schedules is 76% and 59%, respectively. Indicative of the high rate of labor law violations experienced by tipped workers, 35% reported that they are not paid for working overtime compared to 28% of workers who do not receive tips. Similarly, 16% of tipped workers reported that they are not always paid on time and consistently, compared to nine percent of workers that do not receive tips. However, workers that did not receive tips reported that they were over one-and-a-half times as likely as their tipped counterparts (25% and 16%, respectively) to work for eight hours without a meal break.

Another source of concern for tipped workers arises in the misappropriation and distribution of tips. Fourteen percent of workers reported that

TABLE 4

### MEDIAN WAGES IN THE BAY AREA'S RESTAURANTS

|  | Men | Women | White | People of Color |
|---|---|---|---|---|
| All | $15.76 | $14.55 | $14.25 | $15.05 |
| Fine Dining | $19.66 | $16.32 | $22.44 | $16.32 |
| Tipped Occupations | $19.34 | $17.50 | $18.15 | $17.69 |
| Limited Service | $13.25 | $12.88 | $13.00 | $12.88 |

Source: Bay Area Restaurant Industry Coalition survey data. Wages are adjusted to 2016 by accounting for minimum wage increases in the region.

management took a share of their tips. Misappropriation of tips is also exacerbated by race: 15% of tipped workers of color reported that management took a share of their tips, compared to 13% of white tipped workers.

Examining wages (see Table 4), tipped workers earn higher median wages than restaurant workers as a whole, but the gains in wages are heavily tilted towards white workers and white men in particular. Workers of color and women, in general, fare worse in tipped occupations, denied equal access to the livable wage jobs enjoyed by white workers and men.

Until recently, due to California's status as a one wage state, tips could be shared with workers in the Back-of-the-House.[35] A 2015 survey of restaurant workers in San Diego found that 29% of Back-of-the-House workers received tips.[36] In this study of the Bay Area, we found that 56.8% of Back-of-the-House workers received tips, and that Back-of-the-House workers who received tips earned $18.72 compared to $12.55 earned by Back-of-the-House workers who did not receive tips. This finding merits further investigation.

TABLE 4

**TIPPED WORKERS SCHEDULE CHANGE DISTRIBUTION**

| SCHEDULE CHANGE FREQUENCY | ALL | TIPPED | NOT TIPPED |
|---|---|---|---|
| Frequently | 22.4% | 25.7% | 15.7% |
| Sometimes | 47.4% | 49.6% | 43.0% |
| Never | 30.2% | 24.7% | 41.3% |

Source: Bay Area Restaurant Industry Coalition survey data.

WORKER PROFILE

## Anh SERVER

Anh is an Asian American server with 8 years' experience. She's worked in fast casual and fine dining restaurants as a prep cook and server, respectively. Anh loves working with people and finds the restaurant industry an excellent vehicle for that. However, she doesn't like the favoritism and sexual harassment problems that define the industry. Anh believes that the industry would be much more sustainable for workers and customers if workers had stronger protection against sexual harassment, defined career ladders and training opportunities, as well as access to benefits such as paid vacation days, and health insurance. She believes that creating pathways for better representation of women in back of house positions would help shift what she calls a patriarchal culture that is represented there.

According to Anh, in the restaurant industry, "rape culture is seen as pretty normative." By this she means that employers, coworkers, and customers "act like women should accept sexual harassment and not view it as that." Her own experience speaks to the pervasiveness of the issue, "I've experienced verbal sexual harassment both from customers and also one of the assistant managers, who makes super inappropriate comments." To make matters worse Anh fears retaliation for demanding respect at work, "If they say something that makes you uncomfortable you're just seen as too sensitive and so they don't schedule you as much."

Anh related what she considers a typical experience of sexual harassment in the restaurant industry:
"I had a customer who was drunk and he asked me for a glass of water. He said, 'I'd kiss you if you bring me a glass of water,' and the manager was right there, and I was like 'no', and he was really insistent and he got up and he was going to kiss me. The manager was standing right there but he didn't do anything, I even looked at him to see if he saw, and he saw. But I felt like he should have stepped in and like, said something. But I didn't complain about it because people who have made complaints in the past, they didn't do anything about it and they kind of view you as a problematic employee. When they first gave me sexual harassment training, they kind of framed it as, some people are more sensitive towards it instead of saying these actions are completely inappropriate. They kind of already placed the blame on the victim."

Even though restaurant workers in states with a subminimum wage for tipped workers experience sexual harassment at much higher rates, sexual harassment remains endemic to the restaurant industry in the Bay Area.[37] One third of restaurant workers in the Bay reported experiencing or observing some form of sexual harassment, 24% from customers or guests, 19% from coworkers, and 12% from management. Unlike our findings in other states, rates of sexual harassment did not vary significantly by position or tips.



FIGURE 3

**SEXUAL HARASSMENT IN THE BAY AREA**
Sexual harassment experienced by restaurant workers in the Bay Area.

Source: Bay Area Restaurant Industry Coalition survey data.

**MANAGEMENT**
9%   3%

**COWORKERS**
14%   5%

**CUSTOMERS**
17%   6%

**ALL**
22%   10%

BACK-OF-THE-HOUSE TIPPED
36%

BACK-OF-THE-HOUSE NOT TIPPED
30%

FRONT-OF-THE-HOUSE TIPPED
36%

FRONT-OF-THE-HOUSE NOT TIPPED
23%

## HOUSING

The Bay Area is infamous for having among the highest rents in the country;[38] restaurant workers' lower purchasing power strongly affects how and where they live. The generally accepted standard on housing affordability is that rent should be no more than 30% of income. According to the National Low Income Housing Coalition, the fair market rent for a two-bedroom unit in Oakland is $1,585, and $2,062 in San Francisco.[39] In order to afford that rent, a worker would need an hourly wage of $30.48 in Oakland and $39.65 in San Francisco, CA. Over 95% of the restaurant workers we surveyed earned less than the amount necessary to afford rent in Oakland, and more than 99% earned less than the amount necessary in San Francisco. A typical restaurant worker would need to work 107 hours per week to afford a home.

Survey data demonstrated that restaurant workers in the Bay Area are paying on average $689 per month in rent. In addition to this, many workers reported commuting significant distances from lower-income areas with more affordable rents and sharing housing costs by living with multiple people. On average, restaurant workers live in a house, apartment, or home with 4 total residents, and 79% of restaurant workers do not work and live in the same city.

# TIP OWNERSHIP, TIP SHARING, AND SERVICE CHARGES IN THE BAY AREA



Tip sharing is a common means of pooling gratuities across workers who render service to a patron. This approach allows all employees who contribute towards a patron's service to enjoy a fair share of gratuities even if they do not provide direct table service, and thus have little means of receiving tips directly.

Under the federal Fair Labor Standards Act (FLSA), which allows an employer to pay a subminimum wage to tipped employees, the employer may require that employees pool tips with other employees who customarily and regularly receive tips, but not with Back-of-the-House workers such as cooks and dishwashers who are paid the full minimum wage.[40] However, courts have until recently held that the FLSA's restriction on tip sharing between Front and Back-of-the-House workers applies only when employers pay their tipped workers a subminimum wage.[41] As a result, many restaurants in the seven states (including California) that do not allow for a two-tiered wage system have included kitchen workers in their tip pools for years, and these workers have come to rely on tips as a significant portion of their income.

However, in February 2016, the Ninth Circuit Court of Appeals issued a ruling that disallows tip pools from extending to Back-of-the-House workers like cooks and dishwashers.[42] Cutting these kitchen workers off from tips will exacerbate existing wage disparities in fine dining restaurants between Front-of-the-House and Back-of-the-House workers. As the wage disparity between Front and Back-of-the-House workers widens, so too does racial disparity, as white workers are concentrated in highly-tipped fine dining and bartending positions while workers of color are concentrated in lower earning tipped and Back-of-the-House positions in fine dining restaurants. This has contributed to the $6.12 per hour median wage gap between white workers and workers of color in the Bay Area fine dining restaurant sector. It has also contributed to high turnover and labor shortages in the Back-of-the-House that currently afflict the restaurant industry.[43]

One means through which employers are addressing disparities between the Front and Back-of-the-House is through mandatory service charges. Under California law, service charges are the property of the employer, as opposed to gratuities, which are the property of tipped workers.[44] Service charges allow flexibility in balancing disparities, but also create the potential for abuse as some employers use service charges to compensate supervisors, managers, owners, or to meet other business expenses.

Whether an employer mandates a tip pool or service charges, workers need policies that protect these tips and service charges, which are left by customers expecting they will compensate employees providing a service. One such policy was included in Santa Monica's recent minimum wage ordinance, which requires that employers who collect service charges pay the entirety of those charges to workers who facilitate a customer's service.[45] Santa Monica's Minimum Wage Ordinance allows flexibility in sharing service charges between Front and Back-of-the-House workers while ensuring transparency about how service charges are distributed by requiring that employers share with employees' detailed records about service charge revenue receipts and spending. Emeryville and Oakland also mandate that service charges be paid to hospitality employees who collected them (see Service Charge Protections, below).

While these recent regulations protecting employee ownership of service charges mark a step forward, they also do little to challenge the authority of employers to distribute gratuities without the consent of employees. Democratic, voluntary tip pools offer an alternative model by extending the concept that gratuities are the property of the employee and creating a framework for workers to fairly and democratically decide on the distribution of gratuities.

# DO YOU KNOW THE LAW?
## BAY AREA LABOR STANDARDS

### PATH TO A LIVING WAGE
All Employees in California have a path to $15, but many municipalities in the Bay Area have a faster track (see Table 6). Many workers, and more in cities with a minimum wage higher than the state minimum wage do not know the minimum wage, or believe it higher than it really is (see Figure 4). California businesses with 25 or fewer employees will have an additional year to comply with the new minimum wage. For those employees, the minimum wage will first increase on January 1, 2018 and will reach $15 on January 1, 2023.[46]

### ACCESS TO PAID SICK LEAVE
On July 1, 2015, California's new Paid Sick Leave Law went into effect, requiring employers to provide Paid Sick Leave at the accrual rate of one hour for every 30 hours worked. The Bay Area cities of San Francisco, Oakland, and Emeryville mandate additional Paid Sick Leave benefits beyond the State requirements.[47] All of these policies offer 1 hour of sick leave for every 30 hours worked, but have different accrual caps ranging from 48 to 72 hours.

### SCHEDULING RIGHTS
Covered employers in San Francisco (chain stores with at least 40 formula retail establishments worldwide) must conduct fair scheduling practices by giving two weeks' notice of work schedules. Additionally, covered employers must offer any extra work hours to current qualified part-time employees before hiring new employees and treat part-time employees equally with respect to hourly wage, access to time off, and eligibility for promotion.[48]

### HEALTH CARE SECURITY
The San Francisco Health Care Security Ordinance requires covered employers (20 or more employees) to satisfy an Employer Spending Requirement (based on business size), resulting in an additional pathway for low wage workers to gain access to health care.[49]

### BAN THE BOX
San Francisco's 'Fair Chance Ordinance', prohibits employers with 20 or more employees from inquiring about a job applicant's criminal history on an employment application, 'banning the box' where applicants might otherwise be required to indicate criminal convictions. The law also prohibits covered employers from asking about criminal records during an initial interview. If an applicant voluntarily discloses their criminal history then that information may only be considered in the selection process if it has "a direct and specific negative bearing on that person's ability to perform the duties or responsibilities necessarily related to the employment position."[51]

### SERVICE CHARGE PROTECTION
Emeryville's service charge law requires that hospitality employers who collect service charges from customers must pay the entirety of those charges to the hospitality workers who performed the services for which the charge was collected. Additionally, employers must disclose in writing how the charges are distributed and report to employees. Similarly, Oakland's Minimum Wage Law contains provisions that require hospitality employers who collect service charges from customers to pay all of those charges to their employees.[52]

### WAGE THEFT PREVENTION
San Francisco, through its own labor standards and enforcement agency (OLSE), offers workers additional wage theft protection above the State of California, by empowering the City to conduct investigations and hold noncompliant employers accountable. Of particular interest is the OLSE's community-based enforcement model which realizes enforcement from the bottom-up by empowering workers and their organizations to conduct outreach and education about the law as well as identifying workers with potential wage theft claims.[53]

TABLE 6

### SCHEDULE OF MINIMUM WAGE INCREASES IN CALIFORNIA, THE BAY AREA, AND SAN JOSE[50]

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| California | $8.00 | $8.00 | $9.00 | $10.00 |
| San Francisco | $10.55 | $10.74 | $12.25* | $13.00* |
| Oakland | $8.00 | $8.00 | $12.25* | $12.55 |
| Berkeley | $9.00 | $10.00* | $11.00* | $12.53* |
| Emeryville | $8.00 | $8.00 | $14.44* | $14.82* |
| San Jose | $10.00 | $10.15 | $10.30 | $10.30 |

*Effective dates for minimum wage increases fall on January 1 unless flagged with an asterisk. In San Francisco the minimum wage went up to $12.26 on May 1, 2015 and increases on July 1 annually thereafter. Oakland's minimum wage went into effect on March 2, 2015. Berkeley's minimum wage went into effect October 1, 2014 and increases on October 1 annually. Emeryville's minimum wage for businesses with 56 or more employees went into effect June 2, 2015 and increases on July 1 annually.

FIGURE 4

### WHAT IS THE MINIMUM WAGE?
Workers do not always know the minimum wage. Well over one third of workers surveyed did not know the minimum wage, and another third believed it higher than in actuality.



| | SAN FRANCISCO | SAN JOSE | BERKELEY | OTHER BAY AREA |
|---|---|---|---|---|
| ANSWERED GREATER THAN MINIMUM WAGE | 32% | 38% | 51% | 29% |
| KNEW MINIMUM WAGE | 13% | 19% | 18% | 31% |
| DIDN'T KNOW OR ANSWERED LESS THAN MINIMUM WAGE | 55% | 43% / 31% | 31% | 33% |

Source: Bay Area Restaurant Industry Coalition survey data.

Gentrification is also a concern. Workers of color pay higher rents, $695 per rent on average, and live in homes with over three other roommates, compared to $664 for white workers who live with over two other roommates. Overall, 27% of restaurant workers earning a low wage live in a house with five or more total residents, compared to 14% of those earning 150% of the poverty wage or more. Fourteen percent of restaurant workers earning a poverty wage live in a house with seven or more total residents.

## BENEFITS

*"I don't have health insurance. I also don't have any dental, or eye, or anything like that… one time I couldn't come into work because I was sick and they told me I had to get a doctor's note. So I came into work sick, got all my coworkers sick, just because I couldn't afford to pay a doctor just for [a] note, because I couldn't afford health insurance, you know." —SERVER*

The majority of restaurant workers surveyed reported that they do not receive workplace benefits. Eighty two percent of workers surveyed do not have health insurance through their employer and 52% reported not having any form of healthcare insurance coverage. Even when employers do offer healthcare, it is often inadequate and doesn't extend to part-time workers. As one hostess we interviewed pointed out, "[I've had] no health benefits really from any of the restaurants I've worked at. Unless it's full time, but none of those jobs are full time."

The absence of employer-provision of job benefits and health care at the workplace displaces the responsibility to other family members or the state to meet restaurant workers basic needs. Twenty percent of restaurant workers surveyed have had to rely on the Emergency Room without being able to pay. A significant number of the 52% of restaurant workers who report not having any form of health insurance coverage rely on community clinics, free services at health fairs, and the Emergency Room to receive their healthcare. Most strikingly, 19% of restaurant workers without health insurance report that they primarily receive healthcare through the emergency room (see Table 7).

TABLE 7

**JOB BENEFITS REPORTED BY RESTAURANT WORKERS**

| | |
|---|---|
| **82.1%** | Does not receive health insurance from employer |
| **51.7%** | Do not have any health insurance coverage |
| **19.8%** | Gone to the ER without being able to pay in the past year |
| **88.4%** | Do not get paid vacation days |

HOW WORKERS WITHOUT INSURANCE RECEIVE HEALTHCARE

| | |
|---|---|
| **26.9%** | Have not seen a doctor since being uninsured |
| **54.0%** | Free or discount health clinic |
| **19.1%** | Emergency Room |

Source: Bay Area Restaurant Industry Coalition survey data.

WORKER PROFILE

## Susana BUSSER

"They don't like it when you're sick ." Susana is new to the restaurant industry, having worked as a busser at a café for nearly a year. Despite San Francisco's sick leave policy, Susana reports that her employer doesn't offer sick leave, "As far as being sick you need to call in two days in advance. But you can't really call in two days in advance, "Oh, I'm going to be sick in two days." No you can't do that. So, being sick is frowned upon for the most part." According to Susana, lack of access to sick leave perpetuates a contagion cycle at her cafe, "We've had about five, six people sick in the past month. So, it does spread quite a bit when people come in sick." Sadly, as a result, "We've had people, including myself, we've gone in sick because they didn't want us changing shifts. And we've thrown up inside the restaurant and they still didn't let us go, which is completely unsanitary, but they need the manpower so they don't really care… unless it's extreme and you go to a hospital or something like that. They want you to come in."

## SICK LEAVE

### WORKING WHILE SICK IN THE BAY: PAID SICK LEAVE IMPLEMENTATION

In 2007, San Francisco enacted a paid sick days benefit for all employees in the city so they would not be forced to work when sick, or so they could have the opportunity to care for a sick family member.[54] In 2015, the State of California enacted paid sick days for workers statewide, and that same year Oakland and Emeryville also adopted more expansive paid sick days provisions.[55]

Although this survey was conducted before the enactment of statewide paid sick days regulations, a similar benefit already existed in San Francisco so here we compare access in San Francisco to the entire Bay Area and discuss implications for access to this important benefit.

> *"We don't get any, like, sick time at all. I have worked while I was sick, even though when you are working in the food industry, it is illegal to be at a restaurant depending on the type of illness you have because you are working around food. Sometimes you just have to work because you can't find someone to cover your shift."* —BARISTA

Since San Francisco enacted the ordinance in 2007, employers have been required to provide paid leave for their employees to attend to their own or their family's health and critical safety needs. A trail-blazing policy, San Francisco was the first city to create a path to paid sick leave for all workers. Nearly a decade after the enactment of paid sick days in San Francisco, restaurant workers reported significant difficulties accessing the benefit, but reported higher access than other workers in the Bay Area. Nearly three quarters (73%), of restaurant work-

TABLE 8

**REASONS WORKERS WORKED WHILE SICK**

Source: Bay Area Restaurant Industry Coalition survey data.

| | SAN FRANCISCO | OTHER BAY AREA |
|---|---|---|
| Have worked when sick | 62.7% | 59.3% |
| Could not afford to take day off without pay | 73.2% | 60.7% |
| Concerned I would be fired or penalized | 38.6% | 15.1% |
| Couldn't find anyone to replace me and didn't want to overburden coworkers | 58.6% | 50.4% |



**FIGURE 5**

**SICK LEAVE ACCESS IN THE BAY AREA**

Source: Bay Area Restaurant Industry Coalition survey data.

DO NOT GET PAID SICK DAYS
SAN FRANCISCO 73%
OTHER BAY AREA 94%

HAVE WORKED WHEN SICK
63%
59%

ABLE TO USE PAID SICK DAYS WHEN AVAILABLE
84%
49%

USED SICK LEAVE TO CARE FOR A FAMILY MEMBER
11%
29%

TOOK TIME OFF TO CARE FOR A FAMILY MEMBER
47%
24%

REQUIRED TO SHIFT SWAP
26%
21%

ers in San Francisco reported that they do not receive paid sick leave, compared to 94% of restaurant workers in the rest of the Bay (see Figure 5). Restaurant workers in San Francisco were three times as likely to have access to paid sick days than workers in the rest of the Bay. With the statewide implementation of paid sick days and expansion to other cities, it is possible that restaurant workers across the Bay Area now have access similar to what was found in San Francisco, but it is clear that significant enforcement challenges remain to ensure this benefit is universally available.

*"If you're sick, you either have to go in or you have to get your shift covered, but if you can't get your shift covered then you get written up. But the only thing they do, say, is if you bring in a doctor's note you won't be written up… most of us don't have health insurance so we're not going to go to the doctor's to pay you know a hundred bucks just to get a doctor's note. So, most of the time if someone gets sick they'll just go in and work it, or they'll try to get someone to cover it. But it's kind of hard to get shifts covered there because now they're kind of short-staffed because so many people have quit. It was during December and January when everyone was getting sick. I initially got like ten people sick, it was crazy and I felt really bad but they made me come into work. And everyone was getting better and then suddenly some other person got sick. It was another server and it just spread all over again. So everyone just got sick again."* —SERVER

Only 11% of restaurant workers in San Francisco used sick leave to care for an ill family member or a dependent, but nearly half (47%) took unpaid time off from work to care for a family member. Sixty three percent of restaurant workers in San Francisco reported that they've worked while sick. Of those who went into work sick, 64% coughed or sneezed while handling food, and 41% reported getting a co-worker sick (see Table 9). As one server recounted:

*"One time I couldn't come into work because I was sick and they told me I had to get a doctor's note. So I came into work sick, got all my coworkers sick just because I couldn't afford to pay a doctor just for a note, because I couldn't afford health insurance."* —SERVER

| TABLE 9 | | SAN FRANCISCO | OTHER BAY AREA |
|---|---|---|---|
| **CONSEQUENCES OF GOING INTO WORK SICK** | 'Unable to complete the necessary tasks for work' | 28.9% | 30.9% |
| | 'My illness got worse or lasted longer' | 30.5% | 45.5% |
| | 'Coughed or sneezed while handling food' | 63.8% | 19.3% |
| | 'I got other workers sick' | 40.6% | 16.9% |

Source: Bay Area Restaurant Industry Coalition survey data.

Restaurant workers reported that they prepared and served food while sick for a variety of reasons. Seventy three percent of restaurant workers in San Francisco reported that they couldn't afford to take the day off without pay compared to 61% of other workers in the Bay Area, indicative of the higher cost-of-living in that city. Nearly two-fifths (39%) of workers who worked sick in San Francisco were concerned that they could be fired or penalized, compared to only 15% in the rest of the Bay. As evidence that many managers continue to require ill workers to find a replacement for their shifts, 59% of restaurant workers who went into work sick in San Francisco reported that they couldn't get their shift covered (see Table 8). Despite paid sick leave having been on the books for nearly a decade, many restaurant workers didn't have access to the benefit.

*"There's a lot of bullying that goes on. Talking behind peoples' back and drama. And it even goes to the managers. They'll make up excuses that because so and so went partying this weekend, that's why they're sick, and its' your fault. So, they see it as a bad thing."*
—SERVER



**WORKER PROFILE**

## Sarah SERVER

Anh is an Asian American server with 8 years' experience. She's worked in fast casual and fine dining restaurants as a "I was working in a very, very high end restaurant. It was Valentine's Day, of course. One of the busiest days of the year in a restaurant. By the time we got to pre-shift meeting, it was obvious that I couldn't speak any longer because my throat hurt so bad. But, of course, there was no way they were going to let me go, and I didn't know at this point I had strep throat. It was very, very painful, to the point that a couple of times during the night there were tears coming to my eyes. You can't really swallow, and in reality you have to keep talking, even though the plan is for you to not talk. I said a couple of times during the evening, 'is it possible for me to leave now?'… and it wasn't. So I spent the whole night serving up a little bit of strep, along with their cocktails."

"I was fortunate enough to work in a restaurant where I had health insurance, but I certainly did not have any paid days off. And no way that my boss had any provisions… for accommodating anyone who was sick. 'Y'know, that's just the way that it's always been… that's just the way it is. [Y]ou just suck it up and do your shift.' This is what we hear on and on, again, that this is what we do and we just work through it and try to be careful."

# WORKING CONDITIONS

## SCHEDULING

*"It varies a lot.…The schedules are very uncertain. Um, just depending on how many employees they have at a given time. Since they've been short-staffed lately I've been working like 30-35 a week, but before that it was only 10-15. So, I never know, how much it's gonna be"* —SERVER

Our survey indicates that many restaurant workers struggle with unpredictable schedules. Twenty two percent of workers reported that their schedule changed frequently, and an additional 47% reported that their schedule sometimes changed. Without predictable schedules restaurant workers in the Bay Area struggle to plan budgets to meet their family's needs. Moreover, workers with unstable schedules relayed that the associated insecurity left them unable to plan to take up additional work or training, and made childcare arrangements difficult. Not only did many workers relate that their schedules were "posted just a few days before", but that their schedules were heavily shaped by either favoritism or retaliation on the part of managers. One server described how this dynamic affected schedules at her restaurant, "my boss would have favorites… if she liked you, she would hook you up, if she didn't, you were screwed."

Only 29% of workers reported regularly having input in schedule making. Thirty percent of restaurant workers reported being issued their schedules without any input into hours or changes to the schedule, and another 34% reported only sometimes being asked for their input into scheduling. As discussed earlier, this problem was most acutely felt by tipped workers. (see Table 5). Creating space for restaurant workers to attend to their family and personal needs is impossible without affording workers the right to confer with management about their scheduling preferences.

## WAGE THEFT

*"There was shadiness going on… they were taking certain things off your check, or would cut off times. So on my clock, hours would have a time sheet and I would try to match up the time sheet with my clock out slips so it would show what time you clocked in and the time you clocked out. So, it didn't match up… I actually questioned my manager who was the one doing this. And she gave me a hard time saying, well, don't you get a lot of breaks, and this and that."* —SERVER

Employer practices that break wage and hour laws are often described as 'wage theft.' Our survey found that wage theft is widespread in the Bay Area restaurant industry. A full third of restaurant workers who worked over 40 hours a week, or over eight hours in a day, reported not receiving the legally mandated overtime rate (see Table 10). One server reported to us that they only received overtime pay after challenging their boss, "That's one thing I would say, if you're going to have me work overtime I should get paid for it… I'm not going to stay here and, you know, work for free." Similarly, a quarter of all restaurant workers reported working off the clock without pay, 19% of restaurant workers reported working more than 8 hours without a paid break, and 36% of restaurant workers reported that they were required to pay for all or

a portion of their uniform. Fourteen percent of restaurant workers that received tips reported that management took a portion of their tips.

*"No I didn't actually get any breaks. If we requested a break- we- I mean, I guess we had the chance to, but we were always on our feet. Always, like assisting somebody, always, you know… oh, we always had to be ready to give water to somebody."* —SERVER

*"When I first started working at [a barbeque restaurant], uh no, I was not paid on time a lot of times."* —BUSSER

Employment law violations occurred unevenly between industry segments. Restaurant workers in fine dining restaurants were nearly twice as likely as fast food workers to work more than eight hours straight without a meal break (see Table 10), but workers in fast food were more likely to not receive overtime pay properly.

*"We'd all sign waivers because of lunches. In restaurants, unless it's a corporate place, you don't take lunch breaks. It's not what happens."* —BARTENDER

TABLE 10

**EMPLOYMENT LAW VIOLATIONS REPORTED BY RESTAURANT WORKERS**

| | TOTAL | FINE DINING | FAMILY STYLE | QUICK SERVE |
|---|---|---|---|---|
| Experienced overtime wage violations | 32.7% | 28.7% | 31.3% | 36.7% |
| Worked off the clock without pay | 25.2% | 28.8% | 23.3% | 24.8% |
| Management takes share of tips | 13.8% | 8.2% | 17.7% | 11.3% |
| Worked more than eight hours straight without a meal break | 18.9% | 25.6% | 18.6% | 15.3% |
| Earned below the minimum wage | 10.9% | 9.7% | 7.0% | 14.9% |

Source: Bay Area Restaurant Industry Coalition survey data.

WORKER PROFILE



## Flor COOK

Flor is from Oaxaca, Mexico, and is indigenous Zapoteca. She is 37 and has been living in the Bay Area for 7 years. Making food is part of Flor's culture and is her passion. At her last kitchen job, Flor experienced and witnessed many instances of labor and verbal abuse. Flor was only assigned as a prep-cook, yet she was given many more responsibilities such as, "receiving produce, making prep lists, cooking main plates, and training more than 10 people in a kitchen." She played such a vital role in the kitchen that she even shared her traditional recipes with the chef at this Oaxacan Mexican Restaurant. "The executive chef [took] advantage of my knowledge, skills, and passion for Mexican cuisine and would also make me create whole new recipes [and menus] without any direction." All of this was asked of her with "no incentives or proper pay of [her] dedication and teachings."

In addition to this uncompensated cultural theft, she also experienced labor abuses. Her "daily schedule exceeded up to 12 hours without access to breaks [or] food breaks." After giving her heart, soul, and sweat to the restaurant, they ended up firing her. "There is no security in the infrastructure of the industry," Flor stated. "It's vital to emphasize that the abuse continued against workers and more specifically towards indigenous workers and people of color… [is] because of language barriers, the need to keep our jobs or the lack of knowledge to our basic rights within this industry… We couldn't do or say anything about it for fear of their actions, [and] we do not know how to proceed against these injustices." Currently Flor, along with other ex-employees of this restaurant are filling a class-action lawsuit for their labor abuses and wage theft. Flor is seeking justice not only for her and her colleagues, but also for the entire Oakland community.

## HEALTH AND SAFETY

Our survey revealed hazards in restaurant workplaces that do not comply with regulations intended to protect the health and safety of workers. Thirty three percent of restaurant workers reported fire hazards such as non-functioning fire extinguishers and blocked doors. Nineteen percent reported that there were no mats on the floor to prevent potential slips and 18% that cutting machines in their kitchen lacked appropriate guards. Twenty nine percent of restaurant workers reported having to carry out tasks in the workplace that put their safety at risk.

As a result of pervasive health and safety hazards in the workplace, the rate of workplace injuries reported by restaurant workers in the Bay Area was high. Thirty nine percent of restaurant workers reported suffering burns on the job, 38% had endured work related cuts, and nearly half (45%) came into contact with toxic chemicals in the workplace. Back-of-the-House workers were more likely than Front-of-the-House workers to experience burns, and to come into contact with toxic chemicals on the job, while Front-of-the-House workers were more likely to experience cuts on the job (see Table 11). Thirteen percent of restaurant workers reported that they've slipped and injured themselves on the job (see Table 11). Nearly a quarter (24%) reported chronic pain caused by or exacerbated by their work duties.

Hazards in the workplace can be amplified by understaffing, defined as not having enough personnel to run the restaurant without excessive stress and strain on workers. Ninety one percent of workers reported that they've worked when their restaurant was understaffed, and 85% reported having to perform several jobs at once. Related to this, nearly half (47%) of restaurant workers related that they've performed work that they were not trained for. Threadbare staffing levels pressure workers to perform under undo stress in ways that endanger their health and safety as well as the well being of customers — 29% of restaurant workers reported that they've done something due to time pressure that might have been unsafe for customers.

| TABLE 11 | WORKPLACE INJURIES | TOTAL | FRONT-OF-THE-HOUSE | BACK-OF-THE-HOUSE |
|---|---|---|---|---|
| **WORKPLACE INJURIES BY OCCUPATION** | Fire hazards in the restaurant | 33.4% | 21.4% | 55.7% |
| | Have been burned while on the job | 38.7% | 36.9% | 42.8% |
| | Have been cut while on the job | 37.8% | 44.1% | 24.2% |
| | Have come into contact with toxic chemicals | 44.5% | 36.4% | 61.7% |

Source: Bay Area Restaurant Industry Coalition survey data.

## UNFAIR APPLICATION OF DISCIPLINE

Many restaurant workers reported being disciplined more severely or often than their co-workers on the basis of their race, gender, age, immigration status, or sexual orientation. Of those who experienced more severe discipline than their co-workers, race was the most prominent factor cited in the uneven application of discipline reported (37%), closely followed by gender at 32%, age at 31%, and immigration status at 28% (see Table 12). Thirty nine percent of restaurant workers reported that they or a co-worker had experienced verbal abuse in the past 12 months.

Of those who had experienced or observed verbal abuse, race was the most cited factor in shaping that abuse (49% of respondents), followed by gender at 39%, age at 35%, and sexual orientation at 23% (see Table 13).

TABLE 12

**UNEVEN APPLICATION OF DISCIPLINE**

| Responded that in the past 12 months they or a co-worker had been disciplined more often or severely than others | 16.8% |
|---|---|

**Of those who reported frequent or more severe discipline, reported that a factor was:**

| | |
|---|---|
| Race or ethnicity | 36.5% |
| Gender | 32.1% |
| Age | 30.9% |
| Immigration status | 28.2% |
| Language | 26.6% |
| Politics | 13% |
| Sexual orientation | 8.4% |
| Religion | 3.3% |
| Prior Criminal Record | 1.6% |

Source: Bay Area Restaurant Industry Coalition survey data.

TABLE 13

**EXPERIENCE OF VERBAL ABUSE**

| Responded that in the past 12 months they or a co-worker had experienced verbal abuse | 38.6% |
|---|---|

**Of those who reported experiencing verbal abuse, reported that a factor was:**

| | |
|---|---|
| Race or ethnicity | 48.8% |
| Gender | 38.8% |
| Age | 34.8% |
| Sexual orientation | 23.4% |
| Language | 20.5% |
| Politics | 18.3% |
| Immigration status | 15.6% |
| Religion | 5.4% |
| Prior criminal record | 2.2% |

Source: Bay Area Restaurant Industry Coalition survey data.

WORKER PROFILE



## Jenny LINE COOK

"I have been working in restaurants in the Bay Area over the past three years. Originally interested in pursuing a career as a chef, I started out in the Back-of-the-House working as a line cook. In many of the restaurants where I worked, I experienced wage theft in many forms. At one restaurant, I would work a 12 hour shift from noon to midnight. However, cooks were not allowed to clock in until 2pm. We were perpetually understaffed and there was so much work to do that it was necessary to get to work "early" in order to prep all the food on time. In addition, it was a rare occasion to be sitting down for a full thirty minutes for my meal break. I usually found myself scarfing as much food down as possible within five minutes so that I could get back to prepping food.

My wage as a cook was usually minimum wage or a little bit higher. I had the privilege of switching over to Front-of-the-House as a server at one of the restaurants where I used to cook. I found the huge income disparity between Front-of-the-House and Back-of-the-House workers to be appalling and unfair. In a five hour serving shift I made more money than I ever did working a 12-hour cooking shift. It is also distressing to see that Back-of-the-House jobs are often relegated to marginalized, vulnerable communities such as immigrants and people of color. There is a disproportionately higher number of white workers with higher paying and managerial restaurant positions, such as Front-of-the-House jobs."

# MOBILITY WITHIN THE INDUSTRY

## OPPORTUNITIES FOR ADVANCEMENT

In addition to poor wages and benefits, restaurant workers reported that they have few opportunities to advance in pay and responsibility in the industry. Well over half (57.3%) of restaurant workers reported that they had not moved up from their previous job and 54.4% that they do not receive the necessary on-the-job training to be promoted. Without formal training ladders, many workers reported that there was no pathway to regular raises. As one hostess related, "you really only get a raise when you kind of move up the chain as far as positions." When asked what change they'd most like to see in their restaurant, one dishwasher pointed towards "better training and maybe a better pathway so that people could get promoted and more opportunities." Echoing this experience, many restaurant workers we interviewed expressed frustration with being passed over for opportunities by people with less experience. Of those who reported that they were passed over by a promotion, 30% suggested that race or ethnicity was a factor, 22% that gender was a factor, and 20% that language spoken was a factor in being passed over for a promotion (see Table 14).

## OCCUPATIONAL SEGREGATION

*"Everybody who work at the higher paying positions are predominately white, so there is definitely a lack of diversity there, and we've actually come in and complained to one of the female managers about it, saying that we wanted it to be more diverse and represent the people, because most of the servers are white. And the manager just basically said she didn't care, you know."* —BUSSER

While the restaurant industry in the Bay thoroughly reflects the multi-cultural and multi-racial fabric of the city, there is also significant occupational segregation within the industry. This segregation is most pronounced around differences in position and industry segment. Our research indicates that workers of color are disproportionately represented in those industry segments and occupations where poverty wages and poor working conditions are most concentrated in the Back-of-the-House (see Tables 15 & 16). White workers disproportionately occupy living-wage jobs in the industry, such as chefs and bartenders, and people of color disproportionately occupy lower-wage jobs, such as bussers and dishwashers.

Economic and workplace disparities in the restaurant industry can be most readily analyzed by industry segment (fine dining, cas-

**TABLE 14**

### EXPERIENCE OF VERBAL ABUSE

| | |
|---|---|
| Responded that in the past 12 months they or a co-worker had been passed over for a promotion | 21.6% |

**Of those who reported being passed over for a promotion, reported that a factor was:**

| | |
|---|---|
| Race or ethnicity | 29.7% |
| Gender | 21.9% |
| Language | 20.2% |
| Immigration status | 19.8% |
| Age | 17.5% |
| Politics | 13.1% |
| Sexual orientation | 3.5% |
| Religion | 2.6% |
| Prior Criminal Record | 2.2% |

Source: Bay Area Restaurant Industry Coalition survey data.

**TABLE 15**

### JOB DISTRIBUTION BY POSITION AND RACE

| | WHITE | WORKERS OF COLOR |
|---|---|---|
| Front-of-the-House | 23.8% | 76.2% |
| Bartenders and Barbacks | 42.3% | 57.7% |
| Servers | 16.8% | 83.2% |
| Bussers, Runners, Expediters | 17.1% | 82.9% |
| Back-of-the-House | 20.6% | 79.4% |
| Chefs (Sous and Pastry) | 52.3% | 47.7% |
| Cooks (Line and Prep) | 24.1% | 75.9% |
| Dishwashers | 17.1% | 82.9% |
| Total | 22.9% | 77.1% |

Source: Bay Area Restaurant Industry Coalition survey data.

**TABLE 16**

### JOB DISTRIBUTION BY SEGMENT AND RACE

| | WHITE | WORKERS OF COLOR |
|---|---|---|
| Fine Dining | 16.6% | 83.4% |
| Front-of-the-House | 23.3% | 76.7% |
| Back-of-the-House | 6.0% | 94.0% |
| Casual Family Style | 24.5% | 75.5% |
| Front-of-the-House | 28.1% | 71.9% |
| Back-of-the-House | 15.9% | 84.1% |
| Quick Serve | 24.1% | 75.9% |

Source: Bay Area Restaurant Industry Coalition survey data.

**TABLE 17**

**JOB DISTRIBUTION BY GENDER**

|  | WOMEN | MEN |
|---|---|---|
| Full Service | 51.9% | 48.1% |
| Bartenders and Barbacks | 41.2% | 58.8% |
| Servers | 66.5% | 33.5% |
| Quick Serve | 52.9% | 47.1% |
| Total | 53.9% | 46.1% |

Source: Bay Area Restaurant Industry Coalition survey data.

**TABLE 18**

**FRONT-OF-THE-HOUSE AND TIPPED MEDIAN WAGES BY GENDER AND RACE**

|  | MEN | WOMEN | WHITE | PEOPLE OF COLOR |
|---|---|---|---|---|
| Front-of-the-House | $16.22 | $14.50 | $16.47 | $15.05 |
| Tipped | $19.34 | $17.50 | $18.15 | $17.69 |
| Not Tipped | $12.75 | $12.25 | $12.50 | $12.55 |

Source: Bay Area Restaurant Industry Coalition survey data.

**TABLE 19**

**FRONT-OF-THE-HOUSE AND TIPPED MEDIAN WAGES BY GENDER AND RACE**

|  | BARTENDING STAFF | FINE DINING SERVING STAFF | QUICK SERVE |
|---|---|---|---|
| Median wage | $32.56 | $28 | $12.88 |
| White workers | 42.3% | 23.8% | 17.5% |
| Workers of color | 57.7% | 76.2% | 82.5% |

Source: Bay Area Restaurant Industry Coalition survey data.

|  | BARTENDERS | SERVERS | FAST FOOD PREP AND SERVE OCCS |
|---|---|---|---|
| White | 55% | 35% |  |
| Workers of Color | 45% | 65% |  |

Source: American Community Survey, 2011-2014.

ual, and quick serve), and occupation type (Front-of-the-House or Back-of-the-House) and,in both our data show a significant wage gap by both race and gender. Within occupation types, workers of color are paid less than their white counterparts, except for in the lowest paying positions (see Table 18). In the Front-of-the-House, white men reported median wages of $16.94 compared to $14.44 for white women, $15.76 for men of color, and $14.50 for women of color.

*"I mean, diverse, but segregated, you know? Like always, the cooks are Mexican and the bussers are Mexican. You know, one of them is black… I guess it's diverse, but like at probably every restaurant the cooks are Mexican, and the Back-of-House is Mexican, and the Front-of-House is white."* —BARTENDER

Our research indicates that a worker's location in either Front or Back-of-the-House strongly shapes their earning potential, access to benefits, opportunities for training and advancement, and working conditions. Workers of color are highly represented in kitchen positions — constituting 79% of Back-of-the-House workers. Moreover, Back-of-the-House workers experience greater exposure to unsafe work conditions than Front-of-the-House workers (see Table 11). Forty three percent of kitchen workers have been burned and 62% have been exposed to toxic chemicals, compared to 37% and 36% for workers in the Front-of-the-House.

Those working in the best-paid positions in the restaurant industry — fine dining servers and bartenders — reported receiving a median wage of $28 per hour. However, fine dining serving and bartending positions in the Bay Area are also the most difficult to access for workers of color. White workers represented over 42% of bartending staff in our survey, and the disparity is even greater when examining data from the American Community Survey (see Table 19).[56] Conversely, workers of color were overrepresented in the sample of limited service, or fast food prepping and serving workers, with a median wage of just $12.88 per hour.

*"They never hired anyone that was African American."* —COOK

Disparities in pay and workplace conditions were equally evident when comparing the compensation of men and women. Men working in fine dining reported earning a median wage of $19.66 compared to women earning a median wage of $16.32 in the same segment. Male workers overall reported earning a median wage of $15.76 per hour compared with female workers reporting earning $14.50 (see Table 4). Only 41% of bartenders and barbacks in the Bay Area are women (see Table 17).

## DISCRIMINATION IN HIRING, PROMOTION, AND TRAINING

*"I know for Back-of-the-House, a lot of people are really unhappy because they constantly have to deal with being yelled at all the time. Verbal abuse." —SERVER*

*"A manager was dating a bartender, and I was bartending at the same time. And they — I could tell she was getting favored with more set schedules, setting up like the bar, and all that stuff. So just special treatment that none of the other bartenders ever received from the manager when they were working with him. So just not fairly treating everyone equally and fairly." —BARTENDER*

Along with occupational segregation and disparities in working conditions and economic outcomes in the Bay Area restaurant industry, promotion, hiring, and training practices were also of concern. Bay Area restaurant workers reported experiencing discrimination in promotion practices. Of workers who reported being unfairly passed over for a promotion, nearly a third (30%) reported that race was a strong factor in shaping that decision (see Table 14), and 22% of workers who reported being passed over for a promotion reported that gender was a factor.





# Employer Perspectives

Our interviews with 20 employers in the Bay area revealed a number of strategies for thriving in a high-road policy environment with strong consumer preferences for healthy and sustainably sourced food. These employers model practices that link worker well-being with customer satisfaction while maintaining successful businesses. Overwhelmingly, employers placed emphasis on the benefits of reduced turnover and higher productivity as products of providing fair wages and benefits. These employers demonstrate that the high road to profitability is possible in the restaurant industry and that all stakeholders — employers, workers, and customers, benefit from satisfied, well compensated, and well trained employees.

## EMPLOYER INTERVIEWS FOUND THE FOLLOWING:

### Turnover and Productivity
Low employee turnover and high productivity were seen as key to profitability in the high-road policy landscape of the Bay area.

### Wages and Benefits
Living wages and access to paid sick leave were lifted up by employers as defining features of the Bay area restaurant industry.

### Informality & Occupational Segregation
Informal hiring, training, and promotion practices reinforced occupational segregation in the restaurant industry which remains pervasive in the Bay area.

### Taking the High Road
Bay area restaurant employers embraced a strategy for realizing profit on the basis of quality food and service, not by squeezing workers livelihoods.

## EXTERNAL FACTORS AFFECTING WORKPLACE PRACTICES

Customer demand for sustainable and healthy food and labor laws that protect workers are the most salient factors affecting both employers and workers in the Bay area restaurant industry. With laws that guarantee workers a living wage and access to paid sick leave, the Bay area models policies that point towards a high-road strategy for profit and offers a model for the future of the restaurant industry nationally.

Employers reported that high road policies help Bay area restaurants compete on the quality of their food and service rather than through pushing labor costs to a minimum. Many of the employers we interviewed agreed that to thrive in the consumer preference and policy environment of the Bay area involved embracing their human capital and reducing employee turnover as a strategy towards long-term profitability.

## MINIMIZING TURNOVER



> *"I think it's [turnover] really underrated, how much it affects profitability. And the exhaustion factor. People always say owning a restaurant is hard. Turnover is hard. Hiring and training is hard. Learning to trust somebody, finding out who you can trust. All of that is wearying."* —OWNER, fine dining restaurant, 25 years experience

In interviews, employers overwhelmingly reported economic benefits in terms of savings on training periods and enhanced productivity as a product of paying their workers a living wage. Other strategies to retain workers include offering training, promoting from within, offering workplace benefits. One quick serve restaurant owner who pays a living wage and offers healthcare to his workers told us as a result, "People are staying a really long time." Another employer in fine dining that offered dental, a 401k match, as well as healthcare, reported that "7 out of 12 waiters have been with me half the time I've been here, at least 12 years. In the back, 50% have been here at least 12 years. One guy has been here all 22 years [the restaurant] has been open. The newest hire was probably about two years ago."

Another practice utilized by restaurants in the Bay area that employers reported minimized turnover was worker ownership through cooperatives. One worker-owner told us, "Co-ops, these bakeries, have pretty low turnover." According to that worker-owner, co-ops were especially cognizant that worker turnover affects restaurant profitability, "it's a huge investment to train candidates. I think we… fleshed out the numbers once and training them not only how to be a baker but about what a co-op is, it's a big investment. When a candidate doesn't work out or somebody leaves taking institutional knowledge with them, it's a big factor."

## WORKER PRODUCTIVITY

> *"It's not just wages, it's also when you're an owner, you care more, you care about the product you're making, you care about your group."* —WORKER-OWNER, quick serve cooperative, 10 years experience

Employers we interviewed were adamant that worker productivity is key to sustaining an effective and profitable business. Many pointed out that investing in their human capital through practices like paying higher wages for workers, improving working conditions and benefits, creating a pathway to worker-ownership, or offering training and opportunities for advancement, resulted in higher worker productivity.

## WAGES AND BENEFITS

> *"[Due to high wages] we haven't had to hire anyone in the kitchen for 7 years."*
> —OWNER, fine dining restaurant, 25 years experience

Several employers that we interviewed celebrated the fact that living wage policies in the Bay area have created a level playing field where restaurants compete on the quality of their food and service rather than through pushing workers living standards down. Many employers also hoped for immigration reform as a means to further curb unfair competition by dissuading restaurants from paying sub-minimum wages to these more vulnerable workers.

## INFORMALITY AND OCCUPATIONAL SEGREGATION

> *"We're hiring right now. We don't really have a process, every single person who works here lives in neighborhood, they tell their friends, Facebook, I don't think we've ever placed a craigslist ad ever; we haven't had too much trouble."* —OWNER, quick serve restaurant, 3 years experience

Our interviews with employers revealed a widespread culture of informality – defined by a lack of human resource practices detailing objective criteria for hiring and promotion. A majority of the restaurant employers we interviewed did not have a formalized hiring, training, promotion, or grievance procedure. Employers whose restaurants had diverse Front-of-the-House staff had implemented standardized human resources procedures like formal job posting, regular training opportunities, and clear career ladders.

When hiring, employers reported leaning heavily on the social networks of their existing workforce to recruit new workers and only very rarely publicized information about new openings. These informal recruitment and advancement processes facilitate subjectivity in hiring and can enable selections based on race, national origin, and other considerations unrelated to a worker's knowledge and abilities. One employer affirmed the prevalence of this dynamic, "you hire who you are familiar with, inherent tendency… there is a familiarity with culture and background, which plays a role in the hiring process. A review of Craigslist postings show that hiring based on appearance remains a common practice in the Bay, lending itself to the application of implicit and explicit biases.

One fine dining employer we spoke with exemplified the bias that can result from not having a formal hiring process. When asked whether they had a formal hiring process, the employer replied, "I don't. I've hired wait staff. I have to see you face to face and I don't look at resumes. I hire people that I trust, and then I trust them." When asked about their promotion process this owner replied, "There isn't really a process, it's prove yourself and then we'll reward you… a



lot of people don't want to be promoted. I have a dishwasher who's been washing for 15 years and is totally content." Without formal processes for hiring and promotion, an employer's bias and stereotypes can result in occupational segregation. This restaurant owner related that in their restaurant "Mexicans are in the kitchen and Americans are out front." The reason cited was that, "I would never hire an American to work in the kitchen. They are lazy, entitled; they have a huge sense of what's owed to them, even in a restaurant like this one where we give them so much."

## ✳ JOB ADS FOUND ON SAN FRANCISCO BAY AREA CRAIGSLIST

Although many restaurants still request head shots to prospective applicants, some are fostering a culture of inclusivity and opportunity.

**Server/Bartender, Host, Runner** –… (Financial District San Francisco)
… restaurant is looking for hard working, dedicated, and experienced persons with engaging qualities…
Attach a photo of yourself if possible

**Bartender** (mission district)
Looking for "on call" bartender for Mission neighborhood bar.
Please forward PHOTO, WORK EXPERIENCE and REFERENCES.

**Bartenders, Cocktail Waitress & Bouncers wanted for nightclub** (SOMA)

Bartender:… Please include your resume and if you have a picture that would be a plus too.

Cocktail Waitress:… Looking for a female that has experience working in the bar industry. Has to be friendly, have great customer service and know how to up sell bottle service… Please send a resume and picture if interested.

Bartender/Model… We are seeking a bartender/model… In your reply to this posting please include… 3. A picture of yourself. The hospitality/model business is largely predicated on providing great customer service and presenting yourself in a professional manner. Please include a picture of yourself so we know you are not a slob

**BARTENDERS, SERVERS, HOSTS, BUSSERS, LINE COOKS, PREP COOKS, DISHWASHERS**

If you have experience offering ABSOLUTE GUEST SATISFACTION we want you to be a part of our team!

… Equal Opportunity Employer Committed to Fostering a Diverse and Inclusive Working Environment…
Qualified candidates with criminal history will be considered for employment.

# Conclusion and
# Policy Recommendations
*The High Road is Possible*

B y examining workers' experiences alongside industry and government data, we've developed a comprehensive picture of the Bay Area's restaurant industry. Our research suggests that the package of labor policies enacted by cities in the Bay have helped lift earnings and working conditions for restaurant workers considerably. Many Bay Area restaurant owners stand out in the industry by running successful restaurants while offering their employees fair wages, benefits, and working conditions. These policies foster employee satisfaction, lower turnover costs, and increased productivity. However our research also demonstrates that there remains much progress to be made in widening access to the provisions of the Bay Area's labor standards and deepening their enforcement. Many Bay Area restaurant jobs are still characterized by low wages, no benefits, and unsafe working conditions. Low-road practices continue to compromise the health and safety of workers as well as customers, demonstrating the need for greater and more rigorous enforcement of current protections such as wage and hour and paid sick leave, as well as expansion of worker protections such as around scheduling and tip ownership.

## POLICYMAKERS SHOULD:

**1** Address racial segregation in the industry through a combination of policies and programs that increase worker training and certification in livable wage job skills, push and train employers to desegregate their restaurants, and engage consumers in supporting restaurants that desegregate.

**2** Mandate transparent, formalized hiring, promotion and training processes that make a clear and fair ladder for workers to advance to higher-wage positions.

**3** Increase awareness and understanding of local labor laws though deepening and extending collaborations with community groups that train workers so that they know their rights and can organize to realize them.

  • San Francisco's Office of Labor Standards Enforcement (OLSE) offers a promising model for city-community collaboration in enforcement. This model should be expanded in San Francisco and extended regionally.

**4** Strengthen and extend existing progressive legislation to facilitate greater access to healthcare and scheduling rights among all restaurant workers in the Bay Area.

**5** Ensure workers have a voice in ownership and control over gratuities and service charges left on their behalf.

- Service charge protections such as those in place in Emeryville, Oakland, and Santa Monica, mark an important step forward but also do little to change the authority of employers to distribute gratuities without consent of employees.

- California should develop rules for democratic, voluntary tip pools that ensure fairness and increase worker voice.

**6** Support job training programs that provide high-quality and accessible training in the special skills needed to advance within the industry, particularly for underrepresented groups such as people of color, women, and immigrants. Policymakers can provide:

- Incentives to employers who provide on-the job-or off-premises training of this nature.

- Training programs for underrepresented populations to obtain skills to advance to living-wage positions within the industry.

**7** Strengthen and enforce employment laws in the restaurant industry and penalize violators at a level that will deter other employers from violating laws in the first place. This includes:

- Wage theft: higher penalties are needed so that risk of potential damages outweighs immediate gains.

- Similar measures should also be taken to enforce paid sick leave, and health and safety standards.

- Employers must be educated about their legal responsibilities to their employees, and employees must be educated about their legal rights.

**8** Ensure that restaurant workers and their families have affordable access to healthcare. Restaurant workers too often have to rely on emergency room treatment, which raises healthcare costs for the broader community.

**9** Protect workers from violations of federal, state, and local anti-discrimination and equal employment opportunity laws.

- Assist advocates engaged in anti-discrimination campaigns through intervention aimed at encouraging employers to change their discriminatory practices. Additionally, by increasing penalties against employers who violate anti-discrimination laws, legislators can create a deterrent to such discrimination.

- Ensure that employees understand their rights under anti-discrimination laws and make enforcement of such laws within the restaurant industry a priority.

- Adopt legislation that would provide incentives or require employers to provide regular, ongoing sexual harassment training with all employees, including managers.

**10** Publicly support collective organizing among restaurant workers.

**11** Initiate and support further study and dialogue on occupational segregation and other areas where more study is needed.

## EMPLOYERS SHOULD:

**1** Adopt systematic and fair hiring and promotions practices.

**2** Adopt and clearly communicate policies and procedures, including anti-discrimination and harassment policies, to protect the well being of all workers.

**3** Clearly communicate to workers about their benefits, such as earned sick days.

**4** Enhance job quality and employee retention by increasing wages and developing scheduling practices that meet both employer and worker needs.

**5** Employers that move away from tipping should practice open book management so that workers have a clear sense of whether they are receiving their fair share.

**6** Learn techniques that successful restaurant employers use to implement livable wages, benefits, scheduling control, and career ladders. ROC The Bay can act as a resource to provide technical assistance to employers.

## CUSTOMERS SHOULD:

**1** Support responsible restaurant owners who provide fair wages, benefits, and opportunities for workers to advance. Many of these restaurants can be found in the Restaurant Opportunities Centers' National Diners' Guide (www.rocunited.org/dinersguide).

**2** Speak to employers every time you eat out and let them know you care about livable wages, benefits, and opportunities for women and people of color to advance in the restaurant industry.

**3** Where workers have filed legal charges against employers who are violating the law, call the company and let them know that you will not support illegal practices.

## WORKERS SHOULD:

**1** Become involved in the Bay Area restaurant worker movement. There are many opportunities for involvement in worker-led committees, trainings and more.

**2** Support high road employers and thank them for raising standards in the industry.

**3** Demand other restaurants they frequent adopt high road practices by speaking to management, writing reviews that include labor standards, and share their experiences on social media.

**UNWEIGHTED SURVEY DEMOGRAPHICS** SAMPLE SIZE = 525

| AGE | % OF SAMPLE |
|---|---|
| 25 and under | 53.3% |
| 26-35 | 30.2% |
| 36-45 | 11.3% |
| 46-55 | 3.9% |
| Over 55 | 1.3% |

| RESTAURANT SEGMENT | |
|---|---|
| Fine dining | 20.4% |
| Family style | 40.9% |
| Quick Serve | 36.1% |
| Bars and other | 2.6% |

| NATIVITY | |
|---|---|
| Born in the U.S. | 72.3% |
| Foreign born | 27.7% |

| GENDER | |
|---|---|
| Female | 49.2% |
| Male | 50.6% |
| Transgender and other | 0.2% |

| RACE/ETHNICITY | % OF SAMPLE |
|---|---|
| White | 24.6% |
| Black | 13.1% |
| Latino, any race | 32.0% |
| Asian | 24.2% |
| Other | 6.1% |

| LOCATION OF RESTAURANT | |
|---|---|
| Oakland | 28.7% |
| San Francisco | 25.3% |
| Berkeley | 12.4% |
| San Jose | 6.2% |
| Hayward | 5.8% |
| Emeryville | 5.2% |
| Alameda | 3.6% |
| Castro Valley | 3.4% |
| Union City | 3% |
| Fremont | 1.8% |
| San Leandro | 1.4% |
| Other[57] | 3.2% |

| POSITION | |
|---|---|
| Front-of-the-house | 43.4% |
| Back-of-the-house | 56.6% |

Source: Bay Area Restaurant Industry Coalition survey data.

THIS REPORT WAS RESEARCHED AND WRITTEN BY:

Mike Rodriguez, Research Associate

Teófilo Reyes, Research Director, Restaurant Opportunities Centers United

RESTAURANT OPPORTUNITIES CENTERS UNITED WOULD LIKE TO THANK the many restaurant workers, restaurant owners, students, interns, and volunteers who devoted their time to conducting surveys, interviews, data analysis, and reviewing early drafts. In particular, we would like to thank the ROC the Bay Advisory Board Members who helped guide the project: Nwamaka Agbo, Ella Baker Center, Tiffany Crain Altamirano, Dominique Apollon, Race Forward, Jim Araby, UFCW Western States Council, Josué Argüelles, Young Workers United, Nikki Fortunato Bas, EBASE, Jenya Cassidy, Next Generation, Charlotte Chang, UC Berkeley Labor Occupational Health Program, Kevin Christensen, AFL-CIO, Netsy Firestein, Labor Project for Working Families, Nikki Henderson, People's Grocery, Hana Ivanhoe, Fair Food International, Eric Holt-Giménez, Food First, Wei-Ling Huber, Unite 2850, Barbara Giuffre, Shaw San Liu, Chines Progressive Association, Gordon Mar, Jobs with Justice San Francisco, Nicole Marquez, WorkSafe, Derecka Mehrens, Working Partnerships USA, Scott Myers-Lipton, San Jose State University, Jahmese Myres, EBASE, Sarah Norr, Unite Here 2850,  Steven Pitts, UC Berkeley Labor Center, Frank Seo, and Morgan Simon, Toniic.

We extend special thanks to the Professors Russell Jeung, San Francisco State University, Larry Salomon, San Francisco State University, Patrizia Longo, St. Mary's College, Sean Burns, UC Berkeley, and Richard Larson, San Jose State University, and their students, as well as all of the students at the UC Berkeley Food Labor Research Center, in particular Lillian Chen, Rachelle Fleming, Terra Graziani, Nickolas Johnson, Sonya Karabel, Tamara Katoni, Max Pittman, Jeremy Roberts, Colette Robicheaux, Geena St. Andrew, Lisette Solis, and Sarah Quiroz, for their assistance surveying and interviewing workers and employers, and transcribing and coding interviews. We also thank all of the ROC the Bay and ROC United staff that helped coordinate the project, including: Van Nguyen, Rhina Ramos, Yvonne Yen Liu, Wendy Chew, Evelyn Rangel-Medina, Sophia Miyoshi, and Morgan Prentice. We extend the warmest thanks to of all of the employers and workers who agreed to be interviewed and share their invaluable insights. This report would not be possible without their support.

THIS REPORT SHOULD BE CITED AS:

Restaurant Opportunities Centers United, Behind the Kitchen Door: The Promise of Opportunity in the San Francisco and Oakland Bay Area Restaurant Industry, (New York, NY: ROC United, 2016).

Design by Quanci Design | quancidesign.com
© 2016 Restaurant Opportunities Centers United

**1** Bureau of Labor Statistics, "Quarterly Census of Employment and Wages 2004-2014." Accessed October 15, 2015. Available at: http://data.bls.gov/oes.

**2** Ibid.

**3** Bureau of Labor Statistics, "2012 Economic Census." Accessed October 15, 2015. Available at http://www.census.gov/econ/.

**4** Kathryn Vasel, "These cities have the highest rents in the country," CNN Money, April 1, 2016, accessed at: http://money.cnn.com/gallery/real_estate/2016/04/01/cities-with-highest-rents/

**5** Bolton, Megan, Elina Bravve, Emily Miller, Sheila Crowley, Ellen Errico. "Out of Reach 2015: America's Forgotten Housing Crisis." *National Low Income Housing Coalition* (2015): 1-264. Accessed October 15, 2015. http://nlihc.org/sites/default/files/oor/OOR_2015_FULL.pdf

**6** Restaurant Opportunities Centers United, Ending Jim Crow in America's Restaurants: Racial and Gender Occupational Segregation in the Restaurant Industry (New York, NY: ROC United, 2015).

**7** ROC United analysis of American Community Survey (2011-2014) for the San Francisco-Oakland-Hayward Metropolitan Region. Ruggles, Steven, Alexander J. Trent, Genadek Katie, Goeken Ronald, Schroeder Matthew B., and Soebek Matthew, *Integrated Public Use Microdata Series: Version 5.0 [Machine-readable database]*, (Minneapolis: Minnesota Population Center, 2010).

**8** Sylvan Brackett, Wendy Downing, and Sue Moore. The Slow Food Guide to San Francisco and the Bay Area. 2005, Chelsea Green Publishing, White River Junction Vermont (Brackett, Moore, and Downing 2005)

**9** McCarty, G. (2016, February 15). DOL Launches West Coast Restaurant Sweep to Enforce Wage and Hour Laws @ PC Blog, accessed at: http://blog.personnelconcepts.com/2016/02/dol-launches-west-coast-restaurant-sweep-to-enforce-wage-and-hour-laws/, Labor Department launches West Coast sweep to investigate pay practices at fast food establishments to ensure fairness, compliance. (2016, February 04). accessed at: https://www.dol.gov/newsroom/releases/20160204-2

**10** Bureau of Labor Statistics, Current Employment Statistics, 2005-2014. Available at http://www.bls.gov/ces.

**11** Ibid. Estimate uses 6.5% sales tax for the state and 3% for the city. Accessed at http://www.boe.ca.gov/pdf/boe95.pdf

**12** See *supra* note 1.

**13** US Census, North American Industry Classification System, accessed on 2015. Accessed at: http://www.census.gov/eos/www/naics/

**14** See *supra* note 1.

**15** Ibid.

**16** ROC United analysis of American Community Survey (2011-2014) for the San Francisco-Oakland-Hayward Metropolitan Region. Ruggles, Steven, Alexander J. Trent, Genadek Katie, Goeken Ronald, Schroeder Matthew B., and Soebek Matthew, *Integrated Public Use Microdata Series: Version 5.0 [Machine-readable database]*, (Minneapolis: Minnesota Population Center, 2010).

**17** Ibid.

**18** Ibid.

**19** See *supra* note 6.

**20** See *supra* note 16.

**21** Ibid.

**22** Bureau of Labor Statistics, Occupational Employment Statistics, 2015. Accessed on June 6, 2016. Available at http://www.bls.gov/current/oes_41860.htm#35-0000.

**23** Ibid.

**24** United States Department of Labor Employment & Training Administration, "Lower Living Standard Income Level (LLSIL) Guideline." Accessed on October 2, 2015. Accessed at: http://www.doleta.gov/llsil/2015/LLSIL_2015_FRN.pdf.

**25** Ibid.

**26** Ibid. Livable wage is calculated using the Economic Policy Institute's (EPI) Basic Family Budget Calculator for a family of three in San Francisco, CA metro area, adjusted for inflation. Accessed October 2, 2015, http://www.epi.org/resources/budget/

**27** Restaurant Opportunities Centers United, Behind the Kitchen Door: Extreme Inequality and Opportunity in Houston's Vibrant Restaurant Economy, (New York, NY: ROC United, 2015).

**28** Restaurant Opportunities Centers United, Behind the Kitchen Door: The Highs and Lows of Seattle's Booming Restaurant Industry, (New York, NY: ROC United, 2015).

**29** California Labor Code § 245.5, available at https://leginfo.legislature.ca.gov/faces/billCompareClient.xhtml?bill_id=201520160SB3 & New York Labor Law Article 19, §652 http://public.leginfo.state.ny.us/lawssrch.cgi?NVLWO:

**30** Ibid.

**31** San Francisco minimum wage schedule accessed at: http://sfgov.org/olse/minimum-wage-ordinance-mwo , Oakland minimum wage schedule accessed at: http://www2.oaklandnet.com/government/o/CityAdministration/d/MinimumWage/index.htm , Berkeley minimum wage schedule accessed at: http://www.cityofberkeley.info/MWO/ , Emeryville minimum wage schedule accessed

at: http://www.ci.emeryville.ca.us/1024/Minimum-Wage-Ordinance , San Jose minimum wage schedule accessed at: http://www.sanjoseca.gov/?nid=3491

**32** Parsa, H.G., Self, J.T., Njite, D., and King, T. (August 2005). Why Restaurants Fail. *Cornell Hotel & Restaurant Administration Quarterly*, vol. 46, no. 3, 304-322. doi: 10.1177/0010880405275598

**33** See *supra* note 1.

**34** Restaurant Opportunities Centers United, Forward Together, et al. October 7th, 2014. The Glass Floor: Sexual Harassment in the Restaurant Industry. New York, NY: Restaurant Opportunities Centers United

**35** *Cumbie v. Woody Woo, Inc., dba Vita Cafe*, 596 P.2d 577 (9th Cir. 2010)

**36** Jill Esbenshade, "Shorted: Wage Theft, Time Theft, and Discrimination in San Diego County Restaurant Jobs", San Diego State University Department of Sociology and the Center on Policy Initiatives, June 2015, accessed at: https://d3n8a8pro7vhmx.cloudfront.net/onlinecpi/pages/1065/attachments/original/1434401985/cpiWageTheftReportFINAL(corrected6_15_15).pdf?1434401985

**37** See *supra* note 35.

**38** Kathryn Vasel, "These cities have the highest resnts in the country," CNN Money, April 1, 2016, accessed at: http://money.cnn.com/gallery/real_estate/2016/04/01/cities-with-highest-rents/

**39** Bolton, Megan, Elina Bravve, Emily Miller, Sheila Crowley, Ellen Errico. "Out of Reach 2015: America's Forgotten Housing Crisis." *National Low Income Housing Coalition* (2015): 1-264. Accessed on October 15, 2015, accessed at http://nlihc.org/sites/default/files/oor/OOR_2015_FULL.pdf

**40** United States Department of Labor, Wage and Hour Division, Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA), July 2013, accessed at https://www.dol.gov/whd/regs/compliance/whdfs15.htm

**41** See *supra* note 35.

**42** *Oregon Rest. & Lodging Ass'n v. Perez*, 816 F.3d 1080, 1090, (9th Cir. Or. 2016); also available at http://cases.justia.com/federal/appellate-courts/ca9/13-35765/13-35765-2016-02-23.pdf?ts=1456250580

**43** Julia Moskin, "Not Enough Cooks in the Restaurant Kitchen," New York Times, Oct 20, 2015, accessed at: http://www.nytimes.com/2015/10/21/dining/restaurant-kitchen-chef-shortage.html?_r=0

**44** Tips and Gratuities, State of California Department of Labor, accessed at: http://www.dir.ca.gov/dlse/FAQ_tipsandgratuities.htm

**45** Santa Monica Minimum Wage Ordinance accessed at: http://beta.smgov.net/strategic-goals/inclusive-diverse-community/minimum-wage-ordinance

**46** California Labor Code § 245.5, available at https://leginfo.legislature.ca.gov/faces/billCompareClient.xhtml?bill_id=201520160SB3

**47** San Francisco Office of Labor Standards Enforcement, Paid Sick Leave Ordinance accessed at: http://sfgov.org/olse/paid-sick-leave-ordinance-pslo , Californian Paid Sick Leave law accessed at: http://www.dir.ca.gov/dlse/paid_sick_leave.htm , City of Oakland law accessed at: http://www2.oaklandnet.com/government/o/CityAdministration/d/MinimumWage/index.htm , Emeryville Minimum Wage Ordinance accessed at: http://www.ci.emeryville.ca.us/1024/Minimum-Wage-Ordinance

**48** San Francisco Office of Labor Standards Enforcement, Formula Retail Employee Rights Ordinances, accessed at: http://sfgov.org/olse/formula-retail-employee-rights-ordinances

**49** San Francisco Office of Labor Standards Enforcement, Health Care Security Ordinance, accessed at http://sfgov.org/olse/health-care-security-ordinance-hcso

**50** See *supra* note 31

**51** San Francisco Office of Labor Standards Enforcement, Fair Chance Ordinance accessed at: http://sfgov.org/olse/fair-chance-ordinance-fco

**52** Emeryville Minimum Wage Ordinance accessed at: http://www.ci.emeryville.ca.us/1024/Minimum-Wage-Ordinance , City of Oakland law accessed at: http://www2.oaklandnet.com/government/o/CityAdministration/d/MinimumWage/index.htm

**53** Tia Koonse, Miranda Dietz, Annette Bernhardt, Enforcing City Minimum Wage Laws in California: Best Practices and City-State Partnerships, UCLA & UC Berkeley Centers for Labor Research and Education, October 2016, accessed at http://laborcenter.berkeley.edu/pdf/2015/minimum-wage-enforcement.pdf

**54** San Francisco Office of Labor Standards Enforcement, Paid Sick Leave Ordinance http://sfgov.org/olse/paid-sick-leave-ordinance-pslo

**55** Californian Paid Sick Leave law accessed at: http://www.dir.ca.gov/dlse/paid_sick_leave.htm , City of Oakland law accessed at: http://www2.oaklandnet.com/government/o/CityAdministration/d/MinimumWage/index.htm , Emeryville Minimum Wage Ordinance accessed at: http://www.ci.emeryville.ca.us/1024/Minimum-Wage-Ordinance

**56** See *supra* note 7.

**57** Piedmont, and Newark, each representing 0.4% of total sample, and Townsend, Pleasanton, Livermore, Rockridge, Lake Merritt, Concord, Burlingame, Moraga, San Lorenzo, Fairfax, Milpitas, and East Bay each representing 0.2% of total sample..

# Behind the Kitchen Door:
The Promise of Opportunity in the San Francisco and Oakland Bay Area Restaurant Industry



**ROC United**
**275 7th Ave, Suite 1703**
**New York, NY 10001**
**212-343-1771**
**rocunited.org**

# - EXHIBIT 2 -





R E P O R T

July 10, 2014

# TWENTY-THREE YEARS AND STILL WAITING FOR CHANGE

## Why It's Time to Give Tipped Workers the Regular Minimum Wage

BY SYLVIA A. ALLEGRETTO AND DAVID COOPER

# Introduction and executive summary

Last year marked the 75th anniversary of the Fair Labor Standards Act (FLSA), the legislation that established many of the basic labor protections workers enjoy today, such as a 40-hour workweek, overtime protection, and a national minimum wage. There have been periodic amendments to the FLSA over the years, but the 1966 amendments were especially significant. They extended protections to hotel, restaurant, and other service workers who had previously been excluded from the FLSA, but also introduced a new "subminimum wage" for workers who customarily and regularly receive tips.[1] Unlike temporary subminimum wages (such as those for students, youths, and workers in training), the "tip credit" provision afforded to employers uniquely established a permanent sub-wage for tipped workers, under the assumption that these workers' tips, when added to the sub-wage, would ensure that these workers' hourly earnings were at least equal to the regular minimum wage. The creation of the tip credit—the difference, paid for by customers' tips, between the regular minimum wage and the sub-wage for tipped workers—fundamentally changed the practice of tipping. Whereas tips had once been simply a token of gratitude from the served to the server, they became, at least in part, a subsidy from consumers to the employers of tipped workers. In other words, part of the employer wage bill is now paid by customers via their tips.

Today, this two-tiered wage system continues to exist, yet the subsidy to employers provided by customers in restaurants, salons, casinos, and other businesses that employ tipped workers is larger than it has ever been. At the federal level, it currently stands at $5.12 per hour, as employers are required to pay their tipped staff a "tipped minimum wage" of only $2.13 per hour, and the federal regular minimum wage is currently $7.25.[2] Remarkably, the federal tipped minimum wage has been stuck at $2.13 since 1991—a 23-year stretch, over which time inflation has lowered the purchasing power of the federal tipped minimum wage to its lowest point ever.

Proposed federal minimum-wage legislation, the Fair Minimum Wage Act of 2014—also known as the Harkin–Miller bill—would not only increase the federal regular minimum wage to $10.10, but for the first time in decades would also reconnect the subminimum wage for tipped workers back to the regular minimum wage by requiring the former be equal to 70 percent of the latter. This would be a strong step in the right direction; however, we present evidence that tipped workers would be better off still if we simply eliminated the tipped minimum wage, and paid these workers the full regular minimum wage.

Raising the wage floor for tipped workers is crucial for a number of reasons. Rising income inequality and the accompanying slowdown in improving American living standards over the past four decades has been driven by weak hourly wage growth, a problem that has been particularly acute for low-wage workers (Bivens et al. 2014). Tipped workers—whose wages typically fall in the bottom quartile of all U.S. wage earners, even after accounting for tips[3]—are a growing portion of the U.S. workforce. Employment in the full-service restaurant industry has grown over 85 percent since 1990, while overall private-sector employment grew by only 24 percent.[4] In fact, today more than one in 10 U.S. workers is employed in the leisure and hospitality sector, making labor policies for these industries all the more central to defining typical American work life.[5] Ensuring fair pay for tipped workers is also a women's issue. Women comprise two out of every three tipped workers; of the food servers and bartenders who make up over half of the tipped workforce, roughly 70 percent are women.

In their 2011 paper, Allegretto and Filion gave a historical account of the tipped-minimum-wage policy and brought much-needed attention to how the two-tiered wage system results in significantly different living standards for tipped versus non-tipped workers. For instance, tipped workers experience a poverty rate nearly twice that of other workers. The 2011 report, coupled with more recent publications from the White House (2014) and the Congressional Budget Office (2014), contradicts the notion that these workers' tips provide adequate levels of income and reasonable economic security.

Given recent policy interest in the minimum wage and greater attention to the lesser-known subminimum wage for tipped workers, this paper updates the 2011 report to reflect recent changes to state wage policies, and includes updated demographic and earnings profiles of tipped workers. We extend the 2011 analysis especially with regard to the family structure of tipped workers, noting important differences between men and women. We also provide new data on family income levels and participation in federal assistance programs among tipped workers, as well as measures of job quality in the food service industry.

Key findings include:

- The subminimum wage for tipped workers has remained at $2.13 since 1991. In 1996, it was decoupled from the regular minimum wage, such that the tipped wage remained at $2.13 even as the regular minimum wage was increased. At that time, the tipped minimum wage was equal to 50 percent of the regular minimum wage; today it is only equal to a record low 29.4 percent of the regular federal minimum wage of $7.25.

- Customers' tips pay the $5.12 difference between the federal tipped minimum wage and the federal regular minimum wage. Thus, customers provide a subsidy to employers of tipped workers worth more than twice the wage these employers are required to pay their tipped staff.

- The restaurant industry is an intense user of both minimum-wage and tipped-wage workers, with more than 60 percent of tipped workers employed in food service. The full-service restaurant sector has grown about 86 percent from 1990 to 2013, while overall growth in the private sector was up 24 percent—illustrating why it is increasingly important to raise wages for these workers.

- Tipped workers are predominantly women (66.6 percent) and disproportionately young; however, the majority are at least 25, and over one in four are at least 40 years of age.

- Tipped workers have a median wage (including tips) of $10.22, compared with $16.48 for all workers.

- While the poverty rate of non-tipped workers is 6.5 percent, tipped workers have a poverty rate of 12.8 percent. Tipped workers are thus nearly twice as likely to live in poverty as are non-tipped workers. Yet poverty rates are significantly lower for tipped workers in states where they receive the full regular minimum wage.

- Due to their low wages and higher poverty levels, about 46.0 percent of tipped workers and their families rely on public benefits, compared with 35.5 percent of non-tipped workers and their families. While it is a good thing that workers faced with challenging circumstances can turn to these programs for assistance, these programs were not designed to serve as a permanent wage subsidy or part of the business strategy for low-wage employers.

- Job quality, as measured by access to benefits, is far worse for tipped workers. Workers in the accommodation and food service industry—an industry with a high concentration of tipped workers—are offered paid leave (sick, holi-

day, and vacation leave), health insurance, and retirement benefits at rates far below those of private-sector workers overall.

■ Paying tipped workers the regular minimum wage has had no discernable effect on leisure and hospitality employment growth in the seven states where tipped workers receive the full regular minimum wage. In fact, sector growth in these states has been stronger since 1995 than in the states where tipped workers are paid a subminimum wage.

## History of the two-tiered wage floor system

The 1966 amendments to the Fair Labor Standards Act (FLSA) provided for a 50 percent "tip credit" for employers of tipped workers, allowing tipped workers' income from tips to count toward half the regular minimum hourly wage guaranteed to workers by the FLSA, with the newly established subminimum wage comprising the other half. The real (inflation-adjusted) value of the two wages is illustrated in **Figure A**. In real terms, both wages are lower today than in 1966. Over time, the federal tip credit provision—the difference, made up for by customers' tips, between the regular minimum wage and the tipped minimum wage—dropped to as low as 40 percent (1980–1989) while never exceeding half of the regular minimum wage prior to 1996. The roughly proportional relationship between the two wages changed when President Clinton signed into law the Minimum Wage Increase Act of 1996. The act eliminated the FLSA provision that required the tipped minimum wage remain a certain percentage of the full minimum wage, instead locking in the tipped minimum wage at $2.13 per hour. At the time of the bill's passage, the tip credit stood at 50 percent. In October of that year, as the bill's regular minimum-wage increase from $4.25 to $4.75 took effect, the $2.13 tipped minimum wage remained frozen—bringing the tip credit for employers above 50 percent (Whittaker 2006).

In fact, the 1996 law set the stage for an ever-increasing tip credit. When the federal minimum wage was raised in 2007, 2008, and 2009, the tipped minimum wage was left unchanged. Today, the tipped wage remains at $2.13, meaning it is equal to a record low 29.4 percent of the regular minimum wage of $7.25, while the employer tip credit ($5.12) is equal to 70.6 percent of the regular minimum wage. As such, the customer-provided subsidy afforded to employers ($5.12) is now more than twice the base wage ($2.13) employers are required to pay to workers.[6]

The change to the tip credit in 1996 effectively shifted responsibility for an increasing portion of tipped workers' wages from employers to customers; it greatly reduced employers' future wage bill by locking in a low base wage for tipped workers that would remain fixed, even as prices rose or the regular minimum wage was increased. Legally, employers of tipped workers are still required to ensure that the sum of tipped workers' base wages plus their tips is equal to at least the full regular minimum wage; however, as is discussed later in detail, enforcement of this requirement is fraught with problems, and evidence suggests that tipped workers are subject to high rates of wage theft.

## State policies

The two-tiered wage system established under the 1966 amendments to the FLSA did not remain uniform across the country, as states have implemented an array of mixed rules for both the regular minimum wage and the subminimum wage for tipped workers that differ from federal policy.[7] The map in **Figure B** depicts state regular minimum-wage levels and tipped-minimum-wage levels as of January 1, 2014 (a summary of these data is also presented in the top panel of Table 1, which is introduced in the following section). Of the 50 states plus the District of Columbia, 29 follow

**Real value of the federal minimum wage and subminimum wage for tipped workers, 1966–2014**



* The difference, paid for by customers' tips, between the regular minimum wage and the subminimum wage for tipped workers

**Note:** Real 2014 dollars adjusted using the CPI-RS. Minimum- or tipped-wage changes that occurred in mid-year are averaged.

**Source:** Authors' analysis of Fair Labor Standards Act and amendments

the federal regular minimum wage level of $7.25. The 21 states (plus the District of Columbia) with regular minimum wages above the federal $7.25 are denoted in the figure with hash marks.

We next examine states' *tipped* wage policies. As noted previously, the difference between the tipped minimum wage and the regular minimum wage determines the allowable tip credit for employers in each state. In broad terms we refer to the level of tip credit in each state as full, partial, or no tip credit. A full tip credit state (these 19 states are depicted in red on the map) follows the federal $2.13 subminimum wage for tipped workers and thus takes advantage of the maximum allowable tip credit.

There are 31 states (plus the District of Columbia) with tipped minimum wages above the federal $2.13. These include partial tip credit and no tip credit states. A partial tip credit state sets a subminimum wage above $2.13 but below the binding regular minimum wage for that state. These 24 states, plus the District of Columbia, are depicted in blue. Of these, 11 follow the federal regular minimum wage rate, while 14 have higher regular minimum wages. The range of



**FIGURE B**

### Tipped minimum wage and regular minimum wage levels, by state, 2014

■ No employer tip credit (tipped workers receive regular minimum wage)
■ Partial employer tip credit (tipped minimum between $2.13 and regular minimum)
■ Full employer tip credit (tipped minimum wage of $2.13)
▨ States with regular minimum wages above the federal $7.25 level

**Note:** As of January 1, 2014

**Source:** Authors' analysis of U.S. Department of Labor, Wage and Hour Division (various years; 2014)

tipped wages (tip credits) varies considerably across the partial tip credit states, from a low of $2.23 ($5.02) in Delaware to a high of $7.00 (25 cents) in Hawaii.

Lastly, states that do not allow for a subminimum wage are referred to as no tip credit states, or "equal treatment" states, meaning that tipped workers are paid the same minimum wage paid to non-tipped workers (these seven states are depicted in green on the map). In these states, tipped workers are paid regular minimum wages ranging from Minnesota's $7.25 to Washington State's $9.32.[8]

Seventeen states follow federal policy on both counts, while Minnesota is the only one that has a $7.25 regular minimum but does not allow for a subminimum wage. A complete list of state policies is included in Appendix Table A1.

State minimum-wage scenarios are often changing given decades of federal inaction on the tipped wage and five years of federal inaction on the regular minimum wage. Thus far in 2014, 34 states have considered raising their wage floor, and

eight have enacted increases (National Conference of State Legislatures 2014). Yet even as states adopt wage floors above the federal level, they often overlook tipped-wage policy. Indeed, recent minimum-wage increases in seven states plus the District of Columbia were mixed on tipped-minimum-wage policy. For instance, as just noted, Minnesota does not allow for a subminimum wage; thus, tipped workers there will receive the full regular minimum wage when it increases to $9.50 in 2016. Hawaii's regular minimum wage will increase to $10.10 by 2018, and the state also eliminated the previous 25-cent tip credit for employers, although a 75-cent tip credit exception will be allowable in instances where tipped workers earn at least $17.10 per hour after tips. In contrast, Maryland increased its state minimum to $10.10 earlier this year, but kept its subminimum wage frozen at $3.63, where it has remained since 2009. Similarly, the minimum wage in the District of Columbia is set to rise to $11.50 by 2017, but the District's tipped minimum wage will remain fixed at $2.77.

Even if the federal government does not move on the tipped minimum wage, the increasing potential for state action makes it important to understand more about this policy, the population it affects, and the potential effects any policy changes would have. Interestingly, the variation in minimum-wage and tipped-wage policies depicted in the map constitutes a natural experiment of sorts. The restaurant industry is an intense user of both minimum-wage and tipped-wage workers, with more than 60 percent of tipped workers employed in food service. The industry has fought hard to keep the federal $2.13 floor in place over the last two decades, arguing that raising the tipped wage would be severely damaging to the industry and its workers. But restaurants exist in every state and under all the various minimum- and subminimum-wage policies depicted in the map. Moreover, Allegretto (2013) finds that increases in the tipped minimum wage over the last several decades had little to no effect on employment—specifically, employment effects are "small and not distinguished from zero." Allegretto (2013) finds that implementing a policy similar to the Harkin-Miller proposal would have very little effect on restaurant employment while boosting overall earnings for both tipped and minimum-wage workers in full-service restaurants.

## Demographic characteristics of tipped workers

To examine the demographic characteristics of workers who would be affected by increasing the tipped minimum wage, we use the 2011–2013 Current Population Surveys (CPS) to identify workers and tipped workers, as well as a subset of wait staff and bartenders. The three survey years are combined to produce a sufficient sampling of tipped workers. While there is no data set that explicitly identifies tipped workers, we define our sample as best we can by using several variables available in the CPS.[9] Workers are included in the sample if they are at least 16 years old, employed but not self-employed, and report positive wage income. Tipped workers in our sample include those workers in occupations that are predominantly tipped, such as waiters and waitresses, bartenders, gaming service workers, barbers, hairdressers, and other personal appearance workers (see Appendix Table A2 for details). This section first examines the number of tipped workers and their distribution among the state tipped-wage categories. It then examines the gender, age, education, and family characteristics of these workers.

### Number and distribution of tipped workers

The middle part of **Table 1** provides the distribution of our sample of all workers, tipped workers, and a subsample of waiters and bartenders. We single out waiters and bartenders because most are tipped workers and because they comprise the bulk (58 percent) of the tipped workforce. There are approximately 4.3 million tipped workers in the United States, and roughly 2.5 million are waiters and bartenders.[10] A plurality of workers, including tipped workers, reside

TABLE 1

**Distribution of all workers, tipped workers, and waiters/bartenders, by state tipped-minimum-wage level**

| | Nationwide | State tipped-minimum-wage level | | |
|---|---|---|---|---|
| | | Low ($2.13 tipped minimum wage) | Medium (between $2.13 and regular state minimum wage) | Equal treatment (tipped minimum wage = regular state minimum wage) |
| ***All states**** | **51** | **19** | **25** | **7** |
| *State regular minimum wage set to federal level* | 29 | 17 | 11 | 1 |
| *State regular minimum wage set above federal level* | 22 | 2 | 14 | 6 |
| *Total workforce* | 127,063,149 | 45,086,676 | 58,997,685 | 22,978,789 |
| *Share of total workforce* | | 35.5% | 46.4% | 18.1% |
| *Tipped workers* | 4,343,264 | 1,400,640 | 2,145,438 | 797,185 |
| *Share of tipped workers* | | 32.2% | 49.4% | 18.4% |
| *Waiters/bartenders* | 2,515,529 | 843,815 | 1,230,404 | 441,310 |
| *Share of waiters/bartenders* | | 33.5% | 48.9% | 17.5% |
| **Of the workforce** | | | | |
| *Tipped worker share* | 3.4% | 3.1% | 3.6% | 3.5% |
| *Waiter/bartender share* | 2.0% | 1.9% | 2.1% | 1.9% |

\* As of January 1, 2014. Includes District of Columbia.

**Note:** Statistics reflect survey respondents ages 16 and older who are employed, but not self-employed, and report positive income from wages.

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2011–2013

in partial tip credit states that set tipped wages above $2.13 but below the binding state regular minimum wage—46.4 percent of the overall workforce and 49.4 percent of tipped workers reside in these states. Approximately one-third of all tipped workers reside in states with a $2.13 tipped wage rate, and less than one-fifth (18.4 percent) are in "equal treatment" states that do not allow for a tipped or subminimum wage.

The bottom panel of Table 1 shows the tipped worker and waiter/bartender shares of employment, overall and in each of the state tipped wage categories. Tipped workers and waiters/bartenders represent 3.4 percent and 2.0 percent, respectively, of the overall U.S. workforce. Looking across the state tipped wage categories, tipped workers comprise 3.1 percent of the workforce in states with a $2.13 subminimum wage, 3.6 percent of the workforce in partial tip credit states, and 3.5 percent of the workforce in states with no subminimum wage. There are no significant differences in waiters' and bartenders' share of overall employment across the tipped wage scenarios. These results suggest that tipped work opportunities are not diminished in states that do not allow for a subminimum wage.

## Who are tipped workers?

We interact with tipped workers on a regular basis, from our favorite bartender at the local pub to those who serve us at the restaurants we frequent. But, by and large, tipped workers are not representative of the overall workforce. As **Table**

**2** shows, tipped workers are overwhelmingly (two-thirds) female, younger, and tend to have lower levels of education than the overall workforce. Still, although tipped workers are younger than the overall workforce, they are not mainly teenagers, as is often thought. In fact, as shown in **Figure C,** only a small share of tipped workers are teens (12.6 percent). Furthermore, about a quarter of tipped workers are young adults, ages 20 to 24, while the vast majority (62.8 percent) are at least 25 years old. Nearly 30 percent are at least 40 years old.

Tipped workers have lower levels of education than the overall workforce, as 36.5 percent of all workers lack more than a high school education, compared with around 48.2 percent of tipped workers and 45.4 percent of waiters/bartenders. However, more than half of all tipped workers and waiters/bartenders have at least some college experience.

Tipped workers, especially waiters/bartenders, are less likely to be black, as they are underrepresented in this line of work as compared with their representation in the overall workforce. Tipped workers are also less likely to work full time; while this may be at the behest of some of these workers, it is also the case that many workers desire more hours and are unable to receive them.

The bottom of Table 2 details workers' family dynamics. Approximately 35 percent of all U.S. workers are parents. Among tipped workers the corresponding figure is 25.6 percent, yet that figure rises to 30.4 percent if we only look at women, who are the majority of the tipped workforce. Similarly, 29.2 percent of women wait staff and bartenders are parents, and more than half of these parents are single parents.

## Tipped workers' wages

There are two common misconceptions of tipped workers' pay. First, many people are simply unaware of the low base wage that employers actually pay tipped workers, and second, they believe these service workers make a large amount of "extra" money in tips. As already discussed, for most tipped workers, a significant portion of their tip income compensates for their receiving a low subminimum base wage from their employer. More importantly, the data belie the notion that most of these workers make substantial tipped income.

**Table 3** reports median wages—that is, the wage of the worker right in the middle of the distribution—for all workers, tipped workers, and waiters/bartenders. The wage of a typical U.S. worker is about $16.48; females make less than males ($15.09 versus $18.13); workers under 20 earn less than older workers ($8.27 versus $16.98); and the least-educated make less than those with the most education ($9.98 for those with less than a high school degree, versus $25.91 for those with at least a bachelor's degree).

Regardless of demographic category, the median tipped worker and waiter/bartender earns less than the median U.S. worker. Compared with the $16.48 median wage of all workers, tipped workers have a median wage (including tips[11]) of $10.22; waiters/bartenders make slightly less ($10.11). Even as women represent two-thirds of tipped workers, they still make less than their male counterparts ($10.07 for women at the median versus $10.63 for men). The respective figures are $9.89 and $10.71 for waiters and bartenders.

For the most part, tipped work is low-wage work. Hourly pay across all the demographic categories in Table 3 varies from a low of $8.11 to a high of $12.88. The median wages of tipped workers who are also parents are $10.11 and

TABLE 2

### Distribution of all workers, tipped workers, and waiters/bartenders, by demographic group

| Category | Share of total workforce | Share of tipped workers | Share of waiters/bartenders |
|---|---|---|---|
| *All* | 100.0% | 100.0% | 100.0% |
| **Sex** | | | |
| *Male* | 51.7% | 33.4% | 31.5% |
| *Female* | 48.3% | 66.6% | 68.5% |
| **Age** | | | |
| *Under 20* | 3.4% | 12.6% | 12.8% |
| *20 and older* | 96.6% | 87.4% | 87.2% |
| *16–24* | 13.6% | 37.2% | 43.2% |
| *25–39* | 33.2% | 33.5% | 34.8% |
| *40–54* | 33.6% | 19.3% | 15.9% |
| *55 and older* | 19.5% | 10.0% | 6.1% |
| **Education** | | | |
| *Less than high school* | 9.1% | 14.6% | 13.8% |
| *High school* | 27.4% | 33.7% | 31.6% |
| *Some college* | 29.9% | 40.5% | 42.7% |
| *Bachelor's or higher* | 33.6% | 11.2% | 11.9% |
| **Race/ethnicity** | | | |
| *White* | 66.1% | 61.5% | 66.6% |
| *Black* | 11.0% | 8.5% | 6.8% |
| *Hispanic* | 15.6% | 17.7% | 17.7% |
| *Asian or other race* | 7.3% | 12.3% | 8.9% |
| **Work hours** | | | |
| *Part time (< 20 hours)* | 5.7% | 14.6% | 14.0% |
| *Mid time (20–34 hours)* | 14.4% | 38.9% | 44.5% |
| *Full time (35+ hours)* | 79.8% | 46.5% | 41.5% |
| **Family structure** | | | |
| *Married parent* | 26.9% | 15.2% | 11.7% |
| *Single parent* | 7.6% | 10.4% | 12.2% |
| *Married, no kids* | 27.7% | 14.9% | 10.7% |
| *Unmarried, no kids* | 37.8% | 59.5% | 65.3% |
| *Female workers only* | | | |
| *Married parent* | 23.8% | 16.3% | 12.8% |
| *Single parent* | 11.4% | 14.1% | 16.4% |
| *Married, no kids* | 27.7% | 14.6% | 11.1% |
| *Unmarried, no kids* | 37.1% | 55.0% | 59.7% |

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2011–2013

$11.41 for single and married parents, respectively. The wages of the nearly one-in-three female tipped workers who are also parents are even lower, at $10.00 and $10.83 for single and married parents, respectively.



FIGURE C

**VIEW INTERACTIVE** *on epi.org*

## Distribution of tipped workers, by age group

Age 55+: 10.0%

Age 16-19: 12.6%

Age 40-54: 19.3%

Age 20-24: 24.5%

Age 25-39: 33.5%

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2011–2013

ECONOMIC POLICY INSTITUTE

The low wages of tipped workers derive, in part, from the lower base wage or tipped wage provided by employers. As the data show in **Table 4**, the tip credit allowance—the amount of tips an employer can use as credit toward a worker's wage—matters. Across the three broad tip credit policies, there are measurable differences in wages: There is a progression of increasing median wages from the low to higher tipped-wage states both for tipped workers and all workers. This likely also reflects other policies besides tipped-wage floors that would affect wages more broadly. For example, low tipped-wage states are more likely to have low regular state minimum wages, while high tipped-wage states are more likely to have high regular state minimum wages.

Still, the relative gains from low to high tipped-wage states are greater for tipped workers, especially waiters/bartenders, compared with the gains of the general workforce—even though tipped workers earn less in each case. For example, tipped workers in equal treatment states earn 14.2 percent more than tipped workers in low tipped minimum states, compared with an 11.4 percent gain for all workers (the relative difference is 20.6 percent for waiters/bartenders). Looking more closely at the gains for waiters and bartenders, we see that total wages of women are 22.5 percent higher, and of men 19.1 percent higher, in states that do not allow for a subminimum wage compared with the states that follow the $2.13 policy. Restaurant industry advocates often argue that raising or eliminating the tipped minimum wage would leave tipped workers worse off because customers would disproportionately reduce tips if they knew employers were paying higher base wages. These data show that the evidence for this claim is weak, and even if it were true, tipped workers in equal treatment states still earn higher total wages (tips plus base wage) than workers in states with lower tipped minimum wages.

TABLE 3

**Median wage of all workers, tipped workers, and waiters/bartenders, by demographic group**

| Category | All | Tipped workers | Waiters/bartenders |
|---|---|---|---|
| *All* | $16.48 | $10.22 | $10.11 |
| **Sex** | | | |
| *Male* | $18.13 | $10.63 | $10.71 |
| *Female* | $15.09 | $10.07 | $9.89 |
| **Age** | | | |
| *16–19* | $8.27 | $8.11 | $8.14 |
| *20–24* | $10.17 | $9.70 | $9.81 |
| *25–39* | $16.64 | $11.43 | $11.25 |
| *40–54* | $19.63 | $11.81 | $10.99 |
| *55+* | $18.87 | $10.78 | $10.37 |
| **Education** | | | |
| *Less than high school* | $9.98 | $8.31 | $8.25 |
| *High school* | $13.89 | $10.27 | $10.03 |
| *Some college* | $14.99 | $10.60 | $10.44 |
| *Bachelor's or higher* | $25.91 | $12.88 | $12.72 |
| **Race/ethnicity** | | | |
| *White* | $18.19 | $10.25 | $10.19 |
| *Black* | $13.94 | $10.12 | $9.62 |
| *Hispanic* | $12.63 | $9.98 | $9.89 |
| *Asian or other* | $17.95 | $10.63 | $10.38 |
| **Family structure** | | | |
| *Married parent* | $19.87 | $11.41 | $10.75 |
| *Single parent* | $13.36 | $10.11 | $9.83 |
| *Married, no kids* | $19.01 | $11.44 | $10.77 |
| *Unmarried, no kids* | $13.68 | $9.88 | $9.99 |
| *Female workers only* | | | |
| *Married parent* | $17.32 | $10.83 | $10.30 |
| *Single parent* | $12.70 | $10.00 | $9.72 |
| *Married, no kids* | $17.06 | $10.89 | $10.26 |
| *Unmarried, no kids* | $13.21 | $9.66 | $9.74 |

**Note:** Wage values reflect both base wages and tips. Figures are in 2013 dollars adjusted using the CPI-U-RS.

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2011–2013

While these relative differences are important, tipped workers in equal treatment states are still low-wage workers, earning around $11.00 to $12.00 per hour—still in the bottom third of all U.S. wage earners, yet better than the $9.00 to $10.00 per hour for workers in the lowest tipped-wage states.[12]

TABLE 4

**Median wage of all workers, tipped workers, and waiters/bartenders, by state tipped-minimum-wage level**

| | Nationwide | State tipped-minimum-wage level | | |
| --- | --- | --- | --- | --- |
| | | Low ($2.13 tipped minimum wage) | Medium (between $2.13 and regular state minimum wage) | Equal treatment (tipped minimum wage = regular state minimum wage) |
| *All workers* | **$16.48** | **$15.63** | **$16.87** | **$17.41** |
| *Female* | $15.09 | $14.34 | $15.35 | $16.01 |
| *Male* | $18.13 | $17.29 | $18.51 | $18.75 |
| *Tipped workers* | **$10.22** | **$9.80** | **$10.31** | **$11.19** |
| *Female* | $10.07 | $9.55 | $10.14 | $10.91 |
| *Male* | $10.63 | $10.11 | $10.73 | $11.74 |
| *Waiters/ bartenders* | **$10.11** | **$9.52** | **$10.20** | **$11.48** |
| *Female* | $9.89 | $9.14 | $9.97 | $11.20 |
| *Male* | $10.71 | $10.09 | $10.99 | $12.02 |

**Note:** Wage values reflect both base wages and tips. Figures are in 2013 dollars adjusted using the CPI-U-RS.

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2011–2013

## Family income and poverty

The family structure data reported in Table 2 showed that while tipped workers are less likely to be married and have children compared with the overall workforce, they are *more* likely to be single parents—especially female workers. As that table shows, of tipped workers who are women, 30.4 percent are parents, and 14.1 percent are single parents. Among wait staff and bartenders who are women, 16.4 percent are single parents.

Low wages combined with lower marriage rates translate into low family incomes for most tipped workers. The distribution of tipped workers, waiters and bartenders, and the total workforce across family income levels is reported in **Figure D**. About 30.5 percent of all U.S. workers are in families that earn less than $40,000. That share jumps to 47.2 percent for tipped workers and 49.9 percent for waiters and bartenders. Looking only at women (gender-specific breakdowns are not displayed in the figure), the trends are similar, if not slightly more pronounced: 31.7 percent of all working women are in families with total incomes below $40,000, compared with 47.6 percent of tipped workers who are women. Among female wait staff and bartenders, over half (51.8 percent) fall into this low-income group.

The relatively low family incomes of tipped workers mean they also experience poverty at much higher rates than other workers. As shown in **Table 5**, the poverty rate of non-tipped workers is 6.5 percent, while it is 12.8 percent for tipped workers in general and 14.9 percent for waiters and bartenders. While the magnitude of this difference by itself is startling, it is important to note how poverty rates for tipped workers vary significantly based on states' tipped-minimum-wage policies.

As depicted in **Figure E**, poverty rates for non-tipped workers do not vary much by state tipped-wage policies. Yet for tipped workers, and particularly for waiters and bartenders, the correlation between low tipped wages and high poverty rates is dramatic. Among wait staff and bartenders, 18.0 percent are in poverty in states that follow the $2.13 submini-



FIGURE D

**VIEW INTERACTIVE** *on epi.org*

## Distribution of total employment, tipped workers, and waiters/bartenders, by family income level

**Legend:**
- Total workforce
- Tipped workers
- Waiters/ bartenders

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2011–2013

ECONOMIC POLICY INSTITUTE

---

**TABLE 5**

### Poverty rates of all workers, tipped and non-tipped workers, and waiters/bartenders, by state tipped-minimum-wage level

| | | State tipped-minimum-wage level | | |
|---|---|---|---|---|
| | Nationwide | Low ($2.13 tipped minimum wage) | Medium (between $2.13 and regular state minimum wage) | Equal treatment (tipped minimum wage = regular state minimum wage) |
| *All workers* | 6.7% | 7.2% | 6.2% | 7.0% |
| *Non-tipped workers* | 6.5% | 7.0% | 6.0% | 6.8% |
| *Tipped workers* | 12.8% | 14.5% | 12.5% | 10.8% |
| *Waiters/ bartenders* | 14.9% | 18.0% | 14.4% | 10.2% |

**Source:** Authors' analysis of Current Population Survey Annual Social and Economic Supplement microdata, 2010–2012

---

mum wage, compared with 14.4 percent in medium-tipped-wage states and 10.2 percent in equal treatment states that do not allow for a lesser tipped minimum wage. This pattern strongly suggests that higher tipped wages mitigate poverty to some extent, yet it is still the case that poverty among tipped workers is far too high even in states that do not allow for a subminimum wage.

VIEW INTERACTIVE *on epi.org*

**Poverty rates of non-tipped workers, tipped workers, and waiters and bartenders, by state tipped-minimum-wage level**



Source: Authors' analysis of Current Population Survey Annual Social and Economic Supplement microdata, 2010–2012

ECONOMIC POLICY INSTITUTE

## Public-support programs

When workers do not earn enough in wages to make ends meet, they are often forced to rely on publicly provided support programs. While it is a good thing that workers faced with challenging circumstances can turn to these programs for assistance, these programs were not designed to serve as a permanent wage subsidy or part of the business strategy for low-wage employers. Using the Current Population Survey Annual Social and Economic Supplement, we calculated the share of the workforce, non-tipped workers, and tipped workers who receive some publicly funded benefits—such as federal housing or energy subsidies, the earned income tax credit (EITC), school lunch subsidies, Supplemental Nutrition Assistance Program (SNAP) benefits (i.e., "food stamps"), or Supplemental Nutrition Program for Women, Infants, and Children (WIC) benefits—to meet their family needs. As reported in **Table 6**, 35.5 percent of non-tipped workers and their families rely on public benefits, compared with 46.0 percent and 46.2 percent, respectively, of tipped workers in general and waiters/bartenders in particular. Tipped workers receiving some public assistance get about $475 more, on average, in benefits than non-tipped workers who receive aid; waiters and bartenders receive over $600 more, on average, than non-tipped workers receiving aid.[13]

## Job quality

We have shown thus far that tipped workers are subject to low pay, low levels of total family income, and a greater likelihood of being in poverty. It is also the case that tipped workers are much less likely to have workplace benefits, as shown

TABLE 6

**Receipt of federal assistance for all workers, tipped and non-tipped workers, and waiters/bartenders**

| | Share of workers receiving some federal assistance* | Average total value of federal assistance |
|---|---|---|
| *All workers* | 35.9% | $2,122 |
| *Non-tipped workers* | 35.5% | $2,114 |
| *Tipped workers* | 46.0% | $2,588 |
| *Waiters/bartenders* | 46.2% | $2,724 |

\* Receipt of some federal assistance indicates the worker or worker's family receives income from federal housing subsidies; the earned income tax credit (EITC); energy subsidies (LIHEAP); school lunch subsidies; SNAP (food stamps); or the Supplemental Nutrition Program for Women, Infants, and Children (WIC).

**Note:** Average values are the sum of reported dollar values or imputed fair market values for all programs. Figures are in 2013 dollars, deflated by CPI-U-RS.

**Source:** Authors' analysis of Current Population Survey Annual Social and Economic Supplement microdata, 2010–2012

in **Figure F**. The Bureau of Labor Statistics National Compensation Survey (NCS) reports benefits for all private-sector workers and benefits by various establishment and worker characteristics, including a breakout for "accommodation and food services (AFS)"—a sector with the majority of tipped workers.[14] The NCS reports that two of the most common benefits offered to workers are paid vacations and paid holidays—each offered to 77.0 percent of private-sector workers. But among workers in accommodation and food services, just 45.0 percent and 36.0 percent are offered paid vacations and paid holidays, respectively—and these figures are for all workers in that industry, including managers and supervisors.

Health care and retirement benefits are crucial to most workers, but they are offered to just a fraction of AFS workers—30.0 percent and 27.0 percent, respectively, compared with 70.0 percent and 64.0 percent, respectively, of other private-sector workers. Given that the majority of tipped workers are wait staff and bartenders who handle food and drink, it is particularly unfortunate—and potentially dangerous—that their industry does not provide widespread access to paid sick leave; just 23.0 percent of AFS workers receive paid sick leave, compared with 61.0 percent of the total private-sector workforce.

As we've shown, many tipped workers are parents—many single parents—with low family incomes; thus, life insurance and short-term disability protection would be particularly important to these workers and their families, especially given the physical nature of their work. Life insurance and short-term disability protection are offered to 57.0 percent and 40.0 percent of private-sector workers, yet only 17.0 percent and 19.0 percent, respectively, of AFS workers.

Again, while the shares of workers in the broad category of accommodation and food services (which includes managers, supervisors, etc.) who have access to these benefits are very low, we would likely find that the shares of tipped workers and waiters/bartenders with access are even lower, if such data were available.[15]



FIGURE F

**VIEW INTERACTIVE** *on epi.org*

**Share of all private-sector workers and workers in the accommodation and food services industry with various employer-provided benefits, 2013**

Legend:
- All private-sector workers
- Workers in accommodation and food services (AFS)

| Benefit | All private-sector workers | Workers in AFS |
|---|---|---|
| Paid vacations | 77% | 45% |
| Paid holidays | 77% | 36% |
| Health care | 70% | 30% |
| Retirement | 64% | 27% |
| Paid sick leave | 61% | 23% |
| Life insurance | 57% | 17% |
| Short-term disability | 40% | 19% |

**Note:** These data represent all workers within the accommodation and food services sector, including managers and supervisors. It is likely that these shares would be much lower if they reflected access for tipped workers only.

**Source:** U.S. Bureau of Labor Statistics National Compensation Survey 2013 data

ECONOMIC POLICY INSTITUTE

## Other challenges for tipped workers

Tipped workers face a number of other unique challenges in the workplace. As mentioned earlier, in states that allow for a subminimum wage, a tipped worker's tips plus her base or tipped wage must equal at least the regular state minimum wage—if not, her employer must make up the difference. However, tipped workers are often unaware that their tips and base wage must sum to at least the regular minimum wage. This regulation is hard to implement in practice, both because it is logistically difficult to do so and because it is up to the worker to request that her employer make up the difference. To determine compliance with the FLSA's wage requirements, the total of tips plus the subminimum base wage is to be assessed on a workweek basis.[16] A workweek is defined as any fixed and regularly recurring 168-hour period. But many tipped workers work irregular schedules, and the practical implementation of this regulation is unclear; at what point does an employer stop the clock to tally up hours, tips, and base wages? Compliance is difficult to assess even if a good-faith employer would like to do so.

Moreover, a tipped employee seeking to monitor her employer's compliance with the law would need to record her hours for the determined workweek—erratic schedules notwithstanding—record all tips she receives (how employees should treat tips shared with other staff, such as restaurant bussers or bar-backs, in this calculation is also unclear), record the base wage she was paid from her employer, and calculate if the effective hourly rate equaled the required state

or federal minimum wage. If it did not, this employee would have to approach her employer seeking the missing pay. Of course, this is the same employer who determines whether this employee will be given the most lucrative shifts, the best restaurant sections (in the case of waiters and waitresses), or if the employee will retain her job at all. It is unrealistic to think that a tipped employee dealing with an unscrupulous employer would be able to reclaim her lost wages, let alone confront someone with such power over her near-term financial health.

Indeed, the restaurant industry is fraught with violations. In the most recent (2010–2012) compliance sweep of nearly 9,000 full-service restaurants by the U.S. Department of Labor's Wage and Hour Division (WHD), 83.8 percent of investigated restaurants had some type of violation. In total, WHD recovered $56.8 million in back wages for nearly 82,000 workers and assessed $2.5 million in civil money penalties. Violations included 1,170 tip credit infractions that resulted in nearly $5.5 million in back wages.[17]

Research has also shown that the practice of tipping is often discriminatory, with white service workers receiving larger tips than black service workers for the same quality of service (Lynn et al. 2008). The worker advocacy group Restaurant Opportunities Centers (ROC) United has published numerous testimonies from both tipped and non-tipped workers in the restaurant industry that anecdotally describe these problems. ROCs "Behind the Kitchen Door" worker survey reports echo what is found in much of the data presented here: Workers report an array of problems, from low earnings and low to no benefits, to overtime violations, working off the clock, and issues of safety (ROC various years; Jayaraman 2013).

## Should we have a tipped minimum wage?

The results obtained here are informative for policy. The Harkin–Miller minimum-wage bill proposes to increase the regular federal minimum wage from $7.25 to $10.10 in three 95-cent steps. The bill would also reconnect the severed historical link between the tipped and the regular minimum wages by raising the former to 70 percent of the latter over six years. This would certainly improve the situation for tipped workers, adding greater stability to their income and boosting their total pay. Contrary to claims from industry advocates, research has shown that increasing the tipped minimum wage would boost earnings for tipped-wage workers without unduly harming employment, particularly full-service restaurant employment (Allegretto 2013).

Yet given all the problems that the current two-tiered wage system creates, it appears prudent to simply do away with the tipped minimum wage and have tipped workers nationwide be paid the regular minimum wage. Industry advocates may claim that this would be damaging for businesses that employ tipped workers, but the data do not support this claim. From January 1995 to May 2014, employment in the leisure and hospitality sector—a sector with a high concentration of tipped workers—grew by 41 percent nationwide, far faster than total U.S. nonfarm employment growth of roughly 19 percent. Over that period, leisure and hospitality employment grew 43.2 percent in the seven "equal treatment" states without subminimum wages, compared with 39.2 percent growth in the 43 states (plus the District of Columbia) that have lower minimum wages for tipped workers.[18] In other words, the sector that comprises the bulk of tipped employment actually grew faster in states where tipped workers received the regular minimum wage than it did in states with a lower tipped minimum wage.[19] Moreover, the restaurant industry itself projects higher growth rates in these "equal treatment" states than in those with subminimum wages (National Restaurant Association 2014).[20]

# Conclusion

This report explored the history and rationale for the subminimum wage earned by workers who receive tips for their services. The federal tipped minimum wage was originally set at 50 percent of the regular minimum wage. Today, the subminimum wage for tipped workers is a mere $2.13 an hour, where it has been for 23 years. Over that time, its value has eroded to just 29.4 percent of the regular minimum wage that applies to non-tipped workers. Still, many states have enacted tipped minimum wages above $2.13. This report shows that tipped workers receive higher total wages and have lower levels of poverty in states where the tipped minimum wage is relatively high.

Often, discussion and action surrounding the minimum wage ignores or excludes tipped workers and the subminimum wage they receive. Yet this is a growing occupational sector, and effective policy could transform the low-wage, high-poverty jobs in the sector into better quality jobs. Much of tipped employment is the epitome of "just-in-time" employment—adjusting staffing levels on an immediate basis in response to customer flows. While this may be good for the employer, it is far less beneficial for workers because it can produce highly unpredictable work hours, and thus highly unpredictable pay. Wage volatility is further exacerbated by workers' reliance on tips from customers, which also vary considerably. A tipped worker's paycheck can vary wildly depending on the fluctuations of customer tips and assigned shifts, making it difficult for tipped workers to budget, or make investments that require more stable and predictable income levels—such as buying a home or a car, or seeking further education.

In real terms, the U.S. minimum and subminimum wage floors have long been in decline, exacerbating the general stagnation or decline of wages for the vast majority of American workers, particularly low-wage workers. Even the broader world is taking notice, as the International Monetary Fund (2014) recently recommended that the U.S. minimum wage be increased, given its current low level (compared both with its historical values and international standards). The Organization for Economic Cooperation and Development (2014) has also recommended an increase in the U.S. minimum wage as a measure to improve job quality and workers' well-being. Reports from the Congressional Budget Office (2014) as well as research from academia (Dube 2013) conclude that raising the wage floor would lift hundreds of thousands, if not millions, out of poverty.

For all these reasons, it is perhaps no surprise that polling consistently shows that most Americans (73 percent) would like to see a minimum-wage hike (Pew Research Center 2014). To the best of our knowledge, there has not been a poll conducted specifically on changing the $2.13 tipped wage, but in all likelihood, this is simply another indication of the lack of public awareness on this issue. We cannot help but wonder whether, if more Americans knew the exceptionally low base wages being paid to tipped workers, they might prefer these employers pay tipped workers a higher base wage, and let tips once again be simply an expression of gratitude for good service. We suspect most would agree that the consumer subsidy to these employers has grown for too long.

It is certainly time to raise both wage floors, but given the dramatic differences in living standards for tipped versus non-tipped workers, we question whether there should be a two-tiered wage system at all. Tipped workers in the seven "equal treatment" states appear to be noticeably better off than their counterparts in the rest of the country, receiving higher total wages and experiencing poverty at significantly lower rates. At the same time, industries that employ tipped workers in these states are thriving. Raising the tipped minimum wage up to a higher percentage of the regular mini-

mum wage would be a step in the right direction, but perhaps we should simply eliminate the tipped minimum wage altogether, and give tipped workers the same basic protection afforded to other workers.

*— The Economic Policy Institute gratefully acknowledges the generous support it received from the **Ford Foundation** for this project.*

## About the authors

**Sylvia A. Allegretto, Ph.D.** is an economist and co-director of the Center on Wage and Employment Dynamics at the Institute for Research on Labor and Employment at the University of California, Berkeley. She is also a research associate of the Economic Policy Institute and is co-author of many EPI publications, including past editions of *The State of Working America*, *How Does Teacher Pay Compare?*, and *The Teaching Penalty: Teacher Pay Losing Ground*.

*The **Center on Wage and Employment Dynamics** is a center at the Institute for Research on Labor and Employment at the University of California, Berkeley. CWED was established in 2007 to provide a focus for research projects on wage and employment dynamics in contemporary labor markets. Current research topics include minimum wage impacts, tipped worker labor markets, transformation of retail labor markets, health insurance and health policy, immigration, worker turnover and job training, labor relations and productivity, and models of low-wage labor markets.*

**David Cooper** is an economic analyst with the Economic Policy Institute. He conducts national and state-level research on a variety of issues, including the minimum wage, employment and unemployment, poverty, and wage and income trends. He also provides support to the Economic Analysis and Research Network (EARN) on data-related inquiries and quantitative analyses. David has been interviewed and cited by local and national media for his research on the minimum wage, poverty, and U.S. economic trends. His graduate research focused on international development policy and intergenerational social mobility. He holds a Master of Public Policy degree from Georgetown University.

*The **Economic Policy Institute** is a nonprofit, nonpartisan think tank that seeks to broaden the public debate about strategies to achieve a prosperous and fair economy. EPI stresses real-world analysis and a concern for the living standards of working people, and it makes its findings accessible to the general public, the media, and policymakers through books, studies, and popular education materials.*

## Appendices

**Appendix Table A1** shows each state's minimum-wage and tipped-minimum-wage level, as of January 1, 2014.

The Current Population Survey does not explicitly identify tipped workers. Rather, there is a variable that indicates workers who regularly receive tips, overtime, or commissions. In order to identify workers who are likely to be tipped, we first looked at all occupations that had a high share receiving tips, overtime, or commissions. From this group, we selected those occupations that were most likely to receive tips, as shown in **Appendix Table A2**.

### Federal and state minimum-wage and tipped-minimum-wage levels (as of January 1, 2014)

| State | Regular minimum wage | Tip credit for employers | Tipped minimum wage | Tipped minimum as a share of regular minimum wage |
|---|---|---|---|---|
| United States | $7.25 | $5.12 | $2.13 | 29.4% |
| Alabama | 7.25 | 5.12 | 2.13 | 29.4% |
| Alaska | 7.75 | 0.00 | 7.75 | 100.0% |
| Arizona | 7.90 | 3.00 | 4.90 | 62.0% |
| Arkansas | 7.25 | 4.62 | 2.63 | 36.3% |
| California | 8.00 | 0.00 | 8.00 | 100.0% |
| Colorado | 8.00 | 3.02 | 4.98 | 62.3% |
| Connecticut* | 8.70 | 3.01 | 5.69 | 65.4% |
| Delaware | 7.25 | 5.02 | 2.23 | 30.8% |
| District of Columbia | 9.50 | 6.73 | 2.77 | 29.2% |
| Florida | 7.93 | 3.02 | 4.91 | 61.9% |
| Georgia | 7.25 | 5.12 | 2.13 | 29.4% |
| Hawaii | 7.25 | 0.25 | 7.00 | 96.6% |
| Idaho | 7.25 | 3.90 | 3.35 | 46.2% |
| Illinois | 8.25 | 3.30 | 4.95 | 60.0% |
| Indiana | 7.25 | 5.12 | 2.13 | 29.4% |
| Iowa | 7.25 | 2.90 | 4.35 | 60.0% |
| Kansas | 7.25 | 5.12 | 2.13 | 29.4% |
| Kentucky | 7.25 | 5.12 | 2.13 | 29.4% |
| Louisiana | 7.25 | 5.12 | 2.13 | 29.4% |
| Maine | 7.50 | 3.75 | 3.75 | 50.0% |
| Maryland | 7.25 | 3.62 | 3.63 | 50.1% |
| Massachusetts | 8.00 | 5.37 | 2.63 | 32.9% |
| Michigan | 7.40 | 4.75 | 2.65 | 35.8% |
| Minnesota | 7.25 | 0.00 | 7.25 | 100.0% |
| Mississippi | 7.25 | 5.12 | 2.13 | 29.4% |
| Missouri | 7.50 | 3.75 | 3.75 | 50.0% |
| Montana | 7.90 | 0.00 | 7.90 | 100.0% |
| Nebraska | 7.25 | 5.12 | 2.13 | 29.4% |
| Nevada | 8.25 | 0.00 | 8.25 | 100.0% |
| New Hampshire | 7.25 | 3.99 | 3.26 | 45.0% |
| New Jersey | 8.25 | 6.12 | 2.13 | 25.8% |
| New Mexico | 7.50 | 5.37 | 2.13 | 28.4% |
| New York** | 8.00 | 3.10 | 4.90 | 61.3% |
| North Carolina | 7.25 | 5.12 | 2.13 | 29.4% |
| North Dakota | 7.25 | 2.39 | 4.86 | 67.0% |
| Ohio | 7.95 | 3.98 | 3.98 | 50.0% |
| Oklahoma | 7.25 | 5.12 | 2.13 | 29.4% |

| State | Regular minimum wage | Tip credit for employers | Tipped minimum wage | Tipped minimum as a share of regular minimum wage |
|-------|----------------------|--------------------------|---------------------|---------------------------------------------------|
| Oregon | 9.10 | 0.00 | 9.10 | 100.0% |
| Pennsylvania | 7.25 | 4.42 | 2.83 | 39.0% |
| Rhode Island | 8.00 | 5.11 | 2.89 | 36.1% |
| South Carolina | 7.25 | 5.12 | 2.13 | 29.4% |
| South Dakota | 7.25 | 5.12 | 2.13 | 29.4% |
| Tennessee | 7.25 | 5.12 | 2.13 | 29.4% |
| Texas | 7.25 | 5.12 | 2.13 | 29.4% |
| Utah | 7.25 | 5.12 | 2.13 | 29.4% |
| Vermont | 8.73 | 4.50 | 4.23 | 48.5% |
| Virginia | 7.25 | 5.12 | 2.13 | 29.4% |
| Washington | 9.32 | 0.00 | 9.32 | 100.0% |
| West Virginia | 7.25 | 1.45 | 5.80 | 80.0% |
| Wisconsin | 7.25 | 4.92 | 2.33 | 32.1% |
| Wyoming | 7.25 | 5.12 | 2.13 | 29.4% |

\* Connecticut has a higher $7.34 tipped minimum wage for bartenders only.

\*\* New York has a tipped minimum wage of $5.00 for "food service workers" and $5.65 for "service employees."

**Note:** For states that do not have a state minimum wage or a minimum wage that is less than the federal minimum, we report the federal standards because most workers in these states are legally required to be paid the federal rate.

**Source:** Authors' analysis of U.S. Department of Labor (2014)

## Wages and gender composition of predominantly tipped occupations

| Occupation | Employment | Share of tipped workers | Median wage | 10th percentile wage | Women | Women as a share of employment |
|---|---|---|---|---|---|---|
| *All workers, tipped and non-tipped occupations* | 127,063,149 | - | $16.48 | $8.45 | 61,377,151 | 48.3% |
| **Predominantly tipped occupations** | | | | | | |
| *Massage therapists* | 88,151 | 2.0% | $14.22 | $7.92 | 71,505 | 81.1% |
| *Bartenders* | 393,102 | 9.1% | $12.02 | $6.99 | 229,676 | 58.4% |
| *Waiters and waitresses* | 2,122,427 | 48.9% | $9.93 | $5.71 | 1,492,454 | 70.3% |
| *Dining room, cafeteria attendants, and bartender helpers in hospitality industries* | 244,953 | 5.6% | $8.79 | $6.46 | 72,763 | 29.7% |
| *Hosts and hostesses, restaurant, lounge, and coffee shop* | 283,677 | 6.5% | $8.64 | $ 6.87 | 242,305 | 85.4% |
| *Gaming service workers* | 106,252 | 2.4% | $14.69 | $7.93 | 51,478 | 48.4% |
| *Barbers* | 59,002 | 1.4% | $10.41 | $5.93 | 13,919 | 23.6% |
| *Hairdressers, hairstylists, and cosmetologists* | 483,312 | 11.1% | $11.90 | $7.10 | 455,006 | 94.1% |
| *Miscellaneous personal appearance workers* | 227,634 | 5.2% | $10.80 | $7.24 | 187,776 | 82.5% |
| *Personal care and service workers, all other* | 73,854 | 1.7% | $10.24 | $7.18 | 35,826 | 48.5% |
| *Taxi drivers and chauffeurs* | 260,901 | 6.0% | $11.95 | $7.52 | 38,207 | 14.6% |
| *Total predominantly tipped workers* | 4,343,264 | 100.0% | $10.22 | $6.49 | 2,890,915 | 66.6% |

**Note:** The tipped occupations listed here, and used in this report, are the same as those used in CBO (2014).

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, pooled sample 2011–2013

# Endnotes

**1.** Legislation originally enacted in 1966 required that a worker had to customarily and regularly earn at least $20 a month in tips for their employers to qualify for the tip credit. This was raised to $30 a month in 1978. Adjusted for inflation, that $20 minimum would now be about $146.34 per month.

**2.** If a tipped employee's tips plus her base wage do not sum to at least the full minimum wage in any two-week period, the tipped worker's employer is required to make up the difference through a higher base wage; however, as explained in later sections, this intended safeguard is fraught with problems.

**3.** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2013

**4.** Bureau of Labor Statistics, Quarterly Census of Employment and Wages data, 1990Q1 to 2013Q1

**5.** Authors' analysis of Local Area Unemployment Statistics data from the Bureau of Labor Statistics

**6.** For more historical information, see Allegretto and Filion (2011).

**7.** The scenarios are always changing as federal and/or state wage polices are adopted; the map depicts the wage policies as of January 1, 2014. Some states have already legislated both regular and tipped-minimum-wage increases that will occur over the next several years.

**8.** There are variations within state policy. For example, Nevada, a no tip credit state, has a wage floor of $7.25 for workers with or $8.25 without employer-provided health insurance.

**9.** It is important to keep in mind that not all tipped workers have been identified because the Current Population Survey does not have a unique identifier for such a distinction. The CPS includes a variable that identifies persons who usually receive "overtime pay, tips or commissions." Likely tipped workers were identified using this variable along with additional analysis. There are other workers, especially in the restaurant industry or food service occupations (such as bussers, delivery workers, and runners) who may also be tipped workers—even though their tips may come indirectly from wait staff, instead of directly from customers.

**10.** In Allegretto and Filion (2011), we included slightly fewer occupational categories as predominantly tipped occupations. White House (2014) uses this slightly smaller set of predominantly tipped occupations as well; however, CBO (2014) employs the broader set of tipped occupations listed in Appendix Table A2. We analyzed demographic characteristics, wage rates, poverty rates, and public transfer receipt rates between the two sets of predominantly tipped occupations and found that they were not substantially different, and thus opted to use the set of occupations consistent with the CBO's definition of tipped workers.

**11.** All wage values in this report reflect total wages, i.e., base wages plus tips.

**12.** In 2013, the 30th percentile wage for U.S. workers was $12.00, according to data from the Current Population Survey.

**13.** These findings are similar to those in *Fast Food, Poverty Wages* by Allegretto et al. (2013a). In that paper, it was estimated that 25 percent of working families rely on public benefits (Medicaid, Children's Health Insurance Program [CHIP], federal EITC, SNAP, and Temporary Assistance for Needy Families [TANF]), while the share rises considerably to 52 percent among fast-food workers and their families. That study was restricted to workers who worked at least 27 weeks per year and at least 10 hours per week. Using the same data and methodology from the fast-food worker study, we estimate that 40 percent of tipped workers and their families, and 42 percent of waiters/bartenders and their families, receive public benefits to make ends meet—again compared with 24 percent of working families in general.

**14.** The industry sector of accommodation and food services captures many tipped workers but also non-tipped workers and staff such as managers who are likely to have higher wages and benefits. These data are from an unpublished NCS report on 2013 benefits (forthcoming in 2014).

**15.** We requested figures from the BLS for tipped workers and/or wait staff from the NCS, but sample sizes were too small for these populations by themselves.

**16.** See, e.g., 29 U.S.C. 206(a) in the FLSA (http://bit.ly/1qoLKwH).

**17.** Email correspondence with U.S. Department of Labor program analysts from the Wage and Hour Division

**18.** Authors' analysis of Local Area Unemployment Statistics (LAUS) data from the Bureau of Labor Statistics

**19.** We do not mean to imply any sort of causal relationship here, and looking at changes in specific industries within the leisure and hospitality sector or over different timeframes might yield different results. There are undoubtedly other factors correlated with state tipped-wage policies influencing employment growth between these groups of states. A more precise inquiry into the relationship between tipped-wage policies and employment that controls for these factors is beyond the scope of this paper. However, Allegretto (2014) examines this specific question with an appropriate set of controls and finds no significant effect on employment from higher tipped minimum wages. The relevant point here is that if paying the regular minimum wage to tipped workers were significantly harmful to these industries, we would expect these harmful effects to be readily apparent—and they are not.

**20.** For more information, see ROC United (2014).

# References

Allegretto, Sylvia A., and Kai Filion. 2011. *Waiting for Change: The $2.13 Federal Subminimum Wage*. Economic Policy Institute and Center for Wage and Employment Dynamics, Briefing Paper #297. http://www.epi.org/publication/waiting_for_change_the_213_federal_subminimum_wage/

Allegretto, Sylvia A. 2013. *Waiting for Change: Is It Time to Increase the $2.13 Subminimum Wage?* Institute for Research on Labor and Employment, Working Paper No. 155-13. http://irle.berkeley.edu/workingpapers/155-13.pdf

Allegretto, Sylvia A., Marc Doussard, Dave Graham-Squire, Ken Jacobs, Dan Thompson, and Jeremy Thompson. 2013a. *Fast Food, Poverty Wages: The Public Cost of Low-Wage Jobs in the Fast-Food Industry*. Center for Labor Research and Education. http://laborcenter.berkeley.edu/publiccosts/fastfoodpovertywages.shtml

Allegretto, Sylvia, Arindrajit Dube, Michael Reich, and Ben Zipperer. 2013b. *Credible Research Designs for Minimum Wage Studies*. IRLE Working Paper No. 148-13. http://irle.berkeley.edu/workingpapers/148-13.pdf

Bivens, Josh, Elise Gould, Lawrence Mishel, and Heidi Shierholz. 2014. *Raising America's Pay: Why It's Our Central Economic Policy Challenge*. Economic Policy Institute, Briefing Paper #378. http://www.epi.org/publication/raising-americas-pay/

Bureau of Labor Statistics. Various years. Local Area Unemployment Statistics. http://www.bls.gov/lau/ststdsadata.txt

Bureau of Labor Statistics. Various years. Quarterly Census of Employment and Wages. http://www.bls.gov/cew/

Bureau of Labor Statistics. 2014 [forthcoming]. *National Compensation Survey: Employee Benefits in the United States*. Unpublished data forthcoming summer 2014.

Congressional Budget Office (CBO). 2014. *The Effects of a Minimum-Wage Increase on Employment and Family Income*. http://www.cbo.gov/publication/44995

Current Population Survey Annual Social and Economic Supplement microdata. Various years. Survey conducted by the Bureau of the Census for the Bureau of Labor Statistics [machine-readable microdata file]. Washington, D.C.: U.S. Census Bureau. http://www.bls.census.gov/cps_ftp.html#cpsmarch

Current Population Survey Outgoing Rotation Group microdata. Various years. Survey conducted by the Bureau of the Census for the Bureau of Labor Statistics [machine-readable microdata file]. Washington, D.C.: U.S. Census Bureau. http://www.bls.census.gov/cps_ftp.html#cpsbasic

Dube, Arindrajit. 2013. *Minimum Wages and the Distribution of Family Incomes*. University of Massachusetts Amherst, Working Paper. https://dl.dropboxusercontent.com/u/15038936/Dube_MinimumWagesFamilyIncomes.pdf

International Monetary Fund (IMF). 2014. "Article IV Consultation with the United States of America Concluding Statement of the IMF Mission." Accessed June 19, 2014. http://www.imf.org/external/np/ms/2014/061614.htm

Jayaraman, Saru, and Eric Schlosser. 2013. *Behind the Kitchen Door*. Ithaca, N.Y.: ILR Press.

Lynn, M., M. Sturman, C. Ganley, E. Adams, M. Douglas, and J. McNeil. 2008. "Consumer Racial Discrimination in Tipping: A Replication and Extension." *Journal of Applied Social Psychology*, vol. 38, 1045–1060. http://onlinelibrary.wiley.com/doi/10.1111/j.1559-1816.2008.00338.x/full

National Conference of State Legislatures. 2014. "State Minimum Wages" [data table accessed June 18, 2014]. http://www.ncsl.org/research/labor-and-employment/state-minimum-wage-chart.aspx

National Restaurant Association. 2014. *2014 Restaurant Industry Forecast.*

Organization for Economic Cooperation and Development (OECD). 2014. *OECD Economic Surveys: United States 2014.* http://dx.doi.org/1.1781/econ_surveys-usa-2014-en

Pew Research Center. 2014. "Most See Inequality Growing, but Partisans Differ over Solutions." January 23. http://www.people-press.org/2014/01/23/most-see-inequality-growing-but-partisans-differ-over-solutions/

Restaurant Opportunities Centers (ROC) United. Various years. http://rocunited.org/research-resources/our-reports/.

Restaurant Opportunities Centers (ROC) United. 2014. "Recipe for Success: Abolish the Subminimum Wage to Strengthen the Restaurant Industry." http://rocunited.org/recipeforsuccess/

United States Department of Labor, Wage and Hour Division. Various years. "Fair Labor Standards Act." http://www.dol.gov/whd/flsa/

United States Department of Labor, Wage and Hour Division. 2014. "Minimum Wages for Tipped Employees" [web page], accessed June 1. http://www.dol.gov/whd/state/tipped.htm

White House. 2014. *The Impact of Raising the Minimum Wage on Women and the Importance of Ensuring a Robust Tipped Minimum Wage.* http://www.whitehouse.gov/sites/default/files/docs/20140325minimumwageandwomenreportfinal.pdf

Whittaker, William G. 2006. *The Tip Credit Provisions of the Fair Labor Standards Act.* Congressional Research Service Report for Congress.