1    J. Leah Castella (SBN 205990)
     E-mail: lcastella@bwslaw.com
2    Benjamin L. Stock (SBN 208774)
     E-mail: bstock@bwslaw.com
3    BURKE, WILLIAMS & SORENSEN, LLP
     1901 Harrison Street, Suite 900
4    Oakland, CA 94612-3501
     Tel: 510.273.8780  Fax: 510.839.9104
5

6    Attorneys for Defendant
     CITY OF EMERYVILLE

7    Paul L. More (SBN 228589
     E-mail: pmore@msh.law
8    McCRACKEN, STEMERMAN & HOLSBERRY, LLP
     595 Market Street, Suite 800
9    San Francisco, CA 94105
     Tel: 415.597.7200  Fax: 415.597.7201
10

11    Attorneys for Intervenor
     UNITE HERE LOCAL 2850

FILING FEE EXEMPT PURSUANT TO
GOVERNMENT CODE § 6103

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION, a California nonprofit mutual benefit corporation,<br><br>                Plaintiff,<br><br>v.<br><br>CITY OF EMERYVILLE, a California municipal corporation,<br><br>                Defendant. | Case No. 3:16-cv-06660-JST<br><br>**DEFENDANT CITY OF EMERYVILLE'S** *SUPPLEMENTAL* **APPENDIX OF NON-FEDERAL AUTHORITIES IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>**Date:    March 23, 2017**<br>**Time:   2:00 p.m.**<br>**Place:  Courtroom 9 – 19th Floor** |

      Defendant City of Emeryville hereby submits the following Supplemental Appendix of Non-Federal Authorities in Support of Motion to Dismiss Plaintiff's Complaint.

<u>**CASES**</u>                                                                                                    <u>**Exhibit**</u>

*Henning v. Industrial Welfare Comm'n,*
     46 Cal.3d 1262, 1279 (1988)........................................................................... 1

*Walgreens Co. v. City and County of San Francisco*
     185 Cal. App. 4th 424 (2010)........................................................................... 2

///

**STATUTES** **Exhibit**

Cal. Rev. & Tax Code, § 6012(a)(2) ............................................................................ 3

**OTHER AUTHORITIES**

BOE Publication 115, Tips, Gratuities, and Service Charges (May 2015),
    available at: https://www.boe.ca.gov/formspubs/pub115/ .............................. 4

California Restaurant Association Website, available at:
    http://www.calrest.org/mandatory-service-charges-vs-tips.html ..................... 5

Ronald Mann, *Argument analysis: Merchants seem to fall short in*
    *challenge to New York statute banning credit-card "surcharges"*
    SCOTUSblog (Jan. 11, 2017, 10:49 AM), http://www.scotusblog.com /
    2017/01/argument-analysis-merchants-seem-fall-short-challenge-new-
    york-statute-banning-credit-card-surcharges/ ................................................. 6

Sylvia Allegretto and David Cooper, *Twenty-Three Years and Still*
    *Waiting For Change: Why It's Time to Give Tipped Workers*
    *the Regular Minimum Wage* (Economic Policy Institute 2014),
    at 7, http://www.epi.org/files/2014/EPI-CWED-BP379.pdf. ........................... 7

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Oakland

SF #4846-6798-1380 v2                                - 2 -                    SUPPLEMENTAL APPENDIX OF NON-
                                                                              FED'L AUTHORITIES 3:16-CV-06660-JST

**- EXHIBIT 1 -**

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Oakland

Henning v. Industrial Welfare Com., 46 Cal.3d 1262 (1988)

762 P.2d 442, 252 Cal.Rptr. 278, 28 Wage & Hour Cas. (BNA) 1619...

46 Cal.3d 1262, 762 P.2d 442, 252 Cal.Rptr. 278, 28 Wage & Hour Cas. (BNA) 1619, 110 Lab.Cas. P 55,965

JOHN F. HENNING, Individually and as Secretary-Treasurer, etc., et al., Petitioners,

v.

INDUSTRIAL WELFARE COMMISSION et al., Respondents;

CALIFORNIA RESTAURANT ASSOCIATION et al., Interveners

No. S005119.

Supreme Court of California

Oct 31, 1988.

## SUMMARY

In original mandamus proceedings brought against the Industrial Welfare Commission and associated defendants by numerous petitioners seeking a writ to compel the commission to vacate and treat as void an order purporting to fix or allow a different minimum wage for tipped employees and to compel the Division of Labor Standards Enforcement and the Department of Industrial Relations to give effect to the minimum wage order for all employees without regard to the purported exception for tipped employees, the Court of Appeal, Third Dist., No. C004101, granted the writ. The court held that Lab. Code, § 351, as previously construed by the Supreme Court, barred the "two- tier" minimum wage system at issue.

The Supreme Court affirmed the judgment of the Court of Appeal. The court, according the commission the fullest deference justified by the facts and consistent with the court's obligation to declare the meaning of the law, held that Lab. Code, § 351, must be construed to bar the "two-tier" minimum wage system and that the commission's current interpretation of the provision was unreasonable, and void *ab initio*. It held that the Court of Appeal, while misconstruing the effect of a previous Supreme Court decision as definitively adopting the commission's former construction of the statute barring a lower minimum wage for tipped employees, correctly decided that § 351 barred the minimum wage system at issue, and correctly ordered the relief sought, i.e., the establishment of a single minimum wage of $4.25 per hour for all employees without exception. (Opinion by Mosk, J., with Lucas, C. J., Panelli, Eagleson and Kaufman, JJ., concurring. Separate concurring opinion by Broussard, J., with Arguelles, J., concurring.)

## HEADNOTES

### Classified to California Digest of Official Reports

(1)

Labor § 6--Regulation of Working Conditions--Industrial Welfare Commission--Quasi-legislative Authority.
In fulfilling its broad statutory mandate, the Industrial Welfare Commission engages in a quasi-legislative endeavor, a task which requires the exercise of a considerable degree of policy-making judgment and discretion. Because of the nature of the commission's authority, judicial review of wage orders is properly circumscribed. A reviewing court does not superimpose its own policy judgment on a quasi-legislative agency in the absence of an arbitrary decision; rather, the review is limited to an examination of the proceedings to determine whether the action is arbitrary or entirely lacking in evidentiary support or whether the agency has violated the procedure required by law; in these technical matters requiring the assistance of experts and the collection and study of statistical data, courts let administrative boards and officers work out their problems with as little judicial interference as possible.

(2)

762 P.2d 442, 252 Cal.Rptr. 278, 28 Wage & Hour Cas. (BNA) 1619...

Labor § 6--Regulation of Working Conditions--Industrial Welfare Commission--Liberal Construction.
In light of the legislative enactments authorizing the regulation of wages, hours, and working conditions by the Industrial Welfare Commission for the protection and benefit of employees, the statutory provisions are to be liberally construed to promote such protection. Remedial statutes such as those governing the adoption of wage orders are to be liberally construed. They are not construed within narrow limits of the letter of the law, but rather are to be given liberal effect to promote the general object sought to be accomplished. Regulations and orders of the commission are presumed to be reasonable and lawful.


(3)
Administrative Law § 10--Administrative Construction and Interpretation of Laws.
The construction of a statute by officials charged with its administration is entitled to great weight. Indeed, if a court concludes that the administrative construction is reasonable, it will generally defer to the agency's judgment and uphold its interpretation against challenge.


(4)
Administrative Law § 10--Administrative Construction and Interpretation of Laws--Change of Interpretation.
In the general case an administrative agency may change its interpretation of a statute, rejecting an old construction and adopting a new one. Even when an agency adopts a new interpretation of a statute and rejects an old interpretation, a court must continue to apply a deferential standard of review. There is an exception to the rule, however: an administrative agency is precluded from changing its mind when the construction that it would reject has been definitively adopted by a court as its own, since the ultimate interpretation of a statute is an exercise of the judicial power.


(5)
Labor § 10--Regulation of Working Conditions--Single Minimum Wage.
The Industrial Welfare Commission is generally not required to fix a single minimum wage for all employees. In Cal. Const., art. 14, § 1, the Legislature has been given broad power in this area which it has delegated to the commission in Lab. Code, §§ 1173 and 1178. Neither the Constitution nor the code imply a single-minimum-wage requirement with reasonable clarity.


(6)
Administrative Law § 10--Administrative Construction and Interpretation of Laws--Noncontemporaneous Interpretation.
When an administrative interpretation of a statute is not a contemporaneous one and in fact flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the statute, its construction cannot command significant deference from the courts.


(7)
Labor § 10--Regulation of Wages--Two-tier Minimum Wage System--Tipped Employees--Validity.
An order of the Industrial Welfare Commission which established a so-called "two-tier" minimum wage system containing a lower, "alternative minimum wage" for certain employees who customarily receive tips, was barred by Lab. Code, § 351, and was void *ab initio.* The words and legislative history of § 351 in its current and previous forms reveal a legislative intent that tips belong to the employee, and the commission may not permit an employer to obtain the benefit of such tips by paying a tipped employee a wage lower than he would be obligated to pay if the employee did not receive tips. The commission may not permit an employer to use a "tip credit" to pay a tipped employee a wage lower than a minimum wage he would be obligated to pay if the employee did not receive tips. In view of the legislative intent underlying § 351 in its current form, the commission's construction of the provision to permit the "two-tier" minimum

Henning v. Industrial Welfare Com., 46 Cal.3d 1262 (1988)

Case 3:16-cv-06660-JST   Document 34-1   Filed 02/28/17   Page 6 of 80

762 P.2d 442, 252 Cal.Rptr. 278, 28 Wage & Hour Cas. (BNA) 1619...

wage system at issue was unreasonable. The words and history of the statute did not reveal a legislative intent to prohibit only " tip credit" and not its effect, i.e., lower income for tipped employees.

[See **Cal.Jur.3d,** Labor §§ 30, 36; **Am.Jur.2d,** Labor and Labor Relations, § 2555.]

COUNSEL

Charles P. Scully II, Donald C. Carroll, Mark Rosenbaum, Kathryn Grannis, Fran Bernstein, Carmen Estrada, Mark Greenberg, Dennis W. Hayashi, John True, Patricia Shiu, Christopher Ho, Shauna Marshall, Patrick O. Patterson, Julius L. Chambers, James M. Nabrit III, John Charles Boger and Jon C. Dugan for Petitioners.
William Genego and Lucy White as Amici Curiae on behalf of Petitioners.
Jan T. Chilton, Donald J. Querio, John H. Feldmann III, Severson, Werson, Berke & Melchior and H. Thomas Cadell, Jr., for Respondents.
Stephen W. Solomon, Ralph B. Saltsman and Solomon, Saltsman & Jamieson as Amici Curiae on behalf of Respondents.
Alan S. Levins, Michele J. Silak, Jeffrey M. Tanenbaum and Littler, Mendelson, Fastiff & Tichy for Interveners.

**MOSK, J.**

We granted review in this proceeding to answer a question that is urgent and of statewide importance: whether Order No. MW-88 of the Industrial Welfare Commission (hereinafter the IWC or Commission), which established, effective July 1, 1988, a so-called " two-tier" minimum wage system containing a lower, "alternative minimum wage" for certain employees who customarily receive tips, is barred by Labor Code section 351 (hereinafter section 351). As we shall explain, we conclude that the question must be answered in the affirmative.

### I. The Facts

On December 18, 1987, the IWC adopted Order No. MW-88, effective July 1, 1988, raising the minimum wage from $3.35 to $4.25 per hour for employees generally and from $3.35 to $3.50 per hour for employees who customarily receive tips of not less than $60 per month (hereinafter tipped employees).

On January 22, 1988, the IWC adopted its Statement as to the Basis upon which Industrial Welfare Commission Order No. MW-88 Regulating the Minimum Wage, is Predicated (hereinafter the *Statement of Basis for Order No. MW-88*). Although the Commission had formerly construed  **\*1266**  section 351 to prohibit a lower, "alternative minimum wage" for tipped employees, it now rejected that interpretation: "creating a tipped classification did not violate Labor Code Section 351" (*Statement of Basis for Order No. MW-88, supra*, at p. 11).

On March 23 petitioners initiated this proceeding in mandate in the Court of Appeal against the IWC, the Division of Labor Standards Enforcement, and the Department of Industrial Relations. They contended that the Commission was generally required to establish a single minimum wage for all employees and hence could not set a lower, "alternative minimum wage" for some. They also contended that section 351 barred the "two-tier" minimum wage system at issue here: the Commission had formerly construed section 351 to prohibit a lower, "alternative minimum wage" for tipped employees; in *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690 [166 Cal.Rptr. 331, 613 P.2d 579] (hereinafter sometimes the *Industrial Welfare Commission* case), this court definitively adopted that construction of the statute as its own; accordingly, section 351 as construed barred the system under review. Petitioners sought a writ of mandate (1) compelling the Commission "to vacate and treat as void so much of its Order MW-88 as purports to fix or allow a different minimum wage for tipped employees" and (2) compelling the Division of Labor Standards Enforcement and the Department of Industrial Relations "to give effect to Order MW-88 for all employees without regard to the purported exception for tipped employees ...."

On May 18 the Court of Appeal granted an application to intervene brought by the California Restaurant Association (hereinafter the Restaurant Association) and the California Hotel and Motel Association (hereinafter the Hotel Association).

On June 16 the Court of Appeal filed its decision. It found meritorious the second contention presented by petitioners - viz., section 351 barred the "two-tier" minimum wage system at issue here. Evidently because of its resolution of this claim, it did not address the first - viz., whether the Commission was generally required to establish a single minimum wage for all employees. It ordered that the peremptory writ of mandate sought by petitioners should issue. Pursuant to California Rules of Court, rule 24(d), it declared its decision to be final as to itself forthwith.

On June 21 the IWC submitted a petition for review with requests for expedited consideration and for a stay of the peremptory writ. On June 23 and 24 respectively, the Restaurant and Hotel Associations submitted a stay request and a petition for review with a request for expedited consideration. **\*1267**

On June 24 we denied the stay requests as premature: under *Palma* v. *U.S. Industrial Fasteners, Inc*. (1984) 36 Cal.3d 171, 181 [203 Cal.Rptr. 626, 681 P.2d 893], it is only when the decision of the Court of Appeal becomes final as to this court as well as the Court of Appeal that the peremptory writ actually issues.

On July 1 Order No. MW-88 became effective in accordance with its terms.

On July 27, because of the urgency and importance of the underlying issue, we granted review and ordered expedited consideration.

## II. The Issue

The IWC and the Restaurant and Hotel Associations each make what is in substance the following single contention: the Commission is generally not required to establish a single minimum wage for all employees and hence may set a lower, "alternative minimum wage" for some; moreover, section 351 does not bar the "two-tier" minimum wage system at issue here: as it is currently construed by the Commission, the provision does not prohibit a lower, "alternative minimum wage" for tipped employees; this construction is reasonable and hence should be given effect; it is true the Commission's former construction barred such an "alternative minimum wage," but it is not true this court definitively adopted that construction in the *Industrial Welfare Commission* case.

Before addressing the claim we believe it would be helpful to present a brief summary of the historical background of the IWC's jurisdiction and the established legal principles that govern judicial review of its orders. We also think it is essential to survey in some detail the words and legislative history of section 351 in its current and previous forms. Finally, we believe it would be useful to review the Commission's construction, over the years, of the provision as it now stands.

### A. *Background and General Principles of Review*

To describe the historical background of the IWC's jurisdiction and explain the applicable principles of review, we shall begin by quoting from our summary in the *Industrial Welfare Commission* case.

"The IWC is a five-member appointive board initially established by the Legislature in 1913. For the first 60 years of its existence, the IWC's mission was to regulate the wages, hours and conditions of employment of *women and children* employed in this state, in furtherance of such employees' **\*1268** 'health and welfare.' To this end, the commission - beginning in 1916 - promulgated a series of industry- and occupation-wide 'wage orders,' prescribing various minimum requirements with respect to wages, hours, and working conditions to protect the health and welfare of women and child laborers. ...

"In the early 1970s, a number of federal judicial decisions invalidated a substantial portion of the then-prevailing IWC wage orders on the ground that the limited application of such orders to *women* workers (and children) violated the prohibition on sex discrimination embodied in title VII of the federal Civil Rights Act of 1964. [Citations.] In response

762 P.2d 442, 252 Cal.Rptr. 278, 28 Wage & Hour Cas. (BNA) 1619...

to these federal decisions, the California Legislature in 1972 and 1973 amended the applicable provisions of the Labor Code to authorize the IWC to establish minimum wages, maximum hours and standard conditions of employment for *all* employees in the state, men as well as women. [Citations.] The constitutionality of this legislative expansion of the IWC's jurisdiction to all California workers is explicitly confirmed by article XIV[,] section 1 of the California Constitution which declares: 'The Legislature may provide for minimum wages and for the general welfare of employees and for those purposes may confer on a commission legislative, executive and judicial powers.'

"Although the 1973 modification of the IWC's jurisdiction to encompass men as well as women and minors clearly worked a substantial expansion in the number of workers affected by the commission's orders, ... the 1973 legislation did not alter the basic nature of the IWC's decision-making authority or the basic principles governing judicial review of the commission's exercise of that authority. From its inception in 1913 to the present, the commission has been vested with broad statutory authority to investigate 'the comfort, health, safety, and welfare' of the California employees under its aegis [citation] and to establish (1) '[a] minimum wage ... which shall not be less than a wage adequate to supply ... the necessary cost of proper living and to maintain the health and welfare of such [employees],' (2) '[t]he maximum hours of work consistent with the health and welfare of [such employees]' and (3) '[t]he standard conditions of labor demanded by the health and welfare of [such employees] ... [.]' [Citation.]

"Indeed, the 1973 act - while retaining the authorizing language ... quoted above - restated the commission's responsibility in even broader terms, directing the commission continually to review and to update its 'rules, regulations and policies to the extent found by the commission to be necessary to provide *adequate and reasonable wages, hours, and working conditions appropriate for all employees in the modern society*.' (Italics added.) [Citation.]  **\*1269**

([1]) "Judicial authorities have repeatedly emphasized that in fulfilling its broad statutory mandate, the IWC engages in a quasi-legislative endeavor, a task which necessarily and properly requires the commission's exercise of a considerable degree of policy-making judgment and discretion. [Citations.]

"Because of the quasi-legislative nature of the IWC's authority, the judiciary has recognized that its review of the commission's wage orders is properly circumscribed. ... 'A reviewing court does not superimpose its own policy judgment upon a quasi-legislative agency in the absence of an arbitrary decision; rather, the review is limited to an examination of the proceedings to determine whether the action is arbitrary or entirely lacking in evidentiary support or whether the agency has violated the procedure required by law; in these technical matters requiring the assistance of experts and the collection and study of statistical data, courts let administrative boards and officers work out their problems with as little judicial interference as possible.' ...

([2]) "Moreover, past decisions additionally teach that in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection. ... 'Remedial statutes such as those under consideration [i.e., the statutes governing the adoption of wage orders] are to be liberally construed. [Citation.] They are not construed within narrow limits of the letter of the law, but rather are to be given liberal effect to promote the general object sought to be accomplished. ... [ para. ] Regulations and orders of the Industrial Welfare Commission are presumed to be *reasonable and lawful*.' (Italics in original.)" ( *Industrial Welfare Com. v. Superior Court, supra*, 27 Cal.3d at pp. 700-703, fn. omitted.)

([3]) Further, it must be emphasized "that 'the construction of a statute by officials charged with its administration ... is entitled to great weight' .... " ( *Industrial Welfare Com. v. Superior Court, supra*, 27 Cal.3d at p. 724.) Indeed, if a court concludes that the administrative construction is reasonable, it will generally defer to the agency's judgment and uphold its interpretation against challenge. (See *id*. at pp. 729-730; *Merrill v. Department of Motor Vehicles* (1969) 71 Cal.2d 907, 917, fn. 15 [80 Cal.Rptr. 89, 458 P.2d 33]; *Bodinson Mfg. Co. v. California E. Com*. (1941) 17 Cal.2d 321, 325 [109 P.2d 935].)

([4]) In the general case, of course, an administrative agency may change its interpretation of a statute, rejecting an old construction and adopting a new. (*NLRB v. Iron Workers* (1978) 434 U.S. 335, 351 [54 L.Ed.2d 586, 599, 98 S.Ct. 651]; **\*1270** *Placentia-Linda Community Hosp., Inc.* v. *Zaretsky* (1980) 107 Cal.App.3d 850, 854 [166 Cal.Rptr. 7].) Put simply, "An administrative agency is not disqualified from changing its mind ...." (*NLRB v. Iron Workers, supra*, 434 U.S. at p. 351 [54 L.Ed.2d at p. 599].)

Even when an agency adopts a new interpretation of a statute and rejects an old, a court must continue to apply a deferential standard of review: "When [the agency] does [change its mind], the courts still sit in review of the administrative decision and should not approach the statutory construction issue *de novo* and without regard to the administrative understanding of the statutes." (*NLRB v. Iron Workers, supra*, 434 U.S. at p. 351 [54 L.Ed.2d at p. 599].)

To the rule stated above, however, there is an exception: an administrative agency is precluded from changing its mind when the construction that it would reject has been definitively adopted by a court as its own. (See *Crounse Corp. v. I.C.C.* (6th Cir. 1986) 781 F.2d 1176, 1186 [implying that an administrative agency is bound by its prior construction if that construction has been endorsed by the courts]; *Royal Development Co., Ltd. v. N.L.R.B.* (9th Cir. 1983) 703 F.2d 363, 369 [to similar effect].) The reason for the exception seems clear: "The ultimate interpretation of a statute is an exercise of the judicial power." (*Bodinson Mfg. Co.* v. *California E. Com., supra*, 17 Cal.2d at p. 326; accord, *Merrill v. Department of Motor Vehicles, supra*, 71 Cal.2d at p. 917, fn. 15.)

### B. *The Words and Legislative History of Section 351 in Its Current and Previous Forms*

In 1917 the Legislature enacted the statute that is evidently the ultimate source of section 351. The provision declared in relevant part: "Any employer or agent or representative of an employer ... who shall demand or receive directly or indirectly from any person then in the employment of said employer, any fee, gift or other remuneration or consideration, or any part or portion of any tips or gratuities received by such employee while in the employment of said employer, in consideration or as a condition of such employment or hiring or employing any person to perform such services for such employer or of permitting said person to continue in such employment, is guilty of a misdemeanor ...." (Stats. 1917, ch. 172, § 1, p. 257.)

In *In re Farb* (1918) 178 Cal. 592 [174 P. 320, 3 A.L.R. 301], this court struck down the 1917 statute as violative of principles of "substantive due process," specifically "freedom of contract." In the course of its opinion, the court rejected an argument that the provision was designed as a measure to protect the public from fraud regarding the ultimate disposition of tips and was therefore constitutional: "If we concede the correctness of th[e] **\*1271** contention [that the provision was intended to prevent fraud], for the purposes of discussion, still we must declare the statute void as seeking to overcome by prohibition of any contract between employer and employee, a deception which would instantly disappear if the former were required to post in his place of business a notice of the terms of the contract whereby he was to have the benefit of gratuities. ... The law does not tolerate the prohibition of something which may be regulated in such way as to overcome any evils which may be incidentally connected with it." ( *Id.* at p. 598.)

In 1929 the Legislature enacted a statute (hereinafter the 1929 statute) in evident response to *In re Farb*. The relevant provisions were as follows.

"Sec. 2. Every employer, or agent of any employer, who collects, takes or receives any tips or gratuities, or a part thereof, paid or given to or left for his employees by patrons, or who deducts any amount from wages due his employees on account of such tips or gratuities, or who requires his employees to credit the amount, or any part thereof, of such tips or gratuities received by them against and as a part of the wages due such employees from said employer, shall post and keep posted in a conspicuous place ... a notice or notices [explaining the disposition of tips] ....

"

Henning v. Industrial Welfare Com., 46 Cal.3d 1262 (1988)

Case 3:16-cv-06660-JST Document 34-1 Filed 02/28/17 Page 10 of 80

762 P.2d 442, 252 Cal.Rptr. 278, 28 Wage & Hour Cas. (BNA) 1619...

· · · · · · · · · ·

"Such notice shall also state the extent to which the employees are required by such employer to accept such tips or gratuities in lieu of wages or the extent to which the employee is required to accept and credit such tips and gratuities against wages due such employees.

"

· · · · · · · · · ·

"Sec. 5. ... The Legislature ... expressly declares that the purpose of this act is to prevent fraud upon the public in connection with the practice of tipping and declares this a law passed for a public reason which can not be contravened by a private agreement and as a part of the social public policy of this state, binding upon all departments of the state government." (Stats. 1929, ch. 891, §§ 2, 5, pp. 1972-1973.)

In 1937 the Legislature codified the relevant provisions of the 1929 statute in modified form as sections 351, 352, and 356 of the Labor Code.

In its original form section 351 declared in relevant part as follows. "Every employer or agent who collects, takes, or receives any gratuity, or a part thereof, paid, given to, or left for an employee by a patron, or who deducts any amount from wages due an employee on account of such **1272** gratuity, or who requires an employee to credit the amount, or any part thereof, of such gratuity against and as a part of the wages due the employee from the employer, shall keep posted in a conspicuous place ... a notice [explaining the disposition of tips] ...." (Stats. 1937, ch. 90, § 351, p. 203.)

In its original form section 352 declared: "The notice shall also state the extent to which the employees are required by the employer to accept gratuities in lieu of wages or the extent to which the employee is required to accept and credit gratuities against wages." (Stats. 1937, ch. 90, § 352, p. 203.)

Finally, section 356 stated - and continues to state: "The Legislature expressly declares that the purpose of this article [viz., article I (Gratuities) of chapter 3 (Privileges and Prerequisites) of the Labor Code, i.e., sections 350 to 356] is to prevent fraud upon the public in connection with the practice of tipping and declares that this article is passed for a public reason and can not be contravened by a private agreement. As a part of the social public policy of this State, this article is binding upon all departments of the State." (Stats. 1937, ch. 90, § 356, p. 203.)

In 1965 the Legislature amended sections 351 and 352. As amended, section 351 stated as follows: "No employer or agent shall collect, take, or receive any gratuity, or a part thereof, paid, given to, or left for an employee by a patron, or deduct any amount from wages due an employee on account of such gratuity, or require an employee to credit the amount, or any part thereof, of such gratuity against and as a part of the wages due the employee from the employer, unless he posts in a conspicuous place ... a notice [explaining the disposition of tips] ...." (Stats. 1965, ch. 686, § 1, pp. 2062-2063.)

As amended, section 352 declared: "The notice required by Section 351 shall also state the extent to which the employees are required by the employer to accept gratuities in lieu of wages or the extent to which the employee is required to accept and credit gratuities against wages." (Stats. 1965, ch. 686, § 2, p. 2063.)

In 1968 the IWC adopted Wage Order No. 5-68, which established a so-called "tip credit" system: "Amounts may be credited as part of the minimum wage for gratuities received by any [covered employee] engaged in an occupation in which the employee customarily and regularly receives more than twenty dollars ($20) per month in gratuities. The credited amount shall in no case exceed twenty cents (20 cents) per hour." This provision was **1273** codified at subdivision 4(c) of section 11380 of title 8 of the California Administrative Code (now Cal. Code Regs.).

Case 3:16-cv-06660-JST   Document 34-1   Filed 02/28/17   Page 11 of 80

In 1972 Assemblyman Leroy F. Greene introduced Assembly Bill No. 78, 1972 Regular Session (hereinafter A.B. 78) (1 Assem. J. (1972 Reg. Sess.) p. 120) in an attempt to amend section 351. The bill - which was virtually identical in relevant part to the provision as it now stands - would have deleted the "notice" exception and would have added the following provision: "Every ... gratuity is hereby declared to be the sole property of the employee to whom it was paid, given, or left for [*sic*]."

The opinion of the Legislative Counsel on the effect of A.B. 78 was in relevant part as follows. "A.B. 78, as introduced, would delete provisions of law that now, broadly speaking, enable employers to obtain the benefit (as, in effect, the payment of wages) of tips and other gratuities received by their employees, and thereby prohibit an employer from receiving such a benefit." (Ops. Cal. Legis. Counsel on Assem. Bill No. 78 (1972 Reg. Sess.) (Feb. 29, 1972) p. 1 [hereinafter Ops. Cal. Legis. Counsel on A.B. 78].) It also stated: "Pursuant to its authority the Industrial Welfare Commission has promulgated subdivision 4(c) of Section 11380 of Title 8 of the California Administrative Code. Subdivision 4(c) of Section 11380 provides [for a 'tip credit' system.] ... [ para. ] This subdivision, in authorizing the crediting of tips or gratuities against the minimum wage of [covered employees] would be in conflict with the provisions of A.B. 78, as introduced, if A.B. 78, as introduced, should be enacted, since the bill in that form would prohibit any such crediting. Consequently, in view of the preceding, we think that if the bill in that form is enacted into law, subdivision 4(c) of Section 11380 of Title 8 of the Administrative Code would be invalid." (*Id.* at pp. 2-3.)

As 1972 was drawing to a close, however, the attempt to amend section 351 proved unsuccessful: A.B. 78 "died" in the Senate Committee on Industrial Relations. (Assem. Final Hist. (1972 Reg. Sess.) p. 83.)

In 1973 Assemblyman Greene introduced Assembly Bill No. 10, 1973-1974 Regular Session (hereinafter A.B. 10) (1 Assem. J. (1973-1974 Reg. Sess.) p. 17) - which was identical in relevant part to A.B. 78 as introduced - in another attempt to amend section 351.

In a memorandum by the Assembly Committee on Labor Relations it is stated: "AB 10 prohibits an employer from taking any tip given by a patron to his employee and prohibits an employer from requiring that such tip be credited against wages. This eliminates the present practice whereby employers can credit tips up to 20 cents per hour of the minimum wage." (Assem. Com. on Labor Relations, Mem. on Assem. Bill No. 10 (1973-1974 **\*1274** Reg. Sess.) for Apr. 4, 1973, Hg., p. 1 [hereinafter Assem. Com. on Labor Relations, Mem. on A.B. 10].) It further states: "Present law also requires that a notice be posted when tips are being credited against wages. AB 10 eliminates that requirement." (*Ibid.*)

This attempt to amend section 351 proved to be partially successful: the Legislature retained the provision declaring tips to be the employee's property, but added a provision to preserve the validity of the "tip credit" system established by Wage Order No. 5-68.

As amended, section 351 stated in relevant part as follows. "No employer or agent shall collect, take, or receive any gratuity or a part thereof, paid, given to or left for an employee by a patron, or deduct any amount from wages due an employee on account of such gratuity, or require an employee to credit the amount, or any part thereof, of such gratuity against and as a part of the wages due the employee from the employer, *except to the extent that may be permitted by a valid regulation of the California Division of Industrial Welfare*, and further provided he posts in a conspicuous place ... a notice ... stating the extent to which the employees are required by the employer to accept gratuities in lieu of wages or the extent to which the employee is required to accept and credit gratuities against wages. *Every such gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for* [*sic*]." Stats. 1973, ch. 879, § 1, pp. 1610-1611, italics added.) As it amended section 351 into a form that included the substance of section 352, the Legislature repealed section 352 as a separate provision. (Stats. 1973, ch. 879, § 2, p. 1611.)

In 1974 the Legislature amended section 351 by substituting the words "Industrial Welfare Commission" for the words "California Division of Industrial Welfare." (Stats. 1974, ch. 552, § 1, p. 1375.)

Late in that same year Assemblyman Greene introduced Assembly Bill No. 232, 1975-1976 Regular Session (hereinafter A.B. 232) (1 Assem. J. (1975-1976 Reg. Sess.) p. 138), in a final attempt to amend section 351 to reflect the policy he previously urged.

The Legislative Counsel's Digest of A.B. 232 declares: "The existing law prohibits an employer from receiving or deducting from employee wages any part of a gratuity given to or left for an employee by a patron, except to the extent permitted by regulations of the Industrial Welfare Commission, provided that a notice is conspicuously placed in the place of business stating the extent to which the employee is required to credit gratuities against wages. [ para. ] This bill would eliminate the authority of the Industrial Welfare Commission to permit an employer to receive or deduct from **\*1275** employee wages any part of a gratuity given to or left for an employee by a patron." (Legis. Counsel's Dig., Assem. Bill No. 232 (1975-1976 Reg. Sess.), as introduced.)

In a memorandum by the Senate Committee on Industrial Relations it is stated that the purpose of A.B. 232 is "To eliminate the authority of the Industrial Welfare Commission to permit employers to credit tips against the wages of employees." (Sen. Com. on Ind. Relations, Mem. on Assem. Bill No. 232 (1975-1976 Reg. Sess.) (May 19, 1975) p. 1 [hereinafter Sen. Com. on Ind. Relations, Mem. on A.B. 232].) In the memorandum it is also stated that the bill "would eliminate the authority of the Industrial Welfare Commission to permit tips to be credited against the wages of employees. The effect of this bill would be to require employers to pay employees at least the minimum wage regardless of the amount of tips the employees receive." (*Ibid.*)

Similarly, in a memorandum by the Assembly Committee on Labor Relations it is stated that A.B. 232 "would repeal the authority of the Industrial Welfare Commission to permit an employer to deduct tips from wages, and thus, would prohibit the consideration of tips as wages. The basis for this legislation would appear to be that tips or gratuities are given for individual excellence of service above and beyond the basic duties of the employment, and as such, the employer has no vested right to consider tips a part of wages." (Assem. Com. on Labor Relations, Mem. on Assem. Bill No. 232 (1975-1976 Reg. Sess.) p. 1.)

This time, the attempt to amend section 351 proved totally successful: in 1975 the Legislature amended this provision into its current form by deleting the exception introduced at the end of the first sentence in 1974, thereby revoking the authority of the IWC to allow an employer to obtain the benefit of tips received by his employees. Thus, as it now stands section 351 provides in relevant part as follows. "No employer or agent shall collect, take or receive any gratuity or a part thereof, paid, given to or left for an employee by a patron, or deduct any amount from wages due an employee on account of such gratuity, or require an employee to credit the amount, or any part thereof, of such gratuity against and as a part of the wages due the employee from the employer. Every such gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for [*sic*]."

### C. Construction of Section 351 by the IWC

After the Legislature amended section 351 into its current form in 1975, the IWC consistently construed the provision to bar the establishment of a **\*1276** minimum wage for tipped employees lower than the generally applicable minimum wage. For example, in 1976 the Commission reviewed the adequacy of the minimum wage and declared: "Many requests were received from the hotel and restaurant industry for a special, lower wage rate for tipped employees. ... The Commission denied the request ... [T]he Legislature specifically revoked the authority it had earlier given the I.W.C. to allow credit for tips against the minimum wage, when it amended Section 351 of the Labor Code this [*sic*] year." (Statement of Findings by the Cal. Ind. Welf. Com. in Connection with the Revision in 1976 of its Orders Regulating Wages, Hours, and Working Conditions, p. 11.)

Case 3:16-cv-06660-JST Document 34-1 Filed 02/28/17 Page 13 of 80

Henning v. Industrial Welfare Com., 46 Cal.3d 1262 (1988)
762 P.2d 442, 252 Cal.Rptr. 278, 28 Wage & Hour Cas. (BNA) 1619...

In 1979 the IWC again reviewed the adequacy of the minimum wage. The Restaurant and Hotel Associations urged the Commission to "establish a lower cash minimum wage" for tipped employees. (Statement of Position of Cal. Restaurant Assn. and Cal. Hotel and Motel Assn. to Cal. Ind. Welf. Com. in the [M]atter of Proposal for Hours, Wages and Working Conditions Order for the Pub. Housekeeping Industry (Aug. 21, 1979) p. 19.) The Commission denied the request: "the Legislature specifically revoked the authority it had earlier given the IWC to allow credit for tips against the minimum wage, when it amended Section 351 of the Labor Code [in 1975]." (Statement as to the Basis for Ind. Welf. Com. Order No. 5-76 Regulating Wages, Hours, and Working Conditions in the Pub. Housekeeping Industry (as adopted Nov. 16, 1979) p. 20.)

In 1980 the IWC argued before this court in the *Industrial Welfare Commission* case that section 351 barred a lower minimum wage for tipped employees: "Not only is the tip the sole property of the employee but also it may *not* be deducted or used as a credit against the wages due the employee. An employer may not pay an employee less than the minimum wage and then use the tips received by the employee to make up the difference. The Legislature could not have intended to allow indirectly what it forbade directly. The adoption of a lower minimum wage for a tipped employee has the effect of doing just that. A lower minimum (which in itself is to provide an adequate) wage is only possible because tips are used to subsidize it. Thus, an employer, who is allowed to pay a lower minimum wage to those who receive tips, is indirectly deducting from wages those same tips - a practice squarely prohibited by Labor Code section 351." (Replication of Ind. Welf. Com. and Div. of Lab. Stds. Enforcement, etc.; Points and Authorities in Support Thereof, pp. 89-90, italics in original.)

In 1982 the IWC convened a Minimum Wage Board to review the adequacy of the minimum wage. The board considered and rejected a proposal **\*1277** for a lower minimum wage for tipped workers. (Rep. of 1982 Min. Wage Bd., "Minutes," pp. 16-17.)

In 1984 the IWC convened another Minimum Wage Board to review the adequacy of the minimum wage. This board too considered and rejected a proposal for a lower, so-called "alternative minimum wage" for tipped workers. (Rep. of 1984 Min. Wage Bd., "Minutes," pp. 64-67.)

But late in 1987, as stated above, the IWC established a lower, "alternative minimum wage" for tipped employees, rejecting its former construction of section 351 and adopting the contradictory interpretation in its place: "creating a tipped classification did not violate Labor Code Section 351" (*Statement of Basis for Order No. MW-88, supra*, at p. 11).

### D. *Discussion of the Claim Before the Court*

As stated above, the IWC and the Restaurant and Hotel Associations each make what is in substance a single claim: the Commission is generally not required to establish a single minimum wage for all employees and hence may set a lower, "alternative minimum wage" for some; moreover, section 351 does not bar the "two-tier" minimum wage system at issue here: as it is currently construed by the Commission, the provision does not prohibit a lower, "alternative minimum wage" for tipped employees; this construction is reasonable and hence should be given effect; it is true the Commission's former construction barred such an "alternative minimum wage," but it is not true this court definitively adopted that construction in the *Industrial Welfare Commission* case.

([5]) We agree that the IWC is generally not required to fix a single minimum wage for all employees. In article XIV, section 1 of the California Constitution, the people have given the Legislature broad power in this area: "The Legislature may provide for minimum wages and for the general welfare of employees and for those purposes may confer on a commission legislative, executive, and judicial powers." (Italic added.) In Labor Code sections 1173 and 1178 and following, the Legislature in turn has delegated its power in this regard to the Commission. In view of the foregoing, we would be reluctant to recognize a "single-minimum-wage" requirement limiting the Commission's authority unless the Constitution or the code at least implied such a requirement with reasonable clarity. They do no such thing. Hence, we conclude that the Commission is not subject to such a requirement.

Henning v. Industrial Welfare Com., 46 Cal.3d 1262 (1988)

762 P.2d 442, 252 Cal.Rptr. 278, 28 Wage & Hour Cas. (BNA) 1619...

Case 3:16-cv-06600-JST Document 34-1 Filed 02/28/17 Page 14 of 80

We cannot agree, however, that section 351 does not bar the "two-tier" minimum wage system at issue here. Our reasoning is as follows. **\*1278**

We recognize that in *Industrial Welfare Com. v. Superior Court, supra*, 27 Cal.3d 690, we did not definitively adopt as our own the IWC's former construction of the statute barring a lower minimum wage for tipped employees, but simply concluded that such an interpretation was reasonable. ( *Id.* at pp. 729-730.) On this point the Court of Appeal was in error.

([6]) We also recognize that in the abstract, a current administrative interpretation would ordinarily be entitled to great weight. (See *Industrial Welfare Com.* v. *Superior Court, supra*, 27 Cal.3d at p. 724.) But when as here the construction in question is not "a contemporaneous interpretation" of the relevant statute and in fact "flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the ... statute [,]" it cannot command significant deference. (*General Electric Co. v. Gilbert* (1976) 429 U.S. 125, 142 [50 L.Ed.2d 343, 358, 97 S.Ct. 401].)

([7]) Having considered the matter closely and accorded the IWC the fullest deference justified by the facts and consistent with our obligation to declare the meaning of the law, we believe that section 351 must be construed to bar the "two-tier" minimum wage system at issue here and hence that the Commission's current interpretation of the provision is unreasonable.

As we read the words and legislative history of section 351 in its current and previous forms, we discern the legislative intent underlying the provision as it now stands to be as follows. Broadly, the Legislature has declared that tips belong to the employee and the IWC may not permit an employer to obtain the benefit of such tips by paying a tipped employee a wage lower than he would be obligated to pay if the employee did not receive tips. More narrowly, it has declared that the IWC may not permit an employer to use a "tip credit" to pay a tipped employee a wage lower than the minimum wage he would be obligated to pay if the employee did not receive tips.

Our reading of the legislative intent is grounded in the words of A.B. 78 - the ultimate source of section 351 in its current form - and its legislative history. As stated by the Legislative Counsel: "A.B. 78 ... would delete provisions of law that now, broadly speaking, enable employers to obtain the benefit (as, in effect, the payment of wages) of tips and other gratuities received by their employees, and thereby prohibit an employer from receiving such a benefit," and would invalidate the IWC's regulations "authorizing the crediting of tips or gratuities against the minimum wage ...." (Ops. Cal. Legis. Counsel on A.B. 78, *supra*, at pp. 1, 3.)

Our reading receives further support from A.B. 10: "AB 10 prohibits an employer from taking any tip given by a patron to his employee and prohibits **\*1279** an employer from requiring that such tip be credited against wages." (Assem. Com. on Labor Relations, Mem. on A.B. 10, *supra*, at p. 1.)

Finally, our reading is confirmed by A.B. 232, the immediate source of section 351 in its current form: The bill was intended "To eliminate the authority of the Industrial Welfare Commission to permit employers to credit tips against the wages of employees" and thereby "to require employers to pay employees at least the minimum wage regardless of the amount of tips the employees receive." (Sen. Com. on Ind. Relations, Mem. on A.B. 232, *supra*, at p. 1.)

Scrutinized in light of the legislative intent underlying section 351 in its current form, the IWC's construction of the provision to permit the "two - tier" minimum wage system at issue here is unreasonable. As stated above, the Legislature has broadly declared that the Commission may not permit an employer to obtain the benefit of his employee's tips by paying the employee a wage lower than he would be obligated to pay if the employee did not receive tips. But in establishing the system under review, the Commission has attempted to do the very thing the Legislature has prohibited:

under this system, the Commission clearly purports to allow an employer to pay a tipped employee a wage lower than he would be obligated to pay if the employee did not receive tips.

As also stated above, the Legislature declared more narrowly that the IWC may not permit an employer to use a "tip credit" to pay a tipped employee a wage lower than the minimum wage he would be obligated to pay if the employee did not receive tips. Although in form they may be different, in function the "tip credit" and the "alternative minimum wage" are identical. The IWC itself candidly admits as much in its opening brief: "To be sure, the alternative minimum wage, like a tip credit, does result in less total income for tipped employees." Considering the words and legislative history of section 351 in its current and previous forms, we believe that the Legislature impliedly declared that the Commission may not permit an employer to use an "alternative minimum wage" to pay a tipped employee a wage lower than the minimum wage he would be obligated to pay if the employee did not receive tips. We might have come to a different result if the words and legislative history of the provision revealed an intent on the part of the Legislature to prohibit only the "tip credit" and not its effect, i.e., lower income for tipped employees. The provision's words and history, however, reveal no such intent.

Against our conclusion that section 351 in its current form bars the "two-tier" minimum wage system at issue here, the IWC and the Restaurant and Hotel Associations present two broad arguments. **\*1280**

The first is that section 351 does not expressly bar the system under review: by its terms, the provision speaks only of employers and wages due tipped employees, and does not concern the Commission or the scope of its power to fix minimum wages. We agree. Our analysis, however, is not premised in any part whatever on the existence of an express statutory prohibition.

The second argument is that section 351 does not impliedly bar the "two-tier" minimum wage system at issue here. It is claimed that the sole purpose of the provision is definitively declared in section 356 to be the "[prevention of] fraud upon the public in connection with the practice of tipping" and that that purpose is not frustrated by the system under review. The point is without merit. As the analysis presented above reveals, the prevention of fraud cannot be deemed the sole purpose of section 351 *in its current form*: the provision was broadly intended to bar the IWC from permitting an employer to pay a tipped employee a wage lower than he would be obligated to pay if the employee did not receive tips; and it was more narrowly intended to bar the Commission from permitting an employer to use a "tip credit" to pay a tipped employee a wage lower than the minimum wage he would be obligated to pay if the employee did not receive tips. We do not disregard the Legislature's declaration of purpose in section 356. But we cannot consider it "definitive": the declaration was enacted in 1929 and was codified in 1937, when section 351 was simply a "notice" statute; it has remained unchanged since 1937, but in the meantime section 351 has been radically amended into a statute establishing substantive public policy without any "notice" requirement whatever.

It is also claimed that neither the words nor the legislative history of the provision in its current or previous forms reveals any intent on the part of the Legislature to affect the scope of the Commission's power to fix minimum wages or specifically to bar it from establishing a lower, "alternative minimum wage" for tipped employees. But as the analysis presented above shows, this point too is without merit: the intent, albeit implied, is clear.

Therefore, we conclude that the Court of Appeal - although misconstruing the effect of the *Industrial Welfare Commission* case - correctly decided that section 351 barred the "two-tier" minimum wage system at issue here. We also conclude that the court correctly ordered the relief sought, i.e., the establishment of a single minimum wage of $4.25 per hour for all employees without exception.[1] **\*1281**

---

1    In this court the Restaurant and Hotel Associations attempt to raise for the first time a claim to the effect that the invalidation of the lower, "alternative minimum wage" for tipped employees should result not in affirmance of the judgment of the Court of Appeal, but in reversal or vacation of that judgment with directions that the court remand the matter to the IWC to give it

Case 3:16-cv-06660-JST   Document 34-1   Filed 02/28/17   Page 16 of 80

an opportunity to determine a single minimum wage for all employees. We reject the point. To begin with, the claim is too late. (Cal. Rules of Court, rule 29(b)(1).) In any event, it is without merit. Order No. MW-88 contains an express "separability" clause: "If the application of any provision of this Order, or any section, subsection, subdivision, sentence, clause, phrase, word or portion of this Order should be held invalid or unconstitutional or unauthorized or prohibited by statute, the remaining provisions thereof shall not be affected thereby, but shall continue to be given full force and effect as if the part so held invalid or unconstitutional had not been included herein." The Commission explicated the clause thus: "The IWC intends that MW-88 be fully effective and enforceable. Should any part of MW-88 be declared invalid, the IWC intends, by this provision, that the part found invalid be severed from the order and thus maximize the protections for employees." (*Statement of Basis for Order No. MW-88, supra,* at p. 13.) In our view, the Commission has declared in effect that the single minimum wage for all employees - if a single minimum wage there must be - should be $4.25 per hour. Significantly, the Commission makes no complaint about the propriety of the relief granted. Consequently, we conclude that remand is unnecessary.

In its brief on the merits, the Division of Labor Standards Enforcement "seek[s] guidance from the Court .... In the event the Court ... sustain[s] the Court of Appeal, the Division requests that the Court address the issue of the [*sic*] whether the ruling of the Court would be prospective only or retroactive to July 1, 1988, the effective date of the Industrial Welfare Commission's Order MW-88." As the IWC and the Restaurant and Hotel Associations have impliedly conceded, "retroactivity" is called for here: the lower, "alternative minimum wage" for tipped employees was void *ab initio*.

The judgment of the Court of Appeal is affirmed.


Lucas, C. J., Panelli, J., Eagleson, J., and Kaufman, J., concurred.


**BROUSSARD, J.**

I concur in our holding; Labor Code section 351 deprives the Industrial Welfare Commission of authority to establish a two-tier minimum wage system with a lower minimum wage for employees who receive tips. However, we have decided that identical issue before. In 1980, we examined the legislative history of Labor Code section 351, and indorsed the Industrial Welfare Commission's conclusion that the section would not permit a two-tier wage system with a lower minimum wage for tipped employees. (*Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 729-731 [166 Cal.Rptr. 331, 613 P.2d 579].) That decision constituted a judicial interpretation of the statute, and deprived the Industrial Welfare Commission of any authority to interpret the statute in a way which is inconsistent with our 1980 decision. The Court of Appeal was right in this case when it said: "We need not construe section 351, as that judicial function has been performed by the California Supreme Court."

In 1975 the Legislature amended section 351. The same year, the Industrial Welfare Commission rejected the request of employers that it establish a lower minimum wage for tipped employees. The commission interpreted the amended statute as depriving it of authority to establish a lower minimum wage for tipped employees. ( *Industrial Welfare Com.* v. *Superior Court, supra,* 27 Cal.3d at p. 729.) The commission stated: "'First, and most **\*1282** important, the Legislature specifically revoked the authority it had earlier given the IWC to allow credit for tips against the minimum wage, when it amended section 351 of the Labor Code this year.[ ]'" (*Ibid.*)

The employers challenged this conclusion, arguing before this court that the commission had misinterpreted the amended statute. While the amendment may have been intended to prohibit the commission from allowing employers to deduct tips from wages directly, they argued, nothing in the amendment prohibited the indirect approach of allowing the commission to establish a lower minimum wage for tipped employees.

We agreed with the commission. We said: "[W]e think that the legislative history of the 1975 bill supports the IWC's conclusion that the Legislature contemplated that the enactment would insure that tips received by an employee would not reduce an employer's minimum wage obligation, either directly or indirectly." ( *Industrial Welfare Com. v. Superior Court, supra,* 27 Cal.3d at p. 730.) We turned to legislative committee reports to demonstrate that the Legislature intended

Henning v. Industrial Welfare Com., 46 Cal.3d 1262 (1988)

Case 3:16-cv-06660-JST Document 34-1 Filed 02/28/17 Page 17 of 80

762 P.2d 442, 252 Cal.Rptr. 278, 28 Wage & Hour Cas. (BNA) 1619...

the bill to assure that the employer would receive no benefit, even indirectly, from the employee's tips. We concluded: "In light of the legislative history, the IWC could reasonably interpret the amendment of section 351 as a legislative determination that all employees should be guaranteed a minimum wage that is not reduced by virtue of any tips an employee may possibly receive." (*Ibid.*)

Although we spoke of the "reasonableness" of the commission's interpretation, and noted our duty to give the commission's interpretation great weight, we did more than simply defer to the commission. Our examination of the legislative history of the 1975 amendments, and our statement about the intent of the Legislature, made it clear that we were exercising the judicial function of interpreting the statute and reaching a conclusion as to its true meaning. Our analysis of the statutory history showed that the commission's interpretation was the correct interpretation of the statute. This was an exercise of judicial power which it was beyond the authority of the commission to disregard at a later date.

It is our obligation, when presented with a question of statutory interpretation, to determine the true meaning of the statute. (*Bodinson Mfg. Co. v. California E. Com.* (1941) 17 Cal.2d 321, 325-326 [109 P.2d 935]; see also *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1389 [241 Cal.Rptr. 67, 743 P.2d 1323]; *Merrill v. Department of Motor Vehicles* (1969) 71 Cal.2d 907, 917 [80 Cal.Rptr. 89, 458 P.2d 33].) We should not overstate the deference which we owe to administrative **\*1283** interpretations of statutes. [1] It is true that an administrative agency may interpret the statutes it is charged with implementing, and that this construction is entitled to great weight. (*Bodinson Mfg. Co. v. California E. Com., supra,* 17 Cal.2d 321, 325-326; see also *Banning Teachers Assn. v. Public Employment Relations Bd.* (1988) 44 Cal.3d 799, 804 [244 Cal.Rptr. 671, 750 P.2d 313].) Nonetheless, the administrative interpretation is not binding on this court. (See *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 935-936 [216 Cal.Rptr. 345, 702 P.2d 503]; *Carmona v. Division of Industrial Safety* (1975) 13 Cal.3d 303, 310 [118 Cal.Rptr. 473, 530 P.2d 161]; *Skyline Homes, Inc. v. Occupational Safety & Health Appeals Bd.* (1981) 120 Cal.App.3d 663, 669 [174 Cal.Rptr. 665].) "[I]t is the duty of this court, when such a question of law is properly presented, to state the true meaning of the statute finally and conclusively. ... [Citations.] The ultimate interpretation of a statute is an exercise of the judicial power. [Citations.]" (*Bodinson Mfg. Co. v. California E. Com., supra,* 17 Cal.3d at p. 326; see also *Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d 1379, 1389; *Merrill v. Department of Motor Vehicles, supra,* 71 Cal.2d 907, 917, fn. 15.) Once this court has indorsed a particular interpretation of a statute, an administrative agency lacks authority to interpret the statute differently. (See *Crouse Corp. v. I.C.C.* (6th Cir. 1986) 781 F.2d 1176, 1186, cert. den. 479 U.S. 890 [93 L.Ed.2d 264, 107 S.Ct. 290].)

[1]     The United States Supreme Court recently reiterated that courts should not rubber stamp administrative interpretations which the court finds inconsistent with the terms of the statute or the intent of Congress. (*FLRA v. Aberdeen Proving Ground* (1988) 485 U.S. [99 L.Ed.2d 470, 475, 108 S.Ct. 1261], and cases cited.) Federal law, of course, requires courts to exercise the judicial function of declaring the true meaning of a statute when presented with a question of an agency's interpretation of congressional intent. (*Chevron U.S.A. v. Natural Res. Def. Council* (1984) 467 U.S. 837, 842-843, and fn. 10 [81 L.Ed.2d 694, 702-703, 104 S.Ct. 2778]; *Rettig v. Pension Ben. Guar. Corp* (D.C. Cir. 1984) 744 F.2d 133, 140-141 [240 App.D.C. 118].) The District of Columbia Circuit explained the *Chevron* standard: "First, we must determine whether Congress had a specific intent as to the meaning of a particular phrase or provision. [Citation.] To do this, we analyze the language and legislative history of the provision. As the Court noted in *Chevron,* '[t]he judiciary is the final authority on issue[s] of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.' [Citation.] Thus, in ascertaining the congressional intent underlying a specific provision, we are not required to grant any particular deference to the agency's parsing of statutory language or its interpretation of legislative history." (*Ibid.*)

In conclusion, we exercised the judicial function of interpreting Labor Code section 351 when we decided *Industrial Welfare Com. v. Superior Court* in 1980. When the issue was raised again the commission was required to follow our ruling and to refuse to impose a two-tier system with a lower minimum wage for tipped employees. The commission could have asked us to reconsider our 1980 decision. The commission could have sought a change in the law from the Legislature (see e.g., *Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1393). However, **\*1284** the commission was not free to disregard our decision. Our tripartite system of government requires the executive branch

WESTLAW     © 2017 Thomson Reuters. No claim to original U.S. Government Works.

to be bound by judicial decisions on questions of law. We should not permit an unauthorized administrative decision to force us to reopen a question we have already decided. I see no legitimate basis for reconsidering our earlier decision, and so see no need to perform extensive analysis of the legislative history of the statute in order to justify our conclusion that section 351 means the same thing now as it meant in 1980.

Arguelles, J., concurred.

**End of Document**                                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**- EXHIBIT 2 -**

185 Cal.App.4th 424

Court of Appeal, First District, Division 3, California.

WALGREEN CO., Plaintiff and Appellant,

v.

CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents.

No. A123891.
|
June 8, 2010.
|
Certified for Partial Publication. [*]

[*]  Pursuant to California Rules of Court, rules 8.1105(a) and 8.1110, this opinion is certified for publication with the exception of part III.

## Synopsis

**Background:** Drugstore owner challenged on equal protection grounds an ordinance enacted by city/county generally banning the sale of tobacco products in drugstores but not in general grocery stores or "big box" stores containing licensed pharmacies. The Superior Court, City and County of San Francisco, No. 479553, Peter J. Busch, J., sustained city/county's demurrer without leave to amend. Owner appealed.

**[Holding:]** The Court of Appeal, McGuiness, P.J., held that drugstore owner stated an equal protection claim.

Reversed in part; remanded.

## Attorneys and Law Firms

**\*\*501**  Gibson, Dunn & Crutcher LLP, Daniel M. Kolkey, San Francisco, Brett H. Oberst, Los Angeles, and Rebecca Justice Lazarus, San Francisco, for Plaintiff and Appellant.

Dennis Herrera, City Attorney, Wayne Snodgrass and Vince Chhabria, Deputy City Attorneys, for Defendants and Respondents.

Francisco J. Silva, San Bernardino, and Long X. Do, for California Medical Association and San Francisco Medical Society as Amicus on behalf of Defendants and Respondents.

## Opinion

McGUINESS, P.J.

**\*428**  In this appeal we consider a challenge to an ordinance enacted by the City and County of San Francisco (the City) banning the sale of tobacco products in certain retail establishments that contain a pharmacy. The ordinance is premised on the notion that a retail store conveys tacit approval of tobacco use when it sells prescription drugs as well as tobacco products. Appellant Walgreen Co. (Walgreens) contends the ordinance violates the equal protection clauses of the federal and state constitutions, arguing there is no rational basis for prohibiting its stores with pharmacies from selling tobacco products while allowing such sales at "general grocery" stores and "big box" stores that contain pharmacies.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.                   1

Walgreens also claims the ordinance must be invalidated because the City's Office of Economic Analysis (OEA) abused its discretion by failing to prepare a report on the economic impact of the legislation, a purported violation of voter-enacted Proposition I.

We conclude the OEA's failure to prepare an economic impact report does not permit an interested party such as Walgreens to invalidate a duly enacted ordinance. The cause of action premised on failure to comply with Proposition I therefore fails as a matter of law. However, we agree with Walgreens that its complaint adequately states a cause of action alleging an equal protection violation. The issue is a close one only because the deferential rational basis test guides our equal protection analysis. Nevertheless, even under that deferential standard, the challenged distinction among stores containing licensed pharmacies is not fairly related to the object of the prohibition on sales of tobacco products. There is no rational basis to believe the supposed implied message conveyed by selling tobacco products at a Walgreens that has a licensed pharmacy  **502  in the back of the store is different in any meaningful way from the implied message conveyed by selling such products at a supermarket or big box store that contains a licensed pharmacy. Accordingly, we reverse in part the judgment of the trial court sustaining the City's demurrer without leave to amend.

## FACTUAL AND PROCEDURAL BACKGROUND

The legislation challenged in this appeal, City Ordinance No. 194–08 (hereafter the ordinance), amended the San Francisco Health Code to provide that "No person shall sell tobacco products [1] in a pharmacy, except as provided in [San Francisco Health Code] Sec. 1009.93." (S.F. Health Code, § 1009.92.) The term "pharmacy" is defined in the ordinance to refer to  **429  the entire retail establishment that includes the portion normally referred to as a pharmacy, giving rise to some confusion in terminology. [2] To avoid confusion and be consistent with the language of the ordinance, we shall refer to the section of a retail establishment in which a licensed pharmacist prepares and sells prescription pharmaceuticals as a "licensed pharmacy," in contrast to the entire store containing a licensed pharmacy, which the ordinance labels a "pharmacy." The prohibition on sales of tobacco products is not limited to the licensed pharmacy portion of a store but instead applies to the establishment as a whole.

[1]  "Tobacco Product" is defined as "any substance containing tobacco leaf, including but not limited to cigarettes, cigars, pipe, tobacco, snuff, chewing tobacco, and dipping tobacco." (S.F. Health Code, § 1009.91, subd. (f).)

[2]  "Pharmacy" is defined as "a retail establishment in which the profession of pharmacy by a pharmacist licensed by the State of California in accordance with the Business and Professions Code is practiced and where prescriptions are offered for sale. A pharmacy may also offer other retail goods in addition to prescription pharmaceuticals. For purposes of this Article, 'pharmacy' includes retail stores commonly known as drugstores." (S.F. Health Code, § 1009.91, subd. (e).)

In addition to traditional independent pharmacies, which sell little more than prescription drugs, over-the-counter medications, and personal care items, the term "pharmacy" encompasses chain stores, supermarkets, and big box stores that sell a variety of products such as food, beverages, paper goods, and miscellaneous items in addition to prescription drugs. However, although a "general grocery store" [3] or a "big box store" [4] that contains a licensed pharmacy qualifies as a "pharmacy" under the ordinance, the ordinance specifically excludes these establishments from the prohibition on sales of tobacco products. (S.F. Health Code, § 1009.93.) As a result, the ordinance prohibits a Walgreens that contains a licensed pharmacy from selling tobacco products but imposes no such limitation on a Safeway supermarket or a Costco big box store that contains a licensed pharmacy.

[3]  "General Grocery Store" is defined to have "the same meaning as set forth in [San Francisco] Planning Code Section 790.102(a) or any successor provisions." (S.F. Health Code, § 1009.91, subd. (c).) Section 790.102, subdivision (a)(1) of the San Francisco Planning Code, in turn, defines "General Grocery Store" as "[a]n individual retail food establishment that: [¶] (A) Offers a diverse variety of unrelated, non-complementary food and non-food commodities, such as beverages, dairy, dry goods, fresh

produce and other perishable items, frozen foods, household products, and paper goods; [¶] (B) May provide beer, wine, and/or liquor sales for consumption off the premises ...; (C) Prepares minor amounts or no food on-site for immediate consumption; and [¶] (D) Markets the majority of its merchandise at retail prices."

4    "Big Box Store" is defined as "a single retail establishment occupying an area in excess of 100,000 gross square feet." (S.F. Health Code, § 1009.91, subd. (a).)

**503  The legislative findings associated with the ordinance cite the adverse health effects associated with tobacco use. The principal finding upon which the ordinance is premised states: "Through the sale of tobacco products, pharmacies convey tacit approval of the purchase and use of tobacco products. This approval sends a mixed message to consumers who generally patronize pharmacies for health care services."  *430  As further support for the ordinance, the City's Board of Supervisors (Board of Supervisors or Board) also found that "[p]harmacies and drugstores are among the most accessible and trusted sources of health information among the public," and that "[c]linicians can have a significant effect on smokers' probability of quitting smoking."

As reflected in the legislative findings, various medical and pharmaceutical organizations advocate prohibiting sales of tobacco products in pharmacies. Among the organizations supporting such a prohibition are the Tobacco Education and Research Oversight Committee for California, the American Pharmacists Association, the California Pharmacists Association, and the California Medical Association. As far back as 1970 the American Pharmaceutical Association declared that "mass display of cigarettes in pharmacies is in direct contradiction to the role of a pharmacy as a public health facility."

As support for distinguishing between chain drugstores, [5] on the one hand, and general grocery stores and big box stores on the other hand, the ordinance contains a finding that prescription drug sales comprise a much larger part of the business of chain drugstores, as follows: "Prescription drug sales for chain drugstores represent a significantly higher percentage of total sales than for grocery stores and big box stores that contain pharmacies. According to the 2007 Rite Aid Annual Report, prescription drug sales represented 63.7% of total sales in fiscal 2007. Walgreen's 2007 Annual Report documented prescription sales as approximately 65% of net sales that year. Pharmacy sales at Safeway have been estimated at 7.5% of annual volume. Costco's prescription sales generated 1.5% of total revenue in 2002."

5    Neither the ordinance nor the legislative findings define the terms "drugstore" or "chain drugstore." Nevertheless, based on the text of the legislative findings, the City classifies chain stores such as Walgreens and Rite Aid as "chain drugstores," whereas Safeway and Costco are not considered "chain drugstores," even though they are chains and may contain a licensed pharmacy.

During public hearings on the ordinance, one of it main proponents, Dr. Mitchell Katz, the City's Director of Public Health, addressed why the legislation was directed at only certain stores containing licensed pharmacies. Dr. Katz explained: "Well, you know, shouldn't you include all stores [containing licensed pharmacies]. If you're going to do this, you know, let's be fair, look at all stores. But I ask you, in your own experience, if we stop people going into a Walgreens, going into a Rite–Aid, going into one of these independent pharmacies and said, What kind of store are you going into? [T]hey would say, Pharmacy. If you stop someone going into a supermarket, and [say], What kind of store are you going into? [E]ven a supermarket that has a drugstore, they'd say, I'm going into a supermarket. And that's the social perceptibility difference.... You can see as a total of sales that  *431  Walgreens, Rite–Aid, and the two chain stores, [pharmacy sales are] their major line of work, and to me that makes a big difference in terms of how those establishments are viewed by vulnerable adolescents."

**504  When asked during a Board of Supervisors meeting why the legislation did not cover all stores containing a pharmacy, Dr. Katz responded as follows: "What I was trying to do in our work in fashioning the legislation was focusing on the group where I thought the case was strongest. We all go to supermarkets. We all go to warehouse stores. They get a cross section of people. We teach our children that supermarkets, wholesale stores, they're places you go to buy everything. When it comes [to] pharmacies, I feel that our children, our teenagers get a different message.... What we're trying to say is these places market themselves as health-promoting businesses. They're not Walgreens General Store.

They're not Rite Aid. They're Walgreens pharmacy. They're Rite Aid pharmacy. The ['P]harmacy America [T]rusts' and so it sends a very different message. Certainly in the future if we have success and I believe we would, just like San Francisco was the leader and then broaden [ed] the legislation ... around second hand smoke.... [W]e focus on that group we thought was most compelling."

On September 8, 2008, Walgreens filed a complaint seeking to invalidate the ordinance. Walgreens also moved for a preliminary injunction to prevent the ordinance from taking effect. The trial court denied the application for a preliminary injunction on September 30, 2008. The ordinance took effect the following day. Walgreens thereafter filed a first amended complaint (hereafter the complaint).

The complaint contains three causes of action. The first and second causes of action allege violations of the equal protection clauses of the United States and California Constitutions, respectively. Walgreens alleges the ordinance "prohibits some retail establishments with [licensed] pharmacies from selling tobacco products, but arbitrarily exempts from this prohibition other retail establishments with [licensed] pharmacies, namely, general grocery stores and big box stores," in violation of constitutional equal protection guarantees. The third cause of action alleges a violation of Proposition I, which the voters approved in November 2004. Proposition I directed the City to create an Office of Economic Analysis (referred to herein as OEA), which is obligated to provide an economic impact report to the City's Board of Supervisors with respect to any proposed legislation that might have a material impact on the City. (S.F. Admin. Code, § 10.32.) Walgreens contends the failure of the OEA to prepare an economic impact report regarding the Ordinance renders the Ordinance invalid.

**\*432** Walgreens alleges in the complaint that it operates licensed pharmacies in 52 of its 54 full-service stores in the City. The two Walgreens stores that do not operate pharmacies are exempt from the prohibition on selling tobacco. Walgreens contends that licensed pharmacies could also be found in the City at one Costco big box store, one pharmacy operated by Longs Drugs, two Lucky supermarket stores, ten Safeway stores, and six Rite–Aid stores. [6] **\*\*505** Walgreens asserts that its stores containing licensed pharmacies are similar in all relevant respects to the 12 grocery stores and one big box store that are specifically exempt from the ordinance. Among other things, at both Walgreens and the exempt grocery stores, the licensed pharmacy is located in the back of the store, whereas prior to the effective date of the ordinance tobacco products were sold in the front of Walgreens stores. Tobacco products were not sold by pharmacists at Walgreens but instead were "clerk served," meaning that a customer would have to request to purchase a tobacco product from a clerk or checkout attendant. According to Walgreens, both stores subject to the ordinance and those exempt from it typically advertise themselves as health-promoting and have signage on the outside of the store advertising the pharmacy within. Walgreens alleges that, like stores exempt from the ordinance that do not devote a significant percentage of their floor space to their pharmacies, it devotes only 9 percent of the total "front area" of its stores to the pharmacy. Walgreens also asserts that 90 percent of the transactions at Walgreens's stores in the City do not involve an item from the licensed pharmacy and, in contrast to legislative findings indicating that 65 percent of Walgreens's net sales were attributable to prescription items, non-pharmacy sales accounted for slightly less than half (46.7 percent) of Walgreens's sales at its stores in the City during a one-year period ending in July 2008.

[6] The complaint neglects to mention independent pharmacies covered by the ordinance. Dr. Katz testified that there were 16 independent pharmacies in the City at the time the ordinance was enacted. Only four of those independent pharmacies were still selling tobacco products at the time the ordinance was enacted. In its briefing to this court, Walgreens states that it purchased the six Rite–Aid pharmacies located in the City following enactment of the ordinance, leaving it with 58 stores covered by the ordinance. Walgreens asserts it has "58 of the approximately 63 pharmacy establishments covered by the Ordinance." Walgreens's estimate of the total number of pharmacies covered by the ordinance is derived by adding Walgreens's 58 stores to the one operated by Longs Drugs and the four independent pharmacies that were selling tobacco products at the time the ordinance was enacted. Walgreens's tally omits the 12 independent pharmacies that had voluntarily chosen not to sell tobacco products even before the ordinance was enacted. Regardless of how one calculates the number of pharmacies subject to the ban on sales of tobacco products, the fact remains that, following its purchase of Rite–Aid drugstores in the City, Walgreens

operates over three-quarters of the pharmacies covered by the ordinance (58 out of approximately 75), including all but one of the chain drugstores prohibited from selling tobacco products.

**\*433** In a demurrer to the complaint, the City contended the ordinance passes constitutional muster because the exclusion of general grocery stores and big box stores from the ban on sales of tobacco products is rationally related to a legitimate governmental interest. The City also claimed the ordinance is not invalid under Proposition I, reasoning that, while the law imposes an obligation upon the OEA to prepare and submit an analysis to the Board of Supervisors, the Board does not require an OEA analysis before enacting legislation. According to the City, the proper remedy for the failure to comply with Proposition I is a writ of mandate directing the OEA to prepare an economic impact report.

The trial court sustained the City's demurrer without leave to amend. Walgreens timely appealed following entry of judgment in the City's favor.

### DISCUSSION

#### I. STANDARD OF REVIEW

**[1]** **[2]** **[3]** **[4]** **[5]**   "On review of an order sustaining a demurrer without leave to amend, our standard of review is de novo, 'i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law.' [Citation.]" (*Santa Teresa Citizen Action Group v. State Energy Resources Conservation & Development Com.* (2003) 105 Cal.App.4th 1441, 1445, 130 Cal.Rptr.2d 392.) " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.]' "  **\*\*506**  (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126, 119 Cal.Rptr.2d 709, 45 P.3d 1171.) "We affirm if any ground offered in support of the demurrer was well taken but find error if the plaintiff has stated a cause of action under any possible legal theory. [Citations.] We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale. [Citation.]" (*Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625, 631, 27 Cal.Rptr.3d 452.)

#### II. EQUAL PROTECTION

Walgreens contends the challenged ordinance violates the equal protection clauses of the federal and state constitutions, asserting that the disparate treatment of different types of stores containing pharmacies is not rationally related to a legitimate legislative end. For the reasons that follow, we agree that Walgreens's complaint adequately states an equal protection violation.

**\*434** **A.** *Applicable Legal Principles*

**[6]** **[7]**   The Fourteenth Amendment to the United States Constitution provides that "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." The California Constitution likewise prohibits the denial of equal protection. [7] (Cal. Const., art. I, § 7, subd. (a).) " ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." ' [Citations.]" (*In re Eric J.* (1979) 25 Cal.3d 522, 531, 159 Cal.Rptr. 317, 601 P.2d 549.) A corporation is considered a "person" entitled to the constitutional guarantee of equal protection. (*National General Corp. v. Dutch Inns of America, Inc.* (1971) 15 Cal.App.3d 490, 495, fn. 3, 93 Cal.Rptr. 343.)

[7]   In addressing Walgreens's constitutional claims, we consider decisions of the United States Supreme Court and other federal courts as persuasive authority because the equal protection provision of the California Constitution is " 'substantially the equivalent of the equal protection clause of the Fourteenth Amendment to the United States Constitution.' " (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 571, 117 Cal.Rptr.2d 168, 41 P.3d 3.) While it is true the equal protection provisions of the California Constitution are " 'possessed of an independent vitality' " and in a given case may demand an analysis different

from that applicable under the Fourteenth Amendment of the United States Constitution (*Serrano v. Priest* (1976) 18 Cal.3d 728, 764, 135 Cal.Rptr. 345, 557 P.2d 929), the California Supreme Court has rejected the notion that the rational basis test is more rigorous under California law than under federal law. (See, e.g., *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 481, 97 Cal.Rptr.2d 334, 2 P.3d 581 [adhering to federal rational relationship test in face of claim it did not adequately express the state constitutional guarantee].)

**[8]** **[9]** " 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similar situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253, 127 Cal.Rptr.2d 177, 57 P.3d 654.) "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold. [Citation.]" (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155, 88 Cal.Rptr.2d 696.)

**[10]**    The City concedes that, for purposes of the challenged ordinance, all retail establishments containing licensed pharmacies are similarly situated. This concession **\*\*507** is not dispositive of Walgreens's equal protection challenge but merely constitutes an acknowledgement that Walgreens has met its threshold burden to show that the different types of stores containing licensed pharmacies **\*435** are " 'sufficiently similar to merit application of some level of scrutiny to determine whether distinctions between the two groups justify the unequal treatment.' [Citation.]" (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1200, 39 Cal.Rptr.3d 821, 129 P.3d 29 (*Hofsheier* ).) The next step in the analysis is to determine the appropriate level of scrutiny to apply.

**[11]** **[12]** **[13]** **[14]**    "In resolving equal protection issues, the United States Supreme Court has used three levels of analysis. Distinctions in statutes that involve suspect classifications or touch upon fundamental interests are subject to strict scrutiny, and can be sustained only if they are necessary to achieve a compelling state interest. Classifications based on gender are subject to an intermediate level of review. But most legislation is tested only to determine if the challenged classification bears a rational relationship to a legitimate state purpose. [Citations.]" (*Hofsheier, supra,* 37 Cal.4th at p. 1200, 39 Cal.Rptr.3d 821, 129 P.3d 29.) Because the challenged ordinance does not involve a suspect classification or interfere with the exercise of a fundamental right, the parties agree that the deferential "rational relationship" or "rational basis" test governs our consideration of Walgreens's equal protection claim.

**[15]** **[16]**    Rational basis review " 'is the basic and conventional standard for reviewing economic and social welfare legislation in which there is a "discrimination" or differentiation of treatment between classes or individuals. It manifests restraint by the judiciary in relation to the discretionary act of a co-equal branch of government; in so doing it invests legislation involving such differentiated treatment with a presumption of constitutionality and "requir[es] merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose." [Citation.]' " (*Warden v. State Bar* (1999) 21 Cal.4th 628, 641, 88 Cal.Rptr.2d 283, 982 P.2d 154.) "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. [Citations.]" (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211.)

**[17]** **[18]** **[19]**    "[T]hose attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it,' [citation]." (*FCC v. Beach Communications, Inc., supra,* 508 U.S. at p. 315, 113 S.Ct. 2096.) " 'Moreover, the burden of demonstrating the invalidity of a classification under this standard rests squarely upon *the party who assails it.*' [Citation.]" (*Warden v. State Bar, supra,* 21 Cal.4th at p. 641, 88 Cal.Rptr.2d 283, 982 P.2d 154.) "But this is not an **\*436** impossible task. The rationale must be 'plausible' [citation] and the factual basis for that rationale must be *reasonably* conceivable [citation]. And 'even in the ordinary equal protection case calling for the most deferential of standards, [courts must ascertain] the relation between the classification adopted and the object to be attained. The search for the link between classification and objective gives substance to the Equal Protection Clause.' [Citation.]" (*Hofsheier, supra,* 37 Cal.4th at p. 1201, 39 Cal.Rptr.3d 821, 129 P.3d 29.)

**[20]  [21]  [22]**  "[A]lthough it is irrelevant whether the perceived reason for the challenged distinction actually motivated the **\*\*508** Legislature, equal protection 'does require that a purpose may conceivably or "may reasonably have been the purpose and policy" of the relevant governmental decisionmaker' [citation] and that 'the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.' [Citation.]" (*Hofsheier, supra,* 37 Cal.4th at p. 1201, 39 Cal.Rptr.3d 821, 129 P.3d 29.) Thus, "we must undertake ' " ' " *a serious and genuine judicial inquiry* into the correspondence between the classification and the legislative goals" ' " ' [citation] by inquiring whether ' "the statutory classifications are rationally related to the 'realistically conceivable legislative purpose [s]' [citation]" ... and ... by declining to "invent[ ] fictitious purposes that could not have been within the contemplation of the Legislature...." ' [Citation.]" (*Ibid.*) Statutory distinctions resting on "speculative possibility" do not satisfy the requirements of equal protection. (See *id.* at p. 1204, 39 Cal.Rptr.3d 821, 129 P.3d 29.)

### B. *Asserted Rational Grounds for Exempting General Grocery Stores and Big Box Stores from Ban on Sales of Tobacco Products*

**[23]**  We now turn to the question of whether there is a rational basis for exempting general grocery stores and big box stores that contain licensed pharmacies from the ban on sales of tobacco products applicable to all other retail establishments containing licensed pharmacies. We do not question the premise that the presence of a licensed pharmacy within any retail establishment provides a rational justification for prohibiting that store from selling tobacco products, but that is not the question before us. What must be decided here is whether the legitimate objectives of discouraging smoking and avoiding the suggestion that a health care purveyor approves of cigarette smoking provides a rational justification for prohibiting retail establishments such as Walgreens—which contains a licensed pharmacy in the rear of the **\*437** store—from selling tobacco products, while permitting a competing retail establishment such as Safeway or Costco—which sells many of the same products and also has a licensed pharmacy on premises—to sell the very same tobacco products.

The City defends the distinction drawn in the ordinance by asserting that the Board of Supervisors "rationally could have concluded that the sale of cigarettes by drug stores like Walgreens sends the wrong message about cigarettes *more strongly* than does the sale of cigarettes by big box stores or grocery stores, even if those stores too have pharmacies in them." (Italics added.) What the City seems to mean is that customers, particularly "impressionable young people," are more likely to perceive a tacit message that smoking is not harmful when tobacco products are sold in a store the public associates with the sale of health-related products, and a "drugstore" such as Walgreens carries such an association more so than does a supermarket such as Safeway.

The City's premise contradicts the allegation in Walgreens's complaint that "the implied message, if any, conveyed by the sale of tobacco products at a Walgreens [is not] different from the implied message, if any, conveyed by the sale of tobacco products at the exempted stores with [licensed] pharmacies." We must accept Walgreens's allegation as true in this appeal from an order sustaining a demurrer. (See *Zelig v. County of Los Angeles, supra,* 27 Cal.4th at p. 1126, 119 Cal.Rptr.2d 709, 45 P.3d 1171.) More importantly, allegations in the complaint concerning the similarities between Walgreens and general grocery stores support the contention there is no difference in any implied message **\*\*509** that might be conveyed by selling tobacco products in the two types of stores. These allegations appear to be beyond dispute, with the City conceding that similarities exist. Thus, for example, at both Walgreens and the exempt general grocery stores, the licensed pharmacy is located in the back of the store, whereas tobacco products were sold in the front of Walgreens stores prior to the effective date of the ordinance and had to be requested from a clerk. Stores subject to the ordinance and grocery stores exempt from it typically advertise themselves as health-promoting and have signage on the outside of the store advertising the licensed pharmacy within. Indeed, Safeway advertised itself as promoting "Healthy Living." Like stores exempt from the ordinance that do not devote a significant percentage of their floor space to their licensed pharmacies, Walgreens devotes less than 10 percent of the total "front area" of its stores to the licensed pharmacy. In addition, 90 percent of the transactions at Walgreens's stores in the City do not involve a purchase from the licensed pharmacy.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Walgreen Co. v. City and County of San Francisco, 185 Cal.App.4th 424 (2010)
110 Cal.Rptr.3d 498, 10 Cal. Daily Op. Serv. 7207, 2010 Daily Journal D.A.R. 8542

Case 3:16-cv-06660-JST   Document 34-1   Filed 02/28/17   Page 27 of 80

**\*438** Furthermore, as Walgreens points out in its complaint, the majority of its stores in San Francisco meet the primary criteria for the ordinance's definition of "general grocery store," [8] which the ordinance exempts from the ban on sales of tobacco products. Walgreens alleges that the majority of its stores meet the four criteria defining a general grocery store because they "(A) exceed 5,000 gross square feet; (B) offer a diverse variety of unrelated, non-complementary food and non-food commodities, such as beverages, dairy, dry goods, fresh produce and other perishable items, frozen foods, household products, and paper goods; (C) prepare no food on-site for immediate consumption; and (D) market all of their merchandise at retail prices." Walgreens purportedly does not come within the definition of "general grocery store" only because of the peculiar distinction that it is not a "retail food establishment" but instead is a retail store that sells food. The distinction apparently turns upon whether the establishment primarily sells foodstuffs. [9]

[8]     See footnote 3 *ante.*

[9]     The City offers no explanation of the product mix that would be necessary for a store to be considered a "retail food establishment," a troubling ambiguity as hybrid forms of retail stores offering food items continue to appear in the marketplace. At oral argument, counsel for Walgreens explained it would not be in a position to claim it is a "general grocery store" and that it would have been futile to pursue such a status, asserting the City takes the view a "retail food establishment" primarily sells food items. Counsel for the City did not dispute this assessment.

The increasingly blurred distinction between Walgreens and general grocery stores is much like the growing similarities over time between hotels and motels, which the appellate court addressed in *Gawzner Corp. v. Minier* (1975) 46 Cal.App.3d 777, 120 Cal.Rptr. 344. There, the court held that a statute regulating the content of outdoor rate advertising by motels but not hotels violated equal protection and could not be enforced. (*Id.* at p. 791, 120 Cal.Rptr. 344.) The proffered justification for the distinction was that hotels do not seek the business of the motoring public and therefore have no need to display rate signs to appeal to passing motorists. (*Id.* at p. 790, 120 Cal.Rptr. 344.) The court rejected this reasoning as "patently untrue in California in the year 1975." (*Ibid.*) According to the court, "Just as motels have expanded their services to compete with hotels, hotels have added parking facilities to compete with motels." (*Ibid.*) The court concluded **\*\*510** that although a hotel is obviously different from a motel in terms of size, diversity of services, and facilities, they both "rely to a large degree upon the motoring public for business." (*Id.* at p. 791, 120 Cal.Rptr. 344.) Thus, "[w]ith respect to the avowed purpose of [the statute], hotels and motels are similarly situated." (*Ibid.*)

**\*439** Likewise, based on an objective comparison of the stores, a Walgreens store and a general grocery store are similarly situated with respect to the purpose of the ordinance. There is no reason to believe the implied message conveyed by a Walgreens that sells tobacco products is any different from the implied message conveyed by a supermarket or big box store that sells such items. To survive an equal protection challenge, the rationality of the legislative distinction "must be 'plausible' [citation] and the factual basis for that rationale must be *reasonably* conceivable [citation]." (*Hofsheier, supra,* 37 Cal.4th at p. 1201, 39 Cal.Rptr.3d 821, 129 P.3d 29.) Here, there is no reasonably conceivable factual basis for finding that the purported implied message approving tobacco use is "stronger" at a Walgreens than it is at a supermarket containing a licensed pharmacy.

Walgreens attacks not only the exemption for general grocery stores and big box stores but also claims the very premise of the legislation is questionable. According to Walgreens, "It is simply not credible that 'pharmacies convey tacit approval of the purchase and use of tobacco products' ... given the decades of anti-smoking media campaigns and warnings that would counteract any such implied message." The premise underlying the prohibition on sales of tobacco products in pharmacies may not be universally accepted. Nonetheless, the government unquestionably has a legitimate interest in discouraging tobacco use. Here, the City made a determination that prohibiting sales of tobacco products in pharmacies furthers that legitimate interest, a determination supported by numerous professional medical and pharmaceutical organizations. While that assessment may be subject to debate—and indeed was debated by members of the City's Board of Supervisors—it does not violate any constitutional principle.

Although it is generally not the court's role to examine the legitimacy of the legislative purpose underlying legislation, [10] we must necessarily consider a law's purpose more carefully when it provides the justification for treating similarly situated persons differently. In other words, a law based upon a questionable premise may violate no constitutional proscription if applied uniformly to all similarly situated persons. But a law that discriminates among similarly situated persons based upon that same questionable or speculative premise may well lack a rational basis to support the unequal treatment. In this case, the City has relied upon a premise that is itself subject to debate to support narrow distinctions the generic premise simply does not support. With the image of a small, traditional independent pharmacy in mind—one that primarily sells pharmaceutical prescriptions, over-the-counter **440 medications, personal care items, and little more— the justification for precluding customers from obtaining the impression that the licensed pharmacist endorses the use of tobacco products can be readily understood. There is an unmistakable difference, however, between the traditional **511 independent pharmacy selling predominantly pharmaceuticals and contemporary chain stores that sell a far greater variety of merchandise, including foodstuffs as well as prescription drugs. The premise underlying the ordinance —that pharmacies selling tobacco products convey tacit approval of tobacco use—has a questionable application to stores such as Walgreens, and it certainly does not support the narrow distinction in the ordinance between stores such as Walgreens and general grocery stores. As discussed above, the distinction turns largely on whether the store primarily sells food items, a difference that has little bearing on the "strength" of any implied message that may be conveyed by selling tobacco products in a store that contains a licensed pharmacy.

[10]     The day is past when the courts "strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. [Citations.]" (*Williamson v. Lee Optical of Oklahoma* (1955) 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563.)

The analysis in *Hays v. Wood* (1979) 25 Cal.3d 772, 160 Cal.Rptr. 102, 603 P.2d 19 is particularly apt. There, our Supreme Court held equal protection was denied by a provision of the Political Reform Act of 1974 requiring public officials who are also attorneys or brokers to disclose the names of clients paying them $1,000 or more in fees a year, while officials practicing any other professions were required to disclose only clients paying them $10,000 or more in annual fees. (*Id.* at pp. 778–779, 160 Cal.Rptr. 102, 603 P.2d 19.) The court could find no rational basis for creating different financial disclosure levels "for lawyers and brokers on the one hand and, on the other hand ... members of other professions" or others "whose relative profit margin is comparable to theirs." (*Id.* at pp. 789–790, 160 Cal.Rptr. 102, 603 P.2d 19.) The Attorney General advanced four conceivable bases for the distinction, each of which was rejected by the court. As relevant here, the Attorney General urged that the "classification here in question finds a rational basis on the ground of strengthening public confidence in the political process." (*Id.* at p. 794, 160 Cal.Rptr. 102, 603 P.2d 19.) The argument, as the court understood it, "rest[ed] upon the rather curious assertion that the public, seeing an attorney advocate a position in his role as public official, 'may believe, more so than for persons in other professions,' that he is really promoting the interests of a private client." (*Ibid.*) "[T]o disabuse the public of this pernicious and misguided notion," the court was advised that "more stringent disclosure requirements have been placed upon the attorney." (*Id.* at pp. 794–795, 160 Cal.Rptr. 102, 603 P.2d 19.) The court rejected the contention, reasoning that although a concern about the appearance of impropriety **441 involving public officials may support public disclosure laws *in general,* this concern does not justify "significantly different standards of disclosure for members of different professions." (*Id.* at p. 795, 160 Cal.Rptr. 102, 603 P.2d 19.)

Like the distinction among professionals in *Hays v. Wood,* the distinction among pharmacies here rests upon the supposed strength of a perception. That perception may justify the prohibition against sales of tobacco products by pharmacies *in general,* but it does not justify treating stores such as Walgreens differently from general grocery stores and big box stores. The City's claim that the implied message, or perception, is somehow stronger at a Walgreens than it is as a general grocery store or big box store is purely speculative.

The City urges that the factual basis for a statutory distinction may not be "subject to courtroom factfinding" and may rest on "rational speculation." (*FCC v. Beach Communications, Inc., supra,* 508 U.S. at p. 315, 113 S.Ct. 2096.) While true, the distinction must at least be based on "reasonably conceivable facts." (*Hofsheier, supra,* 37 Cal.4th at p. 1204, 39

Cal.Rptr.3d 821, 129 P.3d 29.) The only explanation the City advances as to why it is plausible **512 to assume that, despite their similarities, stores such as Walgreens are more likely than a supermarket such as Safeway or a big box store such as Costco to convey the tacit message that smoking is not harmful is that a greater percentage of Walgreens's sales revenue is derived from prescription drugs than is true of Safeway or Costco. [11]

11    By Walgreens's estimates, pharmacy sales comprise slightly over half of the sales revenue at its San Francisco stores. According to the recitals in the City's ordinance, pharmacy sales at Safeway are estimated to be "7.5% of annual volume" and prescription sales generated "1.5% of total revenue in 2002" at Costco.

But why do these revenue percentages indicate that customers receive a different message concerning the safety of tobacco products sold at a store such as Walgreens than the message received by customers of Safeway or Costco? A customer normally would not be aware of the percentage of pharmacy sales at the different types of stores. The City agrees that the percentage of a store's revenue attributable to pharmacy sales does not *cause* a customer to perceive the various types of stores differently. It claims, however, that the comparison of revenues attributable to pharmacy sales reflects the fact that stores such as Walgreens are *in fact* different from grocery and big box stores. That undoubtedly is true, but it begs the question: why do the different sales percentages indicate that purchasers at the different *442 establishments receive different messages concerning the safety of tobacco products they sell? The public may more closely identify a Walgreens with a licensed pharmacy than a Safeway with a licensed pharmacy, since most Walgreens contain a pharmacy [12] and that is not true of most grocery stores and likely is not true of what have come to be known as supermarkets or big box stores. But the fact that the public considers it more likely to find a licensed pharmacy in a Walgreens than in a supermarket, or is more likely to purchase prescription drugs at a Walgreens than at a supermarket, does not rationally explain why in those stores that contain a licensed pharmacy, the implied approval of smoking is greater in one than the other.

12    The complaint alleges that two Walgreens stores in San Francisco do not contain a licensed pharmacy.

[24]  It is true, as the City argues, that courts do not force policymakers to tackle an entire problem at one time. "Past decisions ... establish that, under the rational relationship test, the state may recognize that different categories or classes of persons within a larger classification may pose varying degrees of risk of harm, and properly may limit a regulation to those classes of persons as to whom the need for regulation is thought to be more crucial or imperative." (*Warden v. State Bar, supra,* 21 Cal.4th at pp. 644–645, 88 Cal.Rptr.2d 283, 982 P.2d 154.) It is also the case, however, that "the legislative body, when it chooses to address a particular area of concern in less than comprehensive fashion by merely 'striking the evil where it is felt most' [citation] may not do so wholly at its whim." (*Hays v. Wood, supra,* 25 Cal.3d at p. 790, 160 Cal.Rptr. 102, 603 P.2d 19.) Further, even when a classification is considered an incremental or partial step in addressing a problem, the differentiation must still be based on "some plausible reason, based on reasonably conceivable facts." (*Hofsheier, supra,* 37 Cal.4th at p. 1204, 39 Cal.Rptr.3d 821, 129 P.3d 29.) As explained above, the challenged classification does not satisfy this standard. There is no plausible reason to believe that members of the public place any greater reliance **513 on implicit advice regarding the healthfulness of tobacco products conveyed by counter clerks, the corporate structure, or the product mix of a Walgreens than of a Safeway or Costco. We conclude that the strength of the purported implied message conveyed by a pharmacy that sell tobacco products does not justify the ordinance's distinction among general grocery stores, big box stores, and all other stores containing a licensed pharmacy.

Other reasons offered by the City to justify the classification among pharmacies are no more persuasive. According to the City, one could rationally conclude that a ban on sales of tobacco products in stores such as Walgreens and Rite–Aid would serve the purpose of limiting the exposure of sick people to cigarettes. The City reasons that customers of Walgreens and Rite–Aid are more likely to be sick than customers of general grocery stores and big box stores. The contention lacks merit. Sick people who go to a *443 licensed pharmacy at a Safeway or Costco are just as likely to be exposed to tobacco products as those who went to a Walgreens. Moreover, there is no reason to believe supermarkets and big box stores have fewer sick customers than Walgreens. People who are sick still need to buy food and will be exposed to tobacco products at the supermarket when they do their grocery shopping, regardless of whether they also patronize the store for pharmacy services. Further, even if it were true that a larger percentage of Walgreens's customers

are sick, it is likely the case that there will be just as many sick customers at supermarkets and big box stores, which common experience suggests have larger numbers of customers overall. Thus, there is no rational relationship between the distinction among pharmacies in the ordinance and the objective of limiting the exposure of sick people to tobacco products.

 **[25]**   In its trial court briefs and again at oral argument in this court, the City contended the Board of Supervisors could have rationally excluded big box stores and grocery stores from the ordinance for economic reasons. Citing an article from the San Francisco Chronicle, the title of which suggests that supermarkets are an "endangered species" in San Francisco, the City urges it is rational to favor supermarkets over stores such as Walgreens in order to discourage them from leaving the City. This proffered rationale is insufficient to support the differential treatment afforded to grocery stores, big box stores, and all other pharmacies. Among other things, the article on which the City relies postdates the enactment of the ordinance and is not contained in the record on appeal. In any event, the article's contents are not a proper subject of judicial notice and therefore may not be considered by this court on review of a ruling sustaining a demurrer. (See *Zelig v. County of Los Angeles, supra,* 27 Cal.4th at p. 1126, 119 Cal.Rptr.2d 709, 45 P.3d 1171 [on review of demurrer court considers only complaint and matters subject to judicial notice]; *Big Valley Band of Pomo Indians v. Superior Court* (2005) 133 Cal.App.4th 1185, 1191–1192, 35 Cal.Rptr.3d 357 [court may take judicial notice of document's existence but not truth of its contents].) Furthermore, the rationale for favoring supermarkets is questionable, at best. There is nothing in the record to suggest the City has a policy of favoring supermarkets over stores such as Walgreens, and none of the ordinance's findings mention an economic basis for the exemptions afforded to general grocery stores. Moreover, given that big box stores as well as general grocery stores enjoy the exemption from the ban on sales of tobacco products, it seems unlikely the exemption could have been motivated by a desire to encourage supermarkets to remain in San Francisco. In short, the economic  **\*\*514**  rationale for the exemption falls into that category of " ' "fictitious purposes that could not have been within the contemplation of the Legislature...." ' [Citation.]" (*Hofsheier, supra,* 37 Cal.4th at p. 1201, 39 Cal.Rptr.3d 821, 129 P.3d 29; *Warden v. State Bar, supra,* 21 Cal.4th at p. 649, 88 Cal.Rptr.2d 283, 982 P.2d 154.)

 **[26]**   For the reasons set forth above, Walgreens's complaint adequately states causes of action for a violation of the equal protections provisions of the  **\*444**  United States and California constitutions. The order sustaining the City's demurrers to the first and second causes of action therefore must be reversed. Walgreens goes one step further and asks this court to direct entry of judgment in its favor on the equal protection causes of action. It claims the relevant facts are "largely undisputed" and that this court could decide the matter in its favor as a matter of law. (See, e.g., *Widders v. Furchtenicht* (2008) 167 Cal.App.4th 769, 786, 84 Cal.Rptr.3d 428 [reversing order sustaining demurrer and directing entry of judgment for plaintiff].) We decline to do so. As far as this court is aware, the City has not yet answered the complaint or had the opportunity to assert and litigate any affirmative defenses it may wish to raise. It is therefore premature to enter judgment in favor of Walgreens. [13]

[13]    Our disposition should not be interpreted to suggest we have reached our decision solely because we must accept as true the allegations in Walgreens's complaint. We agree with Walgreens that the relevant facts appear to be largely beyond dispute. To the extent disputed facts have been brought to our attention, such as the litigants' competing estimates of proportionate revenue attributable to prescription drug sales at Walgreens and other pharmacies, the differences are legally irrelevant, particularly in light of the principle that a legislative choice is not subject to judicial fact-finding. (*FCC v. Beach Communications, Inc., supra,* 508 U.S. at p. 315, 113 S.Ct. 2096.)

As a consequence of our decision, the parties do not start with a clean slate upon remand. The principles of law necessary to this court's decision become law of the case and must be adhered to both in the court below and upon any subsequent appeal. (*Gunn v. Mariners Church, Inc.* (2008) 167 Cal.App.4th 206, 213, 84 Cal.Rptr.3d 1.) "[I]t has long been held that sufficiency of the pleadings is an issue subject to foreclosure by law of the case. [Citation.]" (*People v. Shuey* (1975) 13 Cal.3d 835, 843, 120 Cal.Rptr. 83, 533 P.2d 211, abrogated on other grounds as recognized in *People v. Bennett* (1998) 17 Cal.4th 373, 389–390, fn. 5, 70 Cal.Rptr.2d 850, 949 P.2d 947.) This appeal therefore precludes any further litigation in this court

or the trial court on whether Walgreens's complaint states valid claims for a violation of the equal protection clauses of the federal and state constitutions.

Should Walgreens ultimately prevail on its equal protection causes of action, the court will be required to determine whether the appropriate remedy is to preclude enforcement of the entire ordinance or to invalidate only the exceptions contained in San Francisco Health Code section 1009.93. (See *Hofsheier, supra,* 37 Cal.4th at pp. 1207–1208, 39 Cal.Rptr.3d 821, 129 P.3d 29; *Coalition Advocating Legal Housing Options v. City of Santa Monica* (2001) 88 Cal.App.4th 451, 464, 105 Cal.Rptr.2d 802.) This question should be considered in the first instance in the trial court. We express no opinion at this point concerning the appropriate form of relief.

## III. PROPOSITION I [**]

[**] See footnote *, *ante*.

## *445  DISPOSITION

The judgment is reversed insofar as it sustained the demurrers to the first and second causes of action. On remand, the trial court is directed to enter a new order (1) overruling the demurrers to the first and second causes of action alleging equal protection violations, and (2) sustaining  **515  without leave to amend the demurrer to the third cause of action alleging a violation of Proposition I. Each party shall bear its own costs on appeal.

We concur: POLLAK and JENKINS, JJ.

## All Citations

185 Cal.App.4th 424, 110 Cal.Rptr.3d 498, 10 Cal. Daily Op. Serv. 7207, 2010 Daily Journal D.A.R. 8542

---

**End of Document**                        © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**- EXHIBIT 3 -**

West's Annotated California Codes
    Revenue and Taxation Code (Refs & Annos)
        Division 2. Other Taxes (Refs & Annos)
            Part 1. Sales and Use Taxes (Refs & Annos)
                Chapter 1. General Provisions and Definitions (Refs & Annos)

West's Ann.Cal.Rev. & T.Code § 6012

§ 6012. Gross receipts; excluded items

Effective: January 1, 2003
Currentness

(a) "Gross receipts" mean the total amount of the sale or lease or rental price, as the case may be, of the retail sales of retailers, valued in money, whether received in money or otherwise, without any deduction on account of any of the following:

(1) The cost of the property sold. However, in accordance with any rules and regulations as the board may prescribe, a deduction may be taken if the retailer has purchased property for some other purpose than resale, has reimbursed his or her vendor for tax which the vendor is required to pay to the state or has paid the use tax with respect to the property, and has resold the property prior to making any use of the property other than retention, demonstration, or display while holding it for sale in the regular course of business. If that deduction is taken by the retailer, no refund or credit will be allowed to his or her vendor with respect to the sale of the property.

(2) The cost of the materials used, labor or service cost, interest paid, losses, or any other expense.

(3) The cost of transportation of the property, except as excluded by other provisions of this section.

(4) The amount of any tax imposed by the United States upon producers and importers of gasoline and the amount of any tax imposed pursuant to Part 2 (commencing with Section 7301) of this division.

(b) The total amount of the sale or lease or rental price includes all of the following:

(1) Any services that are a part of the sale.

(2) All receipts, cash, credits and property of any kind.

(3) Any amount for which credit is allowed by the seller to the purchaser.

(c) "Gross receipts" do not include any of the following:

(1) Cash discounts allowed and taken on sales.

(2) Sale price of property returned by customers when that entire amount is refunded either in cash or credit, but this exclusion shall not apply in any instance when the customer, in order to obtain the refund, is required to purchase other property at a price greater than the amount charged for the property that is returned. For the purpose of this section, refund or credit of the entire amount shall be deemed to be given when the purchase price less rehandling and restocking costs are refunded or credited to the customer. The amount withheld for rehandling and restocking costs may be a percentage of the sales price determined by the average cost of rehandling and restocking returned merchandise during the previous accounting cycle.

(3) The price received for labor or services used in installing or applying the property sold.

(4)(A) The amount of any tax (not including, however, any manufacturers' or importers' excise tax, except as provided in subparagraph (B)) imposed by the United States upon or with respect to retail sales whether imposed upon the retailer or the consumer.

(B) The amount of manufacturers' or importers' excise tax imposed pursuant to Section 4081 or 4091 of the Internal Revenue Code for which the purchaser certifies that he or she is entitled to either a direct refund or credit against his or her income tax for the federal excise tax paid or for which the purchaser issues a certificate pursuant to Section 6245.5.

(5) The amount of any tax imposed by any city, county, city and county, or rapid transit district within the State of California upon or with respect to retail sales of tangible personal property measured by a stated percentage of sales price or gross receipts whether imposed upon the retailer or the consumer.

(6) The amount of any tax imposed by any city, county, city and county, or rapid transit district within the State of California with respect to the storage, use or other consumption in that city, county, city and county, or rapid transit district of tangible personal property measured by a stated percentage of sales price or purchase price, whether the tax is imposed upon the retailer or the consumer.

(7) Separately stated charges for transportation from the retailer's place of business or other point from which shipment is made directly to the purchaser, but the exclusion shall not exceed a reasonable charge for transportation by facilities of the retailer or the cost to the retailer of transportation by other than facilities of the retailer. However, if the transportation is by facilities of the retailer, or the property is sold for a delivered price, this exclusion shall be applicable solely with respect to transportation which occurs after the sale of the property is made to the purchaser.

(8) Charges for transporting landfill from an excavation site to a site specified by the purchaser, either if the charge is separately stated and does not exceed a reasonable charge or if the entire consideration consists of payment for transportation.

(9) The amount of any motor vehicle, mobilehome, or commercial coach fee or tax imposed by and paid to the State of California that has been added to or is measured by a stated percentage of the sales or purchase price of a motor vehicle, mobilehome, or commercial coach.

(10)(A) The amount charged for intangible personal property transferred with tangible personal property in any technology transfer agreement, if the technology transfer agreement separately states a reasonable price for the tangible personal property.

(B) If the technology transfer agreement does not separately state a price for the tangible personal property, and the tangible personal property or like tangible personal property has been previously sold or leased, or offered for sale or lease, to third parties at a separate price, the price at which the tangible personal property was sold, leased, or offered to third parties shall be used to establish the retail fair market value of the tangible personal property subject to tax. The remaining amount charged under the technology transfer agreement is for the intangible personal property transferred.

(C) If the technology transfer agreement does not separately state a price for the tangible personal property, and the tangible personal property or like tangible personal property has not been previously sold or leased, or offered for sale or lease, to third parties at a separate price, the retail fair market value shall be equal to 200 percent of the cost of materials and labor used to produce the tangible personal property subject to tax. The remaining amount charged under the technology transfer agreement is for the intangible personal property transferred.

(D) For purposes of this paragraph, "technology transfer agreement" means any agreement under which a person who holds a patent or copyright interest assigns or licenses to another person the right to make and sell a product or to use a process that is subject to the patent or copyright interest.

(11) The amount of any tax imposed upon diesel fuel pursuant to Part 31 (commencing with Section 60001).

(12)(A) The amount of tax imposed by any Indian tribe within the State of California with respect to a retail sale of tangible personal property measured by a stated percentage of the sales or purchase price, whether the tax is imposed upon the retailer or the consumer.

(B) The exclusion authorized by subparagraph (A) shall only apply to those retailers who are in substantial compliance with this part.

For purposes of the sales tax, if the retailers establish to the satisfaction of the board that the sales tax has been added to the total amount of the sale price and has not been absorbed by them, the total amount of the sale price shall be deemed to be the amount received exclusive of the tax imposed. Section 1656.1 of the Civil Code shall apply in determining whether or not the retailers have absorbed the sales tax.

**Credits**

(Added by Stats.1941, c. 36, p. 534, § 1, eff. July 1, 1943. Amended by Stats.1943, c. 699, p. 2454, § 2, eff. May 21, 1943, operative July 1, 1943; Stats.1945, c. 926, p. 1724, § 3, eff. June 15, 1945, operative July 1, 1945; Stats.1947, c. 24, p. 506, § 2, eff. Feb. 6, 1947; Stats.1953, c. 691, p. 1958, § 2, eff. May 15, 1953; Stats.1957, c. 592, p. 1688, § 2; Stats.1960, c. 10, p. 18, § 2; Stats.1961, c. 2193, p. 4536, § 2; Stats.1962, c. 3, p. 6, § 2; Stats.1968, c. 940, p. 1792, § 3; Stats.1971, c. 1400, p. 2781, § 5, operative July 1, 1972; Stats.1978, c. 1211, p. 3921, § 3.5; Stats.1982, c. 1589, p. 6278, § 6; Stats.1983, c. 844, § 2, eff. Sept. 16, 1983, operative Jan. 1, 1984; Stats.1988, c. 500, § 2, eff. Aug. 22, 1988; Stats.1988, c. 1647, § 4, eff. Oct. 1, 1988, operative Jan. 1, 1989; Stats.1993, c. 887 (A.B.103), § 2, eff. Oct. 8, 1993, operative April 1, 1994; Stats.1994,

c. 912 (S.B.840), § 1.5, eff. Sept. 28, 1994, operative July 1, 1995; Stats.2000, c. 923 (A.B.2894), § 1.3; Stats.2002, c. 593 (A.B.2701), § 2, eff. Sept. 16, 2002, operative Jan. 1, 2003.)

Notes of Decisions (42)

West's Ann. Cal. Rev. & T. Code § 6012, CA REV & TAX § 6012
Current with all 2016 Reg.Sess. laws, Ch. 8 of 2015-2016 2nd Ex.Sess., and all propositions on 2016 ballot.

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**- EXHIBIT 4 -**

## Publication 115, *Tips, Gratuities, and Service Charges*

### May 2015

**Optional Charges**    Mandatory Charges    Service Charges    Additional Information

Businesses such as restaurants, hotels, caterers, boarding houses, drive–ins and similar establishments often receive payments designated as tips, gratuities, and service charges from their customers. An optional payment designated as a tip, gratuity, or service charge is not subject to tax. A mandatory payment designated as a tip, gratuity, or service charge is included in taxable gross receipts, even if the amount is later paid by the retailer to employees.

### Optional tips, gratuities, and service charges

Generally, a tip, gratuity, or service charge (tip) is optional if your customer adds the amount to the bill, or leaves a separate amount in addition to the actual amount due from your sale of meals, food, and drinks that include services.

A tip, gratuity, or service charge is optional and not included in taxable gross receipts when:

1. The restaurant check is presented with the "tip" area blank so your customer may voluntarily write in an amount, or

2. The restaurant check is presented to your customer with tip suggestions and the "tip" area is blank so your customers may voluntarily write in an amount if they wish to do so.

| Guest Check | |
|---|---|
| Food Item A | $9.95 |
| Beverage Item B | 3.75 |
| Subtotal | $13.70 |
| 8.25% sales tax | 1.13 |
| Subtotal | $14.83 |
| Tip* | _____ |
| Total | _____ |
| *Suggested tips: 15%=$2.06; 18%=$2.47; 20%=$2.74; other. | |

Case 3:16-cv-06660-JST   Document 34-1   Filed 02/28/17   Page 39 of 80

On and after January 1, 2015, when a retailer keeps records consistent with reporting amounts as tip wages for Internal Revenue Service (IRS) purposes, such amounts are presumed to be optional and not subject to tax. When a retailer does not maintain such records, this presumption does not apply and the amounts may be mandatory and included in taxable gross receipts.

If an employer misappropriates gratuities that are intended for an employee, these amounts are included in the retailer's taxable gross receipts.

### Mandatory tips, gratuities, and service charges

For transactions beginning on and after January 1, 2015, when a retailer's records reflect amounts required to be reported to the IRS as non-tip wages, the amounts are deemed to be mandatory and includable in taxable gross receipts.

When a retailer does not maintain records for purposes of reporting the amounts to the IRS, an amount negotiated between the retailer and the customer in advance of a meal, food, or drinks, or an event that includes a meal, food, or drinks is mandatory.

The amount will also be considered mandatory when the menus, brochures, advertisements or other materials contain printed statements that notify customers that tips, gratuities, or service charges will, or may be added, to the bill. Examples of printed statements include:

> "An 18% gratuity [or service charge] will be added to parties of 8 or more."

> "Suggested gratuity 15%," itemized on the invoice or bill presented to your customer.

> "A 15% voluntary gratuity will be added for parties of 8 or more."

When the menu, brochure, advertisement or other material contains such printed statements, an amount *automatically added* to the bill or invoice is a mandatory charge and subject to tax. An amount is considered automatically added when the retailer adds the amount to the bill without first discussing it with the customer after the service of the meal.

It is presumed that an amount you add as a tip to the bill or invoice you present to the customer is mandatory. A statement on the bill or invoice that the amount is suggested, optional, or may be increased, decreased, or removed by your customer does not change the mandatory nature of the charge. This presumption may be disputed by documentary evidence maintained in your records showing that your customer specifically requested and authorized the gratuity be added to the bill.

Examples of documentary evidence that may be used to overcome the presumption include:

1. A guest check that is presented to the customer showing sales tax reimbursement and the figure upon which it was computed, without "tip" or with the "tip" area blank and a separate document, such as a credit card receipt, to which the retailer adds or prints the requested amount.

2. Guest receipts and payments showing that the percentage of amounts paid by large parties varies from the percentage stated on the menu, brochure, advertisement, or other printed materials.

3. A retailer's written policy stating that its employees shall receive confirmation from a customer before adding an amount together with additional verifiable evidence that the policy has been enforced. The policy is not in itself sufficient documentation to establish that the customer requested and authorized that the amount be added to the bill without such additional verifiable evidence.

Please retain the guest checks and any additional separate documents to show that the payments of tips, gratuities, or service charges are optional. You are also required to maintain other records in accordance with the requirements of Regulation 1698, *Records* (boe.ca.gov/lawguides/business/current/btlg/vol1/sutr/1698.html) .

No employer shall collect, take, or receive any gratuity or a part of that gratuity, paid, given to, or left for an employee by a patron, or deduct any amount from wages due an employee on account of such gratuity, or require an employee to credit the amount, or any part thereof, of such gratuity against and as a part of the wages due the employee from the employer, as provided in Labor Code section 351 (http://www.dir.ca.gov/dlse/FAQ_tipsandgratuities.htm) . If this prohibition is violated, any amount received by the employer will be considered a part of the gross receipts of the employer and subject to the tax.

## Unrelated service charges

Tax does not apply to separately stated charges for services unrelated to furnishing and serving meals, food, or drinks, such as optional entertainment or any staff who do not directly participate in the preparation, furnishing, or serving of the meals, food, or drinks. For example:

1. Coat-check clerks

2. Parking attendants

3. Security guards

## Pooled tips for taxable and nontaxable services

If your contract requires your customer to pay a lump–sum tip in addition to your other charges, tax applies to all charges directly related to the preparation and service of the meal. But if you divide the tip among employees who prepare and serve food and those who provide parking, the portion paid to the parking attendants is not taxable. Your invoice and business records must

clearly document the specific percentage or amount paid to each type of employee and the service provided.

Optional service charges related to nontaxable sales may be segregated by:

1. Listing the taxable charges separately on the invoice

2. Separately stating the sales tax

3. Keeping separate records of taxable and nontaxable charges

## Cover charges

A cover charge is taxable if it allows your customer to consume food or beverages served on the premises without paying additional amounts for them. This is true even if the customer does not consume any food or beverages, or if the value of the food or beverages is less than the cover charge. Separate cover charges for admission only are not taxable.

## Corkage charges

Charges for opening and serving a customer–furnished beverage are generally taxable.

## Health surcharge

By law, restaurants in the City of San Francisco have the choice of either raising their prices or adding on a "health surcharge" cost to each meal check, to cover the owner's portion of the health insurance that they provide to their employees. Despite the fact that this is a government mandate, it is interpreted by the BOE as an increase in the price of the meal and therefore is subject to California sales tax.

## For more information

BOE regulation, publications, and additional information are available at *www.boe.ca.gov, (boe.ca.gov/)* or by calling our Customer Service Center at 1-800-400-7115 (TTY:711).

## Regulations

1603 (boe.ca.gov/lawguides/business/current/btlg/vol1/sutr/1603.html) *Taxable Sales of Food Products*

1698 (boe.ca.gov/lawguides/business/current/btlg/vol1/sutr/1698.html) *Records*

## Publications

22 (boe.ca.gov/pdf/pub22.pdf) *Dining and Beverage Industry*

Case 3:16-cv-06660-JST    Document 34-1    Filed 02/28/17    Page 42 of 80

**- EXHIBIT 5 -**

(/)

Become a member
(https://californiarestaurantcaassoc.wliinc23.com/join-

HOME (/)  |  HELP CENTER (/HELP-CENTER.HTML)  |  SHOP (/SHOP.HTML)  |  MEMBER DIRECTORY          BUYER'S GUIDE
(HTTPS://CALIFORNIARESTAURANTCAASSOC.WLIINC23.COM/ADVANCEDSEARCH)  |  (HTTP://DIRECTORY.CALREST.ORG/BUYERS-GUIDE/SEARCH)

Custom

Login

(/ABOUT.HTML)      ISSUES + POLICIES (/ISSUES-POLICIES.HTML)      MEMBERSHIP (/MEMBERSHIP.HTML)

(NEWS.HTML)      TRAINING (/TRAINING.HTML)          FOUNDATION (HTTP://WWW.CALRESTFOUNDATION.ORG)
HOME (HTTP://WWW.CALREST.ORG)

DAR (HTTP://EVENTS.CALREST.ORG/EVENTS)

# MANDATORY SERVICE CHARGES VERSUS TIPS AND SURCHARGES

**If you are interested in moving your model of compensation to any of the plans mentioned in this Industry Insight, please reach out to the CRA Member Helpline for legal guidance. The implementation process varies based on the model and your current policies. ***

On June 20, 2012, the Internal Revenue Service (IRS) issued Revenue Ruling 2012-18 to clarify and update existing guidelines on taxation issues affecting the hospitality industry. In particular, the ruling helped clarify the distinction between tips and service charges:

According to a previous ruling promulgated by the IRS (Rev. Rul. 59-252) and further clarified in Rev. Rul. 2012-18, a tip is narrowly defined as: (i) an amount of money presented by a guest free from compulsion; (ii) a payment that the customer has the unrestricted right to determine the amount of; (iii) a payment whose amount cannot be the subject of negotiation or dictated by employer policy; and (iv) generally, a payment in which the customer can dictate and determine the recipient. If these four factors are absent, under Rev. Rul. 59-252, the automatic or non-discretionary charge is not a tip and if any portion of the charge is distributed to an employee, it is considered wages for FICA tax purposes. The same factors must be examined with respect to automatic gratuities that are assessed for large parties at a restaurant.

Although the ruling took effect immediately, the IRS understood some businesses may need to make significant changes to their automated or manual tip reporting systems in order to comply, so it provided that, in specified limited circumstances, the distinction could be applied by regulators beginning January 1, 2014. That date has now come and gone, so there is no doubt that all employers must be fully aware of the implications of the ruling.

This policy presents a myriad of problems to operators in the hospitality industry, and in particular to companies that are in the business of hosting banquets, private or similar events because it has long been industry practice for these types of businesses to add a mandatory "gratuity" or service charge to their banquet contracts or invoices.

Further, now some restaurants are adding a surcharge to their receipts to defray costs from a myriad of options over the last several years including but not limited to minimum wage, healthcare, paid sick leave, restrictive scheduling and the current state of the law that does not allow restaurants to mandate tips to employees who do not regularly interact with customers. As such, these surcharges likewise need to be viewed and analyzed for taxation purposes.

First let us think about how service charge, surcharge and tips affect a company from a tax and reporting perspective. Starting in 1994, many restaurants have benefited from being allowed to apply a general business credit toward a portion of the employer's Social Security

and Medicare taxes paid with respect to their employees' cash tip earnings (IRC 45 B). However, the policy set forth in Rev. Rule 2012-18 means that the credit would not apply with respect to service charges, because the mandatory charges do not qualify as tips. In addition, the restaurant should not be reporting the service charges paid out to the employees as tips on their payroll reports, but rather as wages. This also means that while completing Form 8027, Employer's Annual Information Return of Tip Income and Allocated Tips, the service charges distributed to the employees (assuming it is more than 10 percent of the sale) and the respective sale should not be included on the form. Last, for income tax purposes, the Gross Receipts from the event would include the service charge as income and the service charge paid out to the employee would then be reported as Salaries and Wages on the business tax return. All of the above differs from the treatment that would have applied if the charge was considered a tip.

On December 23, 2016, the California State Board of Equalization made it clear that surcharges are also a taxable event.  The BOE states that: "The Revenue and Taxation Code (RTC) provides that sales tax is imposed on the gross receipts from the retail sales of tangible personal property in this state, unless the sale is specifically exempted from taxation by statute. The sales tax is imposed upon the retailer for the privilege of selling tangible personal property at retail in California. RTC section 6012, "Gross receipts," provides that the taxable gross receipts include all amounts received with respect to the sale, with no deduction for the cost of the property sold, materials used, labor or service cost, or any other expense of the retailer passed on to the customer. As explained by RTC section 6012, any expense of a restaurant passed on to customers in the form of a surcharge must be included in taxable gross receipts. Since there are no specific sales and use tax exemption for a surcharge imposed by a restaurant, retailers may not claim the cost of the surcharge as a deduction on their Sales and Use Tax return. Therefore, restaurants that include a separate surcharge on customer bills must include the surcharge amount in the calculation of tax."

As a result, to the extent a restaurant elects to distribute a surcharge to its employees, it will be treated in the same manner as a mandatory service charge in that it must be reported as Salaries and Wages on the business tax return.

Now, while the IRS does not have authority to issue regulations to or interpretations of the Fair Labor Standards Act (FLSA), the ruling does implicate some important issues concerning the minimum wage and overtime laws. Specifically, can an employer apply the tip credit to an employee's wages if he or she is working a shift where an automatic gratuity or service charge has been added to a guest's bill? The answer is relatively simple if an employee works a "banquet shift" or at a restaurant where the employer's policy is to charge a mandatory gratuity or automatic service charge to all patrons. In this scenario, the employer may not take advantage of the tip credit for the simple reason that the employees are not earning any gratuities, as defined by the IRS and the regulations to the FLSA. In this scenario, the employee must be paid the regular minimum wage for the time spent working the banquet or private event. (Currently the federal minimum wage is $7.25 per hour, California state minimum wage is $10.00 per hour if less than 25 employees and $10.50 with 26 employees or more – but certain municipal jurisdictions have implemented even higher minimum wage rates. The employer needs to comply with the highest minimum wage where it is located.) Because the mandatory service charges are not considered to be tips under federal law, employers within jurisdictions that adopt the FLSA in its entirety could conceivably keep the proceeds of the mandatory gratuity or service charge, or pay it out to the employees who worked the events as wages, bonuses or commissions. The same is true of surcharges which are treated the same way for tax purposes as service charges.

Another issue to consider is that an employer who pays out a portion of the mandatory gratuities or service charges to employees may have to recalculate its employees' overtime

rates (if the employees work more than 40 hours in a week or 8 hours a day for businesses in California). Because the regulations consider these payouts to be wages rather than tips, that money would count toward an employee's regular rate of pay and therefore must be factored into the overtime rate calculation.

The situation becomes much more problematic when an employee is serving a large party with an automatic service charge added onto the bill and simultaneously serving several smaller parties with no service charges all in the same shift. Because it is unclear under the current regulations whether an employee working under this "hybrid" scenario would be considered to be engaging in a "customarily and regularly tipped occupation," employers in this situation are facing an administrative nightmare that could expose the company to Department of Labor audits (and collective action lawsuits) if not treated or calculated correctly. Accordingly, we strongly recommend that employers micromanage their schedules to avoid having an employee simultaneously provide service to guests who are leaving totally voluntary tips and to other guests who are paying mandatory gratuities or service charges.

**In contrast, when is a tip really a service charge?**
The ruling provides the following illustration of an alleged tip that is actually a service charge: A restaurant's policy of adding an 18 percent service charge to the bill for parties of six or more is a service charge rather than a tip because the customer did not have the unrestricted right to determine the amount of the payment – it was dictated by the restaurant's policy – and the customer did not make the payment free from compulsion. On the other hand, a bill with sample calculations of different tip amounts, where the actual tip line is left blank, is truly a tip.

**How do you ensure a tip is really a tip?**
To ensure a tip is not actually a service charge according the IRS, make sure the tip line and total amount on any bill is left blank for the customer to complete in his or her discretion. While a restaurant may include sample calculations on the bill of different tip amounts (e.g., 15% = X), these must be clearly identified for reference purposes only so the IRS does not determine a certain amount is being mandated from the customer.

Why does it matter whether a payment is a tip versus a service charge?

- Service charges are considered wages, and, therefore, not eligible for the FICA Tip Credit (The 45B Credit). For many years, restaurants have benefited from being allowed to apply a general business credit toward a portion of the employer's social security and Medicare taxes paid on tips in excess of the federal minimum wage as of Jan. 1, 2007 (i.e., $5.15 per hour).
- As the ruling makes clear that service charges are not tips, they cannot be included in the tip amount that social security and Medicare taxes are paid on, which takes some tax credit off the table for restaurants. This credit is claimed on Form(s) 8846 and 3800.
- Tips and wages are reported on separate lines of the quarterly payroll tax return (Form 941). Incorrectly characterized service charges should be re-characterized and an adjustment made to Form 941 via tax report Form(s) 4666 and 4668.
- When completing Form 8027 (Employer's Annual Information Return of Tip Income and Allocated Tips), service charges distributed to employees and the respective sale should not be included on the form.
- Some business may have to change their automated or manual reporting systems to comply with this distinction.

- Employers who pay out a portion of the automatic gratuities or service charges to employees may have to recalculate its employees' overtime rates. The ruling considers these payouts to be wages, rather than tips, so that money counts toward the employee's regular rate of pay and should be factored into the overtime calculation.

**How does this work in practice?**

Let's say an employee works nine hours in one day, and is thus entitled to one hour of overtime pay. If you have paid him a portion of the automatic gratuities he earned that day, that amount counts toward the overall wages he earned that day and must be factored into the calculation of his regular rate of pay (i.e., total wages ÷ 8 hours). In turn, this is the regular rate of pay that would need to be used to determine his overtime pay rate (one-and-a-half times his regular rate of pay) for the one hour of overtime.

If the same employee works more than 40 hours in a week and is paid a portion of the automatic gratuities he earned that week, the amount of automatic gratuities he was paid is considered part of his wages. Accordingly, his total wages for that week, including the automatic gratuity amount, should be divided by 40 hours in order to determine his regular rate of pay. Again, this is the regular rate of pay that must be used to determine his overtime pay for time worked in excess of 40 hours during the week.

The same analysis applies as to overtime if an employee works in California more than 8 hours in a day. For that day, the overtime rate with the automatic gratuity amount, should be divided by the 8 hours in order to determine that day's regular rate of pay.

Finally, although a service charge on a restaurant bill will most frequently be encountered, restaurants should be cautioned that auto-gratuities paid for catering, banquets, weddings and other amounts mandated by employer policy would likely be covered as well.

As to surcharges, as set forth above, if they are distributed to employees they are wages and should be treated as service charges. Likewise, given recent comments by several City Attorneys like San Diego, it is probably prudent that a restaurant disclose up front that the meal is subject to a surcharge and the percentage i.e. on the menu, in a prominent sign or posting or even a card at the table. Surcharges are allowed but to avoid any claim of false or misleading advertising, disclosure to the customer would be a prudent and a conservative approach of any mandatory additional charge be they called a service charge or surcharge.

What is the solution to avoid confusion between tips and service charges? There are a few options and restaurant owners may not like any of them. Here are some suggestions:

- Indicate a "suggested gratuity" on the customer's receipt but do not add it to the total on the receipt allowing the customer to designate the gratuity voluntarily
- Charge sales tax on all service charges and any separate surcharge line item, regardless of the amount paid to the employee
- Eliminate all service charges and automatic gratuities
- Consult with your tax advisor or attorney to determine the proper method of taxing service charges and paying your employees

 This report was reviewed for legal accuracy and updated in 2017 by Wilson Elser Moskowitz Edelman & Dicker LLP.

**MEMBER SERVICES (/MEMBERSHIP.HTML)**

Contact Us (http://www.calrest.org/contact-us.html)

Online Store (/cra-store.html)

Help Center (/help-center.html)

Join (https://californiarestaurantcaassoc.wliinc23.com/us/index.aspx)

Renew (http://web.calrest.org/portal)

Privacy Policy (/privacy-policy.html)

Terms of Use (/terms-of-use.html)

**CONNECT**

**ISSUES + POLICIES (/ISSUES--POLICIES.HTML)**

Political Action Committees (/political-affairs.html)

Key Issues (/key-issues.html)

Take Action (/action-center.html)

Bill Tracking (/bill-tracking.html)

**RESOURCES (/RESOURCES--SUPPORT.HTML)**

Buyer's Guide (http://directory.calrest.org/buyers-guide/search)

Member Directory (http://directory.calrest.org/search)

Staff Directory (/staff-directory.html)

Legal Center (/legal-center.html)

**THE SOURCE**

Subscribe to *The Source* (/the-source.html), CRA's online newsletter

©2017 California Restaurant Association

Click Here for a print-friendly version of
the primary content on this page.

**Heartland**
(http://www.calrest.org/credit-
card-and-
payroll-
processing-
heartland-
payment-
systems.html)

**EMPLOYERS**
America's small business insurance specialist®
(http://www.calrest.org/workers-
compensation-
insurance-
offered-by-
employersreg.html)

**UnitedHealthcare**
(http://www.calrest.org/health-
insurance-
provided-by-
unitedhealthcare.html)

**BMI**
(http://www.calrest.org/licensing-for-bars-and-restaurants)

**fishbowl**
(http://www.calrest.org/digital-
marketing-
solutions-by-
fishbowl-
marketing.html)

**TIGER**
Natural Gas Company
(http://www.calrest.org/natural-
gas-by-
tiger-
natural-
gas.html)

**CTUIT**
(http://www.calrest.org/business-
intelligence-by-ctuit-
radar.html)

**- EXHIBIT 6 -**

<div style="border:1px solid #0000ff">

Search Blog or Docket

Blog  |  Docket

</div>

**Editor's Note :**    There is a possibility of opinions at 10 a.m. on Wednesday, March 1. We will begin live-blogging at 9:45 a.m.
On Wednesday the court hears oral argument in *Coventry Health Care of Missouri, Inc. v. Nevils*. Ronald Mann has our preview.

 **Ronald Mann** *Contributor*
Posted Wed, January 11th, 2017 10:49 am

Email Ronald
Bio & Post Archive »

# Argument analysis: Merchants seem to fall short in challenge to New York statute banning credit-card "surcharges"

The oral argument yesterday morning in *Expressions Hair Design v. Schneiderman* brought the justices face to face with the battle between merchants and credit-card networks over the "interchange" fees that merchants pay when they accept cards in retail transactions. The dispute that got the fees before the justices involves a New York statute that says that "[n]o seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." The petitioner, Expressions Hair Design (leader of the group of merchants challenging the provision), argues that the statute violates the First Amendment because it limits a merchant's right to describe the extra costs imposed on purchasers using credit cards as "surcharges."

For a case into which so many groups poured so much effort (23 amicus briefs), the argument must have been deeply frustrating, because the most prominent thing not on display was any strong inclination to address the case head-on. Three themes dominated the argument. The first was a considered refusal of the parties to join issue about what the statute actually means. Representing the merchants, Deepak Gupta insisted that the statute prevents merchants from posting separate cash and credit prices and that the state of New York has no justifiable reason to do so. Representing the state, Steven Wu insisted that the statute is aimed only at "bait-and-switch" pricing – when a retailer posts a single price but then asks for a higher price at the register for customers who pay with cards.

At least some of the justices seemed to agree with Gupta that the statute had been applied broadly in the past. Justice Elena Kagan, for example, commented to Wu that "you've walked away from some of that enforcement history in your briefing," explaining that the position he pressed at the argument "is contradicting some of this enforcement history where a different understanding of this law was used." And Justice Samuel Alito was pointedly concerned that Wu's reading of the statute on behalf of the solicitor general of New York would not bind district attorneys throughout the state: "How do we know how all of these other district attorneys are going to interpret the statute? They may interpret it differently." Still, at the end of the day, none of the justices displayed any enthusiasm for declaring that a statute violates the Constitution based on a reading of the statute that the state itself disclaims as unfounded.

A second theme was a strong sense among the justices that neither side's reading of the statute has much to do with what the text actually says. Justice Sonia Sotomayor pressed that point most firmly:

> I'm not sure what you or anybody is saying about this statute or what it means, but not because it's necessarily vague. I just don't see anything about speech in the statute. The statute simply says, "No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." To me, it's very simple: One price for everything.

Justice Kagan seemed similarly minded, worrying that "the law as written actually can be read – and Justice Sotomayor said this before – as just requiring a single price. Now, that's something that none of the parties here say, but if you just look at the law, that's what the law says."

The problem this poses for the merchants is that a reading of the statute as limited to a ban on dual pricing sounds much more like an economic regulation than a speech regulation. Because the merchants more or less conceded that a straightforward one-price statute would pass muster under the First Amendment, that problem left Sotomayor openly skeptical of the merchants' claim: "You told Justice [Stephen] Breyer that [a one-price statute] was okay. ... I'm hard-pressed to see, if that's the interpretation given to what I view as the plain meaning of the statute, that th[e statute] would be unconstitutional."

The third theme of the argument, which Breyer pressed repeatedly, was the most debilitating to the merchants. Breyer plainly saw the case through the lens of traditional pricing regulation and worried that any serious scrutiny of the statute threatened to cast a shadow on economic regulations long considered plainly valid:

> We are diving headlong into an area called price regulation. It is a form of price regulation, and price regulation goes on all over the place in regulatory agencies. And so the word that I fear begins with an "L" and ends with an "R"; it's called *Lochner*. And there we go.

Echoing the concerns of Kagan and Sotomayor, Breyer simply didn't see enough on the face of the statute itself to justify serious First Amendment scrutiny:

What this statute says is "you can't impose a surcharge." And you want to. What's that got to do with speech? I grant you, all business activity takes place through speech. So explain to me what it's got to do with speech. I don't see that in the statute. My statute that I'm reading says you can't charge a surcharge. But you can charge a discount.

The most surprising thing about all of this is how little weight the justices seemed to give to the merchants' evidence about past enforcement history. Ordinarily in First Amendment cases, it is a bad thing for the government when the meaning of a statute is unclear. And when doubts about statutory boundaries are combined with a past history of broad enforcement, something the merchants credibly alleged here, federal courts often examine statutes quite rigorously. There was little evidence at the argument, though, that any of the justices were inclined to follow those doctrinal leads in this case, which seemed to strike them much more as a battle between competing businesses over proper market regulation.

Having said that, it is not nearly so clear where the court will end up. The discussion above suggests that it is most unlikely that the court will reach out to invalidate the New York statute directly. Getting five votes for a ruling like that seems almost impossible given the expressed sentiments of Breyer, Kagan and Sotomayor. At the same time, there was no discussion at all in the argument of the particular ruling of the U.S. Court of Appeals for the 2nd Circuit (holding that a one-price rule did not violate the First Amendment and declining to address application of the statute to dual-pricing schemes), so there wasn't exactly a groundswell of support for a straight-up affirmance. Given the state's expressed unwillingness to apply the statute to the conduct challenged by the merchants, it wouldn't be all that surprising if the court simply dismissed the case entirely, concluding that the dispute was not sufficiently clear-cut to warrant the court's resolution.

But none of the justices went that far during the argument. Rather, to the extent any of the justices suggested a way to dispose of the case, these suggestions reflected a desire for more authoritative information from the New York courts about what the statute actually means. Alito, for example, seemed to agree with the suggestion of the United States that the federal court of appeals should be directed to ask the New York Court of Appeals for a definitive clarification of the statute, advocating use of a "certification" procedure under which federal courts can ask state courts to resolve questions of state law that arise in cases before the federal courts. Because it would involve a remand to the court of appeals, certification necessarily would rest on some rejection of the analysis that the court of appeals applied to uphold the statute, and the argument included no obvious hint about what might justify such a ruling.

I'll be looking forward to this opinion with great interest, then, not so much because I'm expecting anything earth-shattering, but rather to see how the court will agree upon a disposition that removes the case from its docket without directly addressing the questions that brought the case to the court.

[**Disclosure**: Goldstein & Russell, P.C., whose attorneys contribute to this blog in various capacities, is among the counsel on an amicus brief in support of the petitioner in this case.  However, the author of this post is not affiliated with the firm.]

Posted in *Expressions Hair Design v. Schneiderman*, Analysis, Featured, Merits Cases

**Recommended Citation:** Ronald Mann, *Argument analysis: Merchants seem to fall short in challenge to New York statute banning credit-card "surcharges"*, SCOTUSBLOG (Jan. 11, 2017, 10:49 AM), http://www.scotusblog.com/2017/01/argument-analysis-merchants-seem-fall-short-challenge-new-york-statute-banning-credit-card-surcharges/

© 2017 SCOTUSblog (click for license)
Switch to mobile site

**- EXHIBIT 7 -**

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
OAKLAND




R E P O R T

July 10, 2014

# TWENTY-THREE YEARS AND STILL WAITING FOR CHANGE

## Why It's Time to Give Tipped Workers the Regular Minimum Wage

BY **SYLVIA A. ALLEGRETTO** AND **DAVID COOPER**

ECONOMIC POLICY INSTITUTE • 1333 H STREET, NW • SUITE 300, EAST TOWER • WASHINGTON, DC 20005 • 202.775.8810 • WWW.EPI.ORG

# Introduction and executive summary

Last year marked the 75th anniversary of the Fair Labor Standards Act (FLSA), the legislation that established many of the basic labor protections workers enjoy today, such as a 40-hour workweek, overtime protection, and a national minimum wage. There have been periodic amendments to the FLSA over the years, but the 1966 amendments were especially significant. They extended protections to hotel, restaurant, and other service workers who had previously been excluded from the FLSA, but also introduced a new "subminimum wage" for workers who customarily and regularly receive tips.[1] Unlike temporary subminimum wages (such as those for students, youths, and workers in training), the "tip credit" provision afforded to employers uniquely established a permanent sub-wage for tipped workers, under the assumption that these workers' tips, when added to the sub-wage, would ensure that these workers' hourly earnings were at least equal to the regular minimum wage. The creation of the tip credit—the difference, paid for by customers' tips, between the regular minimum wage and the sub-wage for tipped workers—fundamentally changed the practice of tipping. Whereas tips had once been simply a token of gratitude from the served to the server, they became, at least in part, a subsidy from consumers to the employers of tipped workers. In other words, part of the employer wage bill is now paid by customers via their tips.

Today, this two-tiered wage system continues to exist, yet the subsidy to employers provided by customers in restaurants, salons, casinos, and other businesses that employ tipped workers is larger than it has ever been. At the federal level, it currently stands at $5.12 per hour, as employers are required to pay their tipped staff a "tipped minimum wage" of only $2.13 per hour, and the federal regular minimum wage is currently $7.25.[2] Remarkably, the federal tipped minimum wage has been stuck at $2.13 since 1991—a 23-year stretch, over which time inflation has lowered the purchasing power of the federal tipped minimum wage to its lowest point ever.

Proposed federal minimum-wage legislation, the Fair Minimum Wage Act of 2014—also known as the Harkin–Miller bill—would not only increase the federal regular minimum wage to $10.10, but for the first time in decades would also reconnect the subminimum wage for tipped workers back to the regular minimum wage by requiring the former be equal to 70 percent of the latter. This would be a strong step in the right direction; however, we present evidence that tipped workers would be better off still if we simply eliminated the tipped minimum wage, and paid these workers the full regular minimum wage.

Raising the wage floor for tipped workers is crucial for a number of reasons. Rising income inequality and the accompanying slowdown in improving American living standards over the past four decades has been driven by weak hourly wage growth, a problem that has been particularly acute for low-wage workers (Bivens et al. 2014). Tipped workers—whose wages typically fall in the bottom quartile of all U.S. wage earners, even after accounting for tips[3]—are a growing portion of the U.S. workforce. Employment in the full-service restaurant industry has grown over 85 percent since 1990, while overall private-sector employment grew by only 24 percent.[4] In fact, today more than one in 10 U.S. workers is employed in the leisure and hospitality sector, making labor policies for these industries all the more central to defining typical American work life.[5] Ensuring fair pay for tipped workers is also a women's issue. Women comprise two out of every three tipped workers; of the food servers and bartenders who make up over half of the tipped workforce, roughly 70 percent are women.

In their 2011 paper, Allegretto and Filion gave a historical account of the tipped-minimum-wage policy and brought much-needed attention to how the two-tiered wage system results in significantly different living standards for tipped versus non-tipped workers. For instance, tipped workers experience a poverty rate nearly twice that of other workers. The 2011 report, coupled with more recent publications from the White House (2014) and the Congressional Budget Office (2014), contradicts the notion that these workers' tips provide adequate levels of income and reasonable economic security.

Given recent policy interest in the minimum wage and greater attention to the lesser-known subminimum wage for tipped workers, this paper updates the 2011 report to reflect recent changes to state wage policies, and includes updated demographic and earnings profiles of tipped workers. We extend the 2011 analysis especially with regard to the family structure of tipped workers, noting important differences between men and women. We also provide new data on family income levels and participation in federal assistance programs among tipped workers, as well as measures of job quality in the food service industry.

Key findings include:

- The subminimum wage for tipped workers has remained at $2.13 since 1991. In 1996, it was decoupled from the regular minimum wage, such that the tipped wage remained at $2.13 even as the regular minimum wage was increased. At that time, the tipped minimum wage was equal to 50 percent of the regular minimum wage; today it is only equal to a record low 29.4 percent of the regular federal minimum wage of $7.25.

- Customers' tips pay the $5.12 difference between the federal tipped minimum wage and the federal regular minimum wage. Thus, customers provide a subsidy to employers of tipped workers worth more than twice the wage these employers are required to pay their tipped staff.

- The restaurant industry is an intense user of both minimum-wage and tipped-wage workers, with more than 60 percent of tipped workers employed in food service. The full-service restaurant sector has grown about 86 percent from 1990 to 2013, while overall growth in the private sector was up 24 percent—illustrating why it is increasingly important to raise wages for these workers.

- Tipped workers are predominantly women (66.6 percent) and disproportionately young; however, the majority are at least 25, and over one in four are at least 40 years of age.

- Tipped workers have a median wage (including tips) of $10.22, compared with $16.48 for all workers.

- While the poverty rate of non-tipped workers is 6.5 percent, tipped workers have a poverty rate of 12.8 percent. Tipped workers are thus nearly twice as likely to live in poverty as are non-tipped workers. Yet poverty rates are significantly lower for tipped workers in states where they receive the full regular minimum wage.

- Due to their low wages and higher poverty levels, about 46.0 percent of tipped workers and their families rely on public benefits, compared with 35.5 percent of non-tipped workers and their families. While it is a good thing that workers faced with challenging circumstances can turn to these programs for assistance, these programs were not designed to serve as a permanent wage subsidy or part of the business strategy for low-wage employers.

- Job quality, as measured by access to benefits, is far worse for tipped workers. Workers in the accommodation and food service industry—an industry with a high concentration of tipped workers—are offered paid leave (sick, holi-

day, and vacation leave), health insurance, and retirement benefits at rates far below those of private-sector workers overall.

- Paying tipped workers the regular minimum wage has had no discernable effect on leisure and hospitality employment growth in the seven states where tipped workers receive the full regular minimum wage. In fact, sector growth in these states has been stronger since 1995 than in the states where tipped workers are paid a subminimum wage.

## History of the two-tiered wage floor system

The 1966 amendments to the Fair Labor Standards Act (FLSA) provided for a 50 percent "tip credit" for employers of tipped workers, allowing tipped workers' income from tips to count toward half the regular minimum hourly wage guaranteed to workers by the FLSA, with the newly established subminimum wage comprising the other half. The real (inflation-adjusted) value of the two wages is illustrated in **Figure A**. In real terms, both wages are lower today than in 1966. Over time, the federal tip credit provision—the difference, made up for by customers' tips, between the regular minimum wage and the tipped minimum wage—dropped to as low as 40 percent (1980–1989) while never exceeding half of the regular minimum wage prior to 1996. The roughly proportional relationship between the two wages changed when President Clinton signed into law the Minimum Wage Increase Act of 1996. The act eliminated the FLSA provision that required the tipped minimum wage remain a certain percentage of the full minimum wage, instead locking in the tipped minimum wage at $2.13 per hour. At the time of the bill's passage, the tip credit stood at 50 percent. In October of that year, as the bill's regular minimum-wage increase from $4.25 to $4.75 took effect, the $2.13 tipped minimum wage remained frozen—bringing the tip credit for employers above 50 percent (Whittaker 2006).

In fact, the 1996 law set the stage for an ever-increasing tip credit. When the federal minimum wage was raised in 2007, 2008, and 2009, the tipped minimum wage was left unchanged. Today, the tipped wage remains at $2.13, meaning it is equal to a record low 29.4 percent of the regular minimum wage of $7.25, while the employer tip credit ($5.12) is equal to 70.6 percent of the regular minimum wage. As such, the customer-provided subsidy afforded to employers ($5.12) is now more than twice the base wage ($2.13) employers are required to pay to workers.[6]

The change to the tip credit in 1996 effectively shifted responsibility for an increasing portion of tipped workers' wages from employers to customers; it greatly reduced employers' future wage bill by locking in a low base wage for tipped workers that would remain fixed, even as prices rose or the regular minimum wage was increased. Legally, employers of tipped workers are still required to ensure that the sum of tipped workers' base wages plus their tips is equal to at least the full regular minimum wage; however, as is discussed later in detail, enforcement of this requirement is fraught with problems, and evidence suggests that tipped workers are subject to high rates of wage theft.

## State policies

The two-tiered wage system established under the 1966 amendments to the FLSA did not remain uniform across the country, as states have implemented an array of mixed rules for both the regular minimum wage and the subminimum wage for tipped workers that differ from federal policy.[7] The map in **Figure B** depicts state regular minimum-wage levels and tipped-minimum-wage levels as of January 1, 2014 (a summary of these data is also presented in the top panel of Table 1, which is introduced in the following section). Of the 50 states plus the District of Columbia, 29 follow



**FIGURE A**

**Real value of the federal minimum wage and subminimum wage for tipped workers, 1966–2014**

\* The difference, paid for by customers' tips, between the regular minimum wage and the subminimum wage for tipped workers

**Note:** Real 2014 dollars adjusted using the CPI-RS.  Minimum- or tipped-wage changes that occurred in mid-year are averaged.

**Source:** Authors' analysis of Fair Labor Standards Act and amendments

the federal regular minimum wage level of $7.25. The 21 states (plus the District of Columbia) with regular minimum wages above the federal $7.25 are denoted in the figure with hash marks.

We next examine states' *tipped* wage policies. As noted previously, the difference between the tipped minimum wage and the regular minimum wage determines the allowable tip credit for employers in each state. In broad terms we refer to the level of tip credit in each state as full, partial, or no tip credit. A full tip credit state (these 19 states are depicted in red on the map) follows the federal $2.13 subminimum wage for tipped workers and thus takes advantage of the maximum allowable tip credit.

There are 31 states (plus the District of Columbia) with tipped minimum wages above the federal $2.13. These include partial tip credit and no tip credit states. A partial tip credit state sets a subminimum wage above $2.13 but below the binding regular minimum wage for that state. These 24 states, plus the District of Columbia, are depicted in blue. Of these, 11 follow the federal regular minimum wage rate, while 14 have higher regular minimum wages. The range of



**FIGURE B**

Tipped minimum wage and regular minimum wage levels, by state, 2014

- No employer tip credit (tipped workers receive regular minimum wage)
- Partial employer tip credit (tipped minimum between $2.13 and regular minimum)
- Full employer tip credit (tipped minimum wage of $2.13)
- States with regular minimum wages above the federal $7.25 level

**Note:** As of January 1, 2014

**Source:** Authors' analysis of U.S. Department of Labor, Wage and Hour Division (various years; 2014)

tipped wages (tip credits) varies considerably across the partial tip credit states, from a low of $2.23 ($5.02) in Delaware to a high of $7.00 (25 cents) in Hawaii.

Lastly, states that do not allow for a subminimum wage are referred to as no tip credit states, or "equal treatment" states, meaning that tipped workers are paid the same minimum wage paid to non-tipped workers (these seven states are depicted in green on the map). In these states, tipped workers are paid regular minimum wages ranging from Minnesota's $7.25 to Washington State's $9.32.[8]

Seventeen states follow federal policy on both counts, while Minnesota is the only one that has a $7.25 regular minimum but does not allow for a subminimum wage. A complete list of state policies is included in Appendix Table A1.

State minimum-wage scenarios are often changing given decades of federal inaction on the tipped wage and five years of federal inaction on the regular minimum wage. Thus far in 2014, 34 states have considered raising their wage floor, and

eight have enacted increases (National Conference of State Legislatures 2014). Yet even as states adopt wage floors above the federal level, they often overlook tipped-wage policy. Indeed, recent minimum-wage increases in seven states plus the District of Columbia were mixed on tipped-minimum-wage policy. For instance, as just noted, Minnesota does not allow for a subminimum wage; thus, tipped workers there will receive the full regular minimum wage when it increases to $9.50 in 2016. Hawaii's regular minimum wage will increase to $10.10 by 2018, and the state also eliminated the previous 25-cent tip credit for employers, although a 75-cent tip credit exception will be allowable in instances where tipped workers earn at least $17.10 per hour after tips. In contrast, Maryland increased its state minimum to $10.10 earlier this year, but kept its subminimum wage frozen at $3.63, where it has remained since 2009. Similarly, the minimum wage in the District of Columbia is set to rise to $11.50 by 2017, but the District's tipped minimum wage will remain fixed at $2.77.

Even if the federal government does not move on the tipped minimum wage, the increasing potential for state action makes it important to understand more about this policy, the population it affects, and the potential effects any policy changes would have. Interestingly, the variation in minimum-wage and tipped-wage policies depicted in the map constitutes a natural experiment of sorts. The restaurant industry is an intense user of both minimum-wage and tipped-wage workers, with more than 60 percent of tipped workers employed in food service. The industry has fought hard to keep the federal $2.13 floor in place over the last two decades, arguing that raising the tipped wage would be severely damaging to the industry and its workers. But restaurants exist in every state and under all the various minimum- and subminimum-wage policies depicted in the map. Moreover, Allegretto (2013) finds that increases in the tipped minimum wage over the last several decades had little to no effect on employment—specifically, employment effects are "small and not distinguished from zero." Allegretto (2013) finds that implementing a policy similar to the Harkin-Miller proposal would have very little effect on restaurant employment while boosting overall earnings for both tipped and minimum-wage workers in full-service restaurants.

## Demographic characteristics of tipped workers

To examine the demographic characteristics of workers who would be affected by increasing the tipped minimum wage, we use the 2011–2013 Current Population Surveys (CPS) to identify workers and tipped workers, as well as a subset of wait staff and bartenders. The three survey years are combined to produce a sufficient sampling of tipped workers. While there is no data set that explicitly identifies tipped workers, we define our sample as best we can by using several variables available in the CPS.[9] Workers are included in the sample if they are at least 16 years old, employed but not self-employed, and report positive wage income. Tipped workers in our sample include those workers in occupations that are predominantly tipped, such as waiters and waitresses, bartenders, gaming service workers, barbers, hairdressers, and other personal appearance workers (see Appendix Table A2 for details). This section first examines the number of tipped workers and their distribution among the state tipped-wage categories. It then examines the gender, age, education, and family characteristics of these workers.

### Number and distribution of tipped workers

The middle part of **Table 1** provides the distribution of our sample of all workers, tipped workers, and a subsample of waiters and bartenders. We single out waiters and bartenders because most are tipped workers and because they comprise the bulk (58 percent) of the tipped workforce. There are approximately 4.3 million tipped workers in the United States, and roughly 2.5 million are waiters and bartenders.[10] A plurality of workers, including tipped workers, reside

**TABLE 1**

### Distribution of all workers, tipped workers, and waiters/bartenders, by state tipped-minimum-wage level

| | | State tipped-minimum-wage level | | |
|---|---|---|---|---|
| | Nationwide | Low ($2.13 tipped minimum wage) | Medium (between $2.13 and regular state minimum wage) | Equal treatment (tipped minimum wage = regular state minimum wage) |
| *All states** | **51** | **19** | **25** | **7** |
| *State regular minimum wage set to federal level* | 29 | 17 | 11 | 1 |
| *State regular minimum wage set above federal level* | 22 | 2 | 14 | 6 |
| *Total workforce* | **127,063,149** | **45,086,676** | **58,997,685** | **22,978,789** |
| *Share of total workforce* | | 35.5% | 46.4% | 18.1% |
| *Tipped workers* | 4,343,264 | 1,400,640 | 2,145,438 | 797,185 |
| *Share of tipped workers* | | 32.2% | 49.4% | 18.4% |
| *Waiters/bartenders* | 2,515,529 | 843,815 | 1,230,404 | 441,310 |
| *Share of waiters/ bartenders* | | 33.5% | 48.9% | 17.5% |
| **Of the workforce** | | | | |
| *Tipped worker share* | 3.4% | 3.1% | 3.6% | 3.5% |
| *Waiter/bartender share* | 2.0% | 1.9% | 2.1% | 1.9% |

\* As of January 1, 2014. Includes District of Columbia.

**Note:** Statistics reflect survey respondents ages 16 and older who are employed, but not self-employed, and report positive income from wages.

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2011–2013

in partial tip credit states that set tipped wages above $2.13 but below the binding state regular minimum wage—46.4 percent of the overall workforce and 49.4 percent of tipped workers reside in these states. Approximately one-third of all tipped workers reside in states with a $2.13 tipped wage rate, and less than one-fifth (18.4 percent) are in "equal treatment" states that do not allow for a tipped or subminimum wage.

The bottom panel of Table 1 shows the tipped worker and waiter/bartender shares of employment, overall and in each of the state tipped wage categories. Tipped workers and waiters/bartenders represent 3.4 percent and 2.0 percent, respectively, of the overall U.S. workforce. Looking across the state tipped wage categories, tipped workers comprise 3.1 percent of the workforce in states with a $2.13 subminimum wage, 3.6 percent of the workforce in partial tip credit states, and 3.5 percent of the workforce in states with no subminimum wage. There are no significant differences in waiters' and bartenders' share of overall employment across the tipped wage scenarios. These results suggest that tipped work opportunities are not diminished in states that do not allow for a subminimum wage.

## Who are tipped workers?

We interact with tipped workers on a regular basis, from our favorite bartender at the local pub to those who serve us at the restaurants we frequent. But, by and large, tipped workers are not representative of the overall workforce. As **Table**

**2** shows, tipped workers are overwhelmingly (two-thirds) female, younger, and tend to have lower levels of education than the overall workforce. Still, although tipped workers are younger than the overall workforce, they are not mainly teenagers, as is often thought. In fact, as shown in **Figure C,** only a small share of tipped workers are teens (12.6 percent). Furthermore, about a quarter of tipped workers are young adults, ages 20 to 24, while the vast majority (62.8 percent) are at least 25 years old. Nearly 30 percent are at least 40 years old.

Tipped workers have lower levels of education than the overall workforce, as 36.5 percent of all workers lack more than a high school education, compared with around 48.2 percent of tipped workers and 45.4 percent of waiters/bartenders. However, more than half of all tipped workers and waiters/bartenders have at least some college experience.

Tipped workers, especially waiters/bartenders, are less likely to be black, as they are underrepresented in this line of work as compared with their representation in the overall workforce. Tipped workers are also less likely to work full time; while this may be at the behest of some of these workers, it is also the case that many workers desire more hours and are unable to receive them.

The bottom of Table 2 details workers' family dynamics. Approximately 35 percent of all U.S. workers are parents. Among tipped workers the corresponding figure is 25.6 percent, yet that figure rises to 30.4 percent if we only look at women, who are the majority of the tipped workforce. Similarly, 29.2 percent of women wait staff and bartenders are parents, and more than half of these parents are single parents.

## Tipped workers' wages

There are two common misconceptions of tipped workers' pay. First, many people are simply unaware of the low base wage that employers actually pay tipped workers, and second, they believe these service workers make a large amount of "extra" money in tips. As already discussed, for most tipped workers, a significant portion of their tip income compensates for their receiving a low subminimum base wage from their employer. More importantly, the data belie the notion that most of these workers make substantial tipped income.

**Table 3** reports median wages—that is, the wage of the worker right in the middle of the distribution—for all workers, tipped workers, and waiters/bartenders. The wage of a typical U.S. worker is about $16.48; females make less than males ($15.09 versus $18.13); workers under 20 earn less than older workers ($8.27 versus $16.98); and the least-educated make less than those with the most education ($9.98 for those with less than a high school degree, versus $25.91 for those with at least a bachelor's degree).

Regardless of demographic category, the median tipped worker and waiter/bartender earns less than the median U.S. worker. Compared with the $16.48 median wage of all workers, tipped workers have a median wage (including tips[11]) of $10.22; waiters/bartenders make slightly less ($10.11). Even as women represent two-thirds of tipped workers, they still make less than their male counterparts ($10.07 for women at the median versus $10.63 for men). The respective figures are $9.89 and $10.71 for waiters and bartenders.

For the most part, tipped work is low-wage work. Hourly pay across all the demographic categories in Table 3 varies from a low of $8.11 to a high of $12.88. The median wages of tipped workers who are also parents are $10.11 and

**TABLE 2**

### Distribution of all workers, tipped workers, and waiters/bartenders, by demographic group

| Category | Share of total workforce | Share of tipped workers | Share of waiters/bartenders |
|---|---|---|---|
| **All** | 100.0% | 100.0% | 100.0% |
| **Sex** | | | |
| Male | 51.7% | 33.4% | 31.5% |
| Female | 48.3% | 66.6% | 68.5% |
| **Age** | | | |
| Under 20 | 3.4% | 12.6% | 12.8% |
| 20 and older | 96.6% | 87.4% | 87.2% |
| 16–24 | 13.6% | 37.2% | 43.2% |
| 25–39 | 33.2% | 33.5% | 34.8% |
| 40–54 | 33.6% | 19.3% | 15.9% |
| 55 and older | 19.5% | 10.0% | 6.1% |
| **Education** | | | |
| Less than high school | 9.1% | 14.6% | 13.8% |
| High school | 27.4% | 33.7% | 31.6% |
| Some college | 29.9% | 40.5% | 42.7% |
| Bachelor's or higher | 33.6% | 11.2% | 11.9% |
| **Race/ethnicity** | | | |
| White | 66.1% | 61.5% | 66.6% |
| Black | 11.0% | 8.5% | 6.8% |
| Hispanic | 15.6% | 17.7% | 17.7% |
| Asian or other race | 7.3% | 12.3% | 8.9% |
| **Work hours** | | | |
| Part time (< 20 hours) | 5.7% | 14.6% | 14.0% |
| Mid time (20–34 hours) | 14.4% | 38.9% | 44.5% |
| Full time (35+ hours) | 79.8% | 46.5% | 41.5% |
| **Family structure** | | | |
| Married parent | 26.9% | 15.2% | 11.7% |
| Single parent | 7.6% | 10.4% | 12.2% |
| Married, no kids | 27.7% | 14.9% | 10.7% |
| Unmarried, no kids | 37.8% | 59.5% | 65.3% |
| Female workers only | | | |
| Married parent | 23.8% | 16.3% | 12.8% |
| Single parent | 11.4% | 14.1% | 16.4% |
| Married, no kids | 27.7% | 14.6% | 11.1% |
| Unmarried, no kids | 37.1% | 55.0% | 59.7% |

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2011–2013

$11.41 for single and married parents, respectively. The wages of the nearly one-in-three female tipped workers who are also parents are even lower, at $10.00 and $10.83 for single and married parents, respectively.



FIGURE C    VIEW INTERACTIVE *on epi.org*

## Distribution of tipped workers, by age group

Age 55+: 10.0%

Age 40-54: 19.3%

Age 16-19: 12.6%

Age 20-24: 24.5%

Age 25-39: 33.5%

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2011–2013

ECONOMIC POLICY INSTITUTE

The low wages of tipped workers derive, in part, from the lower base wage or tipped wage provided by employers. As the data show in **Table 4**, the tip credit allowance—the amount of tips an employer can use as credit toward a worker's wage—matters. Across the three broad tip credit policies, there are measurable differences in wages: There is a progression of increasing median wages from the low to higher tipped-wage states both for tipped workers and all workers. This likely also reflects other policies besides tipped-wage floors that would affect wages more broadly. For example, low tipped-wage states are more likely to have low regular state minimum wages, while high tipped-wage states are more likely to have high regular state minimum wages.

Still, the relative gains from low to high tipped-wage states are greater for tipped workers, especially waiters/bartenders, compared with the gains of the general workforce—even though tipped workers earn less in each case. For example, tipped workers in equal treatment states earn 14.2 percent more than tipped workers in low tipped minimum states, compared with an 11.4 percent gain for all workers (the relative difference is 20.6 percent for waiters/bartenders). Looking more closely at the gains for waiters and bartenders, we see that total wages of women are 22.5 percent higher, and of men 19.1 percent higher, in states that do not allow for a subminimum wage compared with the states that follow the $2.13 policy. Restaurant industry advocates often argue that raising or eliminating the tipped minimum wage would leave tipped workers worse off because customers would disproportionately reduce tips if they knew employers were paying higher base wages. These data show that the evidence for this claim is weak, and even if it were true, tipped workers in equal treatment states still earn higher total wages (tips plus base wage) than workers in states with lower tipped minimum wages.

**TABLE 3**

### Median wage of all workers, tipped workers, and waiters/bartenders, by demographic group

| Category | All | Tipped workers | Waiters/bartenders |
|---|---|---|---|
| *All* | $16.48 | $10.22 | $10.11 |
| **Sex** | | | |
| *Male* | $18.13 | $10.63 | $10.71 |
| *Female* | $15.09 | $10.07 | $9.89 |
| **Age** | | | |
| *16–19* | $8.27 | $8.11 | $8.14 |
| *20–24* | $10.17 | $9.70 | $9.81 |
| *25–39* | $16.64 | $11.43 | $11.25 |
| *40–54* | $19.63 | $11.81 | $10.99 |
| *55+* | $18.87 | $10.78 | $10.37 |
| **Education** | | | |
| *Less than high school* | $9.98 | $8.31 | $8.25 |
| *High school* | $13.89 | $10.27 | $10.03 |
| *Some college* | $14.99 | $10.60 | $10.44 |
| *Bachelor's or higher* | $25.91 | $12.88 | $12.72 |
| **Race/ethnicity** | | | |
| *White* | $18.19 | $10.25 | $10.19 |
| *Black* | $13.94 | $10.12 | $9.62 |
| *Hispanic* | $12.63 | $9.98 | $9.89 |
| *Asian or other* | $17.95 | $10.63 | $10.38 |
| **Family structure** | | | |
| *Married parent* | $19.87 | $11.41 | $10.75 |
| *Single parent* | $13.36 | $10.11 | $9.83 |
| *Married, no kids* | $19.01 | $11.44 | $10.77 |
| *Unmarried, no kids* | $13.68 | $9.88 | $9.99 |
| *Female workers only* | | | |
| *Married parent* | $17.32 | $10.83 | $10.30 |
| *Single parent* | $12.70 | $10.00 | $9.72 |
| *Married, no kids* | $17.06 | $10.89 | $10.26 |
| *Unmarried, no kids* | $13.21 | $9.66 | $9.74 |

**Note:** Wage values reflect both base wages and tips. Figures are in 2013 dollars adjusted using the CPI-U-RS.

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2011–2013

While these relative differences are important, tipped workers in equal treatment states are still low-wage workers, earning around $11.00 to $12.00 per hour—still in the bottom third of all U.S. wage earners, yet better than the $9.00 to $10.00 per hour for workers in the lowest tipped-wage states.[12]

**TABLE 4**

**Median wage of all workers, tipped workers, and waiters/bartenders, by state tipped-minimum-wage level**

| | Nationwide | State tipped-minimum-wage level | | |
|---|---|---|---|---|
| | | Low ($2.13 tipped minimum wage) | Medium (between $2.13 and regular state minimum wage) | Equal treatment (tipped minimum wage = regular state minimum wage) |
| ***All workers*** | **$16.48** | **$15.63** | **$16.87** | **$17.41** |
| *Female* | $15.09 | $14.34 | $15.35 | $16.01 |
| *Male* | $18.13 | $17.29 | $18.51 | $18.75 |
| ***Tipped workers*** | **$10.22** | **$9.80** | **$10.31** | **$11.19** |
| *Female* | $10.07 | $9.55 | $10.14 | $10.91 |
| *Male* | $10.63 | $10.11 | $10.73 | $11.74 |
| ***Waiters/ bartenders*** | **$10.11** | **$9.52** | **$10.20** | **$11.48** |
| *Female* | $9.89 | $9.14 | $9.97 | $11.20 |
| *Male* | $10.71 | $10.09 | $10.99 | $12.02 |

**Note:** Wage values reflect both base wages and tips. Figures are in 2013 dollars adjusted using the CPI-U-RS.

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2011–2013

## Family income and poverty

The family structure data reported in Table 2 showed that while tipped workers are less likely to be married and have children compared with the overall workforce, they are *more* likely to be single parents—especially female workers. As that table shows, of tipped workers who are women, 30.4 percent are parents, and 14.1 percent are single parents. Among wait staff and bartenders who are women, 16.4 percent are single parents.

Low wages combined with lower marriage rates translate into low family incomes for most tipped workers. The distribution of tipped workers, waiters and bartenders, and the total workforce across family income levels is reported in **Figure D**. About 30.5 percent of all U.S. workers are in families that earn less than $40,000. That share jumps to 47.2 percent for tipped workers and 49.9 percent for waiters and bartenders. Looking only at women (gender-specific breakdowns are not displayed in the figure), the trends are similar, if not slightly more pronounced: 31.7 percent of all working women are in families with total incomes below $40,000, compared with 47.6 percent of tipped workers who are women. Among female wait staff and bartenders, over half (51.8 percent) fall into this low-income group.

The relatively low family incomes of tipped workers mean they also experience poverty at much higher rates than other workers. As shown in **Table 5**, the poverty rate of non-tipped workers is 6.5 percent, while it is 12.8 percent for tipped workers in general and 14.9 percent for waiters and bartenders. While the magnitude of this difference by itself is startling, it is important to note how poverty rates for tipped workers vary significantly based on states' tipped-minimum-wage policies.

As depicted in **Figure E**, poverty rates for non-tipped workers do not vary much by state tipped-wage policies. Yet for tipped workers, and particularly for waiters and bartenders, the correlation between low tipped wages and high poverty rates is dramatic. Among wait staff and bartenders, 18.0 percent are in poverty in states that follow the $2.13 submini-



FIGURE D

**VIEW INTERACTIVE** *on epi.org*

**Distribution of total employment, tipped workers, and waiters/bartenders, by family income level**

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2011–2013

ECONOMIC POLICY INSTITUTE

| | | TABLE 5 | | |
|---|---|---|---|---|

**Poverty rates of all workers, tipped and non-tipped workers, and waiters/bartenders, by state tipped-minimum-wage level**

| | | State tipped-minimum-wage level | | |
|---|---|---|---|---|
| | Nationwide | Low ($2.13 tipped minimum wage) | Medium (between $2.13 and regular state minimum wage) | Equal treatment (tipped minimum wage = regular state minimum wage) |
| *All workers* | 6.7% | 7.2% | 6.2% | 7.0% |
| *Non-tipped workers* | 6.5% | 7.0% | 6.0% | 6.8% |
| *Tipped workers* | 12.8% | 14.5% | 12.5% | 10.8% |
| *Waiters/ bartenders* | 14.9% | 18.0% | 14.4% | 10.2% |

**Source:** Authors' analysis of Current Population Survey Annual Social and Economic Supplement microdata, 2010–2012

mum wage, compared with 14.4 percent in medium-tipped-wage states and 10.2 percent in equal treatment states that do not allow for a lesser tipped minimum wage. This pattern strongly suggests that higher tipped wages mitigate poverty to some extent, yet it is still the case that poverty among tipped workers is far too high even in states that do not allow for a subminimum wage.



FIGURE E   **VIEW INTERACTIVE** *on epi.org*

**Poverty rates of non-tipped workers, tipped workers, and waiters and bartenders, by state tipped-minimum-wage level**

Legend:
- Low ($2.13 tipped minimum wage)
- Medium (above $2.13 and below regular minimum wage)
- Equal treatment (full minimum wage)

Non-tipped workers: 7.0%, 6.0%, 6.8%
Tipped workers: 14.5%, 12.5%, 10.8%
Waiters/bartenders: 18.0%, 14.4%, 10.2%

**Source:** Authors' analysis of Current Population Survey Annual Social and Economic Supplement microdata, 2010–2012

ECONOMIC POLICY INSTITUTE

## Public-support programs

When workers do not earn enough in wages to make ends meet, they are often forced to rely on publicly provided support programs. While it is a good thing that workers faced with challenging circumstances can turn to these programs for assistance, these programs were not designed to serve as a permanent wage subsidy or part of the business strategy for low-wage employers. Using the Current Population Survey Annual Social and Economic Supplement, we calculated the share of the workforce, non-tipped workers, and tipped workers who receive some publicly funded benefits—such as federal housing or energy subsidies, the earned income tax credit (EITC), school lunch subsidies, Supplemental Nutrition Assistance Program (SNAP) benefits (i.e., "food stamps"), or Supplemental Nutrition Program for Women, Infants, and Children (WIC) benefits—to meet their family needs. As reported in **Table 6**, 35.5 percent of non-tipped workers and their families rely on public benefits, compared with 46.0 percent and 46.2 percent, respectively, of tipped workers in general and waiters/bartenders in particular. Tipped workers receiving some public assistance get about $475 more, on average, in benefits than non-tipped workers who receive aid; waiters and bartenders receive over $600 more, on average, than non-tipped workers receiving aid.[13]

## Job quality

We have shown thus far that tipped workers are subject to low pay, low levels of total family income, and a greater likelihood of being in poverty. It is also the case that tipped workers are much less likely to have workplace benefits, as shown

**TABLE 6**

### Receipt of federal assistance for all workers, tipped and non-tipped workers, and waiters/bartenders

|  | Share of workers receiving some federal assistance* | Average total value of federal assistance |
|---|---|---|
| *All workers* | 35.9% | $2,122 |
| *Non-tipped workers* | 35.5% | $2,114 |
| *Tipped workers* | 46.0% | $2,588 |
| *Waiters/bartenders* | 46.2% | $2,724 |

\* Receipt of some federal assistance indicates the worker or worker's family receives income from federal housing subsidies; the earned income tax credit (EITC); energy subsidies (LIHEAP); school lunch subsidies; SNAP (food stamps); or the Supplemental Nutrition Program for Women, Infants, and Children (WIC).

**Note:** Average values are the sum of reported dollar values or imputed fair market values for all programs. Figures are in 2013 dollars, deflated by CPI-U-RS.

**Source:** Authors' analysis of Current Population Survey Annual Social and Economic Supplement microdata, 2010–2012

in **Figure F**. The Bureau of Labor Statistics National Compensation Survey (NCS) reports benefits for all private-sector workers and benefits by various establishment and worker characteristics, including a breakout for "accommodation and food services (AFS)"—a sector with the majority of tipped workers.[14] The NCS reports that two of the most common benefits offered to workers are paid vacations and paid holidays—each offered to 77.0 percent of private-sector workers. But among workers in accommodation and food services, just 45.0 percent and 36.0 percent are offered paid vacations and paid holidays, respectively—and these figures are for all workers in that industry, including managers and supervisors.

Health care and retirement benefits are crucial to most workers, but they are offered to just a fraction of AFS workers—30.0 percent and 27.0 percent, respectively, compared with 70.0 percent and 64.0 percent, respectively, of other private-sector workers. Given that the majority of tipped workers are wait staff and bartenders who handle food and drink, it is particularly unfortunate—and potentially dangerous—that their industry does not provide widespread access to paid sick leave; just 23.0 percent of AFS workers receive paid sick leave, compared with 61.0 percent of the total private-sector workforce.

As we've shown, many tipped workers are parents—many single parents—with low family incomes; thus, life insurance and short-term disability protection would be particularly important to these workers and their families, especially given the physical nature of their work. Life insurance and short-term disability protection are offered to 57.0 percent and 40.0 percent of private-sector workers, yet only 17.0 percent and 19.0 percent, respectively, of AFS workers.

Again, while the shares of workers in the broad category of accommodation and food services (which includes managers, supervisors, etc.) who have access to these benefits are very low, we would likely find that the shares of tipped workers and waiters/bartenders with access are even lower, if such data were available.[15]



FIGURE F    VIEW INTERACTIVE *on epi.org*

**Share of all private-sector workers and workers in the accommodation and food services industry with various employer-provided benefits, 2013**

Legend:
- All private-sector workers
- Workers in accommodation and food services (AFS)

| Benefit | All private-sector workers | Workers in AFS |
|---|---|---|
| Paid vacations | 77% | 45% |
| Paid holidays | 77% | 36% |
| Health care | 70% | 30% |
| Retirement | 64% | 27% |
| Paid sick leave | 61% | 23% |
| Life insurance | 57% | 17% |
| Short-term disability | 40% | 19% |

**Note:** These data represent all workers within the accommodation and food services sector, including managers and supervisors. It is likely that these shares would be much lower if they reflected access for tipped workers only.

**Source:** U.S. Bureau of Labor Statistics National Compensation Survey 2013 data

ECONOMIC POLICY INSTITUTE

## Other challenges for tipped workers

Tipped workers face a number of other unique challenges in the workplace. As mentioned earlier, in states that allow for a subminimum wage, a tipped worker's tips plus her base or tipped wage must equal at least the regular state minimum wage—if not, her employer must make up the difference. However, tipped workers are often unaware that their tips and base wage must sum to at least the regular minimum wage. This regulation is hard to implement in practice, both because it is logistically difficult to do so and because it is up to the worker to request that her employer make up the difference. To determine compliance with the FLSA's wage requirements, the total of tips plus the subminimum base wage is to be assessed on a workweek basis.[16] A workweek is defined as any fixed and regularly recurring 168-hour period. But many tipped workers work irregular schedules, and the practical implementation of this regulation is unclear; at what point does an employer stop the clock to tally up hours, tips, and base wages? Compliance is difficult to assess even if a good-faith employer would like to do so.

Moreover, a tipped employee seeking to monitor her employer's compliance with the law would need to record her hours for the determined workweek—erratic schedules notwithstanding—record all tips she receives (how employees should treat tips shared with other staff, such as restaurant bussers or bar-backs, in this calculation is also unclear), record the base wage she was paid from her employer, and calculate if the effective hourly rate equaled the required state

or federal minimum wage. If it did not, this employee would have to approach her employer seeking the missing pay. Of course, this is the same employer who determines whether this employee will be given the most lucrative shifts, the best restaurant sections (in the case of waiters and waitresses), or if the employee will retain her job at all. It is unrealistic to think that a tipped employee dealing with an unscrupulous employer would be able to reclaim her lost wages, let alone confront someone with such power over her near-term financial health.

Indeed, the restaurant industry is fraught with violations. In the most recent (2010–2012) compliance sweep of nearly 9,000 full-service restaurants by the U.S. Department of Labor's Wage and Hour Division (WHD), 83.8 percent of investigated restaurants had some type of violation. In total, WHD recovered $56.8 million in back wages for nearly 82,000 workers and assessed $2.5 million in civil money penalties. Violations included 1,170 tip credit infractions that resulted in nearly $5.5 million in back wages.[17]

Research has also shown that the practice of tipping is often discriminatory, with white service workers receiving larger tips than black service workers for the same quality of service (Lynn et al. 2008). The worker advocacy group Restaurant Opportunities Centers (ROC) United has published numerous testimonies from both tipped and non-tipped workers in the restaurant industry that anecdotally describe these problems. ROCs "Behind the Kitchen Door" worker survey reports echo what is found in much of the data presented here: Workers report an array of problems, from low earnings and low to no benefits, to overtime violations, working off the clock, and issues of safety (ROC various years; Jayaraman 2013).

## Should we have a tipped minimum wage?

The results obtained here are informative for policy. The Harkin–Miller minimum-wage bill proposes to increase the regular federal minimum wage from $7.25 to $10.10 in three 95-cent steps. The bill would also reconnect the severed historical link between the tipped and the regular minimum wage by raising the former to 70 percent of the latter over six years. This would certainly improve the situation for tipped workers, adding greater stability to their income and boosting their total pay. Contrary to claims from industry advocates, research has shown that increasing the tipped minimum wage would boost earnings for tipped-wage workers without unduly harming employment, particularly full-service restaurant employment (Allegretto 2013).

Yet given all the problems that the current two-tiered wage system creates, it appears prudent to simply do away with the tipped minimum wage and have tipped workers nationwide be paid the regular minimum wage. Industry advocates may claim that this would be damaging for businesses that employ tipped workers, but the data do not support this claim. From January 1995 to May 2014, employment in the leisure and hospitality sector—a sector with a high concentration of tipped workers—grew by 41 percent nationwide, far faster than total U.S. nonfarm employment growth of roughly 19 percent. Over that period, leisure and hospitality employment grew 43.2 percent in the seven "equal treatment" states without subminimum wages, compared with 39.2 percent growth in the 43 states (plus the District of Columbia) that have lower minimum wages for tipped workers.[18] In other words, the sector that comprises the bulk of tipped employment actually grew faster in states where tipped workers received the regular minimum wage than it did in states with a lower tipped minimum wage.[19] Moreover, the restaurant industry itself projects higher growth rates in these "equal treatment" states than in those with subminimum wages (National Restaurant Association 2014).[20]

# Conclusion

This report explored the history and rationale for the subminimum wage earned by workers who receive tips for their services. The federal tipped minimum wage was originally set at 50 percent of the regular minimum wage. Today, the subminimum wage for tipped workers is a mere $2.13 an hour, where it has been for 23 years. Over that time, its value has eroded to just 29.4 percent of the regular minimum wage that applies to non-tipped workers. Still, many states have enacted tipped minimum wages above $2.13. This report shows that tipped workers receive higher total wages and have lower levels of poverty in states where the tipped minimum wage is relatively high.

Often, discussion and action surrounding the minimum wage ignores or excludes tipped workers and the subminimum wage they receive. Yet this is a growing occupational sector, and effective policy could transform the low-wage, high-poverty jobs in the sector into better quality jobs. Much of tipped employment is the epitome of "just-in-time" employment—adjusting staffing levels on an immediate basis in response to customer flows. While this may be good for the employer, it is far less beneficial for workers because it can produce highly unpredictable work hours, and thus highly unpredictable pay. Wage volatility is further exacerbated by workers' reliance on tips from customers, which also vary considerably. A tipped worker's paycheck can vary wildly depending on the fluctuations of customer tips and assigned shifts, making it difficult for tipped workers to budget, or make investments that require more stable and predictable income levels—such as buying a home or a car, or seeking further education.

In real terms, the U.S. minimum and subminimum wage floors have long been in decline, exacerbating the general stagnation or decline of wages for the vast majority of American workers, particularly low-wage workers. Even the broader world is taking notice, as the International Monetary Fund (2014) recently recommended that the U.S. minimum wage be increased, given its current low level (compared both with its historical values and international standards). The Organization for Economic Cooperation and Development (2014) has also recommended an increase in the U.S. minimum wage as a measure to improve job quality and workers' well-being. Reports from the Congressional Budget Office (2014) as well as research from academia (Dube 2013) conclude that raising the wage floor would lift hundreds of thousands, if not millions, out of poverty.

For all these reasons, it is perhaps no surprise that polling consistently shows that most Americans (73 percent) would like to see a minimum-wage hike (Pew Research Center 2014). To the best of our knowledge, there has not been a poll conducted specifically on changing the $2.13 tipped wage, but in all likelihood, this is simply another indication of the lack of public awareness on this issue. We cannot help but wonder whether, if more Americans knew the exceptionally low base wages being paid to tipped workers, they might prefer these employers pay tipped workers a higher base wage, and let tips once again be simply an expression of gratitude for good service. We suspect most would agree that the consumer subsidy to these employers has grown for too long.

It is certainly time to raise both wage floors, but given the dramatic differences in living standards for tipped versus non-tipped workers, we question whether there should be a two-tiered wage system at all. Tipped workers in the seven "equal treatment" states appear to be noticeably better off than their counterparts in the rest of the country, receiving higher total wages and experiencing poverty at significantly lower rates. At the same time, industries that employ tipped workers in these states are thriving. Raising the tipped minimum wage up to a higher percentage of the regular mini-

mum wage would be a step in the right direction, but perhaps we should simply eliminate the tipped minimum wage altogether, and give tipped workers the same basic protection afforded to other workers.

— *The Economic Policy Institute gratefully acknowledges the generous support it received from the* **Ford Foundation** *for this project.*

## About the authors

**Sylvia A. Allegretto, Ph.D.** is an economist and co-director of the Center on Wage and Employment Dynamics at the Institute for Research on Labor and Employment at the University of California, Berkeley. She is also a research associate of the Economic Policy Institute and is co-author of many EPI publications, including past editions of *The State of Working America*, *How Does Teacher Pay Compare?*, and *The Teaching Penalty: Teacher Pay Losing Ground*.

*The* **Center on Wage and Employment Dynamics** *is a center at the Institute for Research on Labor and Employment at the University of California, Berkeley. CWED was established in 2007 to provide a focus for research projects on wage and employment dynamics in contemporary labor markets. Current research topics include minimum wage impacts, tipped worker labor markets, transformation of retail labor markets, health insurance and health policy, immigration, worker turnover and job training, labor relations and productivity, and models of low-wage labor markets.*

**David Cooper** is an economic analyst with the Economic Policy Institute. He conducts national and state-level research on a variety of issues, including the minimum wage, employment and unemployment, poverty, and wage and income trends. He also provides support to the Economic Analysis and Research Network (EARN) on data-related inquiries and quantitative analyses. David has been interviewed and cited by local and national media for his research on the minimum wage, poverty, and U.S. economic trends. His graduate research focused on international development policy and intergenerational social mobility. He holds a Master of Public Policy degree from Georgetown University.

*The* **Economic Policy Institute** *is a nonprofit, nonpartisan think tank that seeks to broaden the public debate about strategies to achieve a prosperous and fair economy. EPI stresses real-world analysis and a concern for the living standards of working people, and it makes its findings accessible to the general public, the media, and policymakers through books, studies, and popular education materials.*

## Appendices

**Appendix Table A1** shows each state's minimum-wage and tipped-minimum-wage level, as of January 1, 2014.

The Current Population Survey does not explicitly identify tipped workers. Rather, there is a variable that indicates workers who regularly receive tips, overtime, or commissions. In order to identify workers who are likely to be tipped, we first looked at all occupations that had a high share receiving tips, overtime, or commissions. From this group, we selected those occupations that were most likely to receive tips, as shown in **Appendix Table A2**.

**TABLE A1**

### Federal and state minimum-wage and tipped-minimum-wage levels (as of January 1, 2014)

| State | Regular minimum wage | Tip credit for employers | Tipped minimum wage | Tipped minimum as a share of regular minimum wage |
|---|---|---|---|---|
| United States | $7.25 | $5.12 | $2.13 | 29.4% |
| Alabama | 7.25 | 5.12 | 2.13 | 29.4% |
| Alaska | 7.75 | 0.00 | 7.75 | 100.0% |
| Arizona | 7.90 | 3.00 | 4.90 | 62.0% |
| Arkansas | 7.25 | 4.62 | 2.63 | 36.3% |
| California | 8.00 | 0.00 | 8.00 | 100.0% |
| Colorado | 8.00 | 3.02 | 4.98 | 62.3% |
| Connecticut* | 8.70 | 3.01 | 5.69 | 65.4% |
| Delaware | 7.25 | 5.02 | 2.23 | 30.8% |
| District of Columbia | 9.50 | 6.73 | 2.77 | 29.2% |
| Florida | 7.93 | 3.02 | 4.91 | 61.9% |
| Georgia | 7.25 | 5.12 | 2.13 | 29.4% |
| Hawaii | 7.25 | 0.25 | 7.00 | 96.6% |
| Idaho | 7.25 | 3.90 | 3.35 | 46.2% |
| Illinois | 8.25 | 3.30 | 4.95 | 60.0% |
| Indiana | 7.25 | 5.12 | 2.13 | 29.4% |
| Iowa | 7.25 | 2.90 | 4.35 | 60.0% |
| Kansas | 7.25 | 5.12 | 2.13 | 29.4% |
| Kentucky | 7.25 | 5.12 | 2.13 | 29.4% |
| Louisiana | 7.25 | 5.12 | 2.13 | 29.4% |
| Maine | 7.50 | 3.75 | 3.75 | 50.0% |
| Maryland | 7.25 | 3.62 | 3.63 | 50.1% |
| Massachusetts | 8.00 | 5.37 | 2.63 | 32.9% |
| Michigan | 7.40 | 4.75 | 2.65 | 35.8% |
| Minnesota | 7.25 | 0.00 | 7.25 | 100.0% |
| Mississippi | 7.25 | 5.12 | 2.13 | 29.4% |
| Missouri | 7.50 | 3.75 | 3.75 | 50.0% |
| Montana | 7.90 | 0.00 | 7.90 | 100.0% |
| Nebraska | 7.25 | 5.12 | 2.13 | 29.4% |
| Nevada | 8.25 | 0.00 | 8.25 | 100.0% |
| New Hampshire | 7.25 | 3.99 | 3.26 | 45.0% |
| New Jersey | 8.25 | 6.12 | 2.13 | 25.8% |
| New Mexico | 7.50 | 5.37 | 2.13 | 28.4% |
| New York** | 8.00 | 3.10 | 4.90 | 61.3% |
| North Carolina | 7.25 | 5.12 | 2.13 | 29.4% |
| North Dakota | 7.25 | 2.39 | 4.86 | 67.0% |
| Ohio | 7.95 | 3.98 | 3.98 | 50.0% |
| Oklahoma | 7.25 | 5.12 | 2.13 | 29.4% |

| | | | TABLE A1 (CONTINUED) |
|---|---|---|---|
| **State** | **Regular minimum wage** | **Tip credit for employers** | **Tipped minimum wage** | **Tipped minimum as a share of regular minimum wage** |
|---|---|---|---|---|
| *Oregon* | 9.10 | 0.00 | 9.10 | 100.0% |
| *Pennsylvania* | 7.25 | 4.42 | 2.83 | 39.0% |
| *Rhode Island* | 8.00 | 5.11 | 2.89 | 36.1% |
| *South Carolina* | 7.25 | 5.12 | 2.13 | 29.4% |
| *South Dakota* | 7.25 | 5.12 | 2.13 | 29.4% |
| *Tennessee* | 7.25 | 5.12 | 2.13 | 29.4% |
| *Texas* | 7.25 | 5.12 | 2.13 | 29.4% |
| *Utah* | 7.25 | 5.12 | 2.13 | 29.4% |
| *Vermont* | 8.73 | 4.50 | 4.23 | 48.5% |
| *Virginia* | 7.25 | 5.12 | 2.13 | 29.4% |
| *Washington* | 9.32 | 0.00 | 9.32 | 100.0% |
| *West Virginia* | 7.25 | 1.45 | 5.80 | 80.0% |
| *Wisconsin* | 7.25 | 4.92 | 2.33 | 32.1% |
| *Wyoming* | 7.25 | 5.12 | 2.13 | 29.4% |

\* Connecticut has a higher $7.34 tipped minimum wage for bartenders only.

\*\* New York has a tipped minimum wage of $5.00 for "food service workers" and $5.65 for "service employees."

**Note:** For states that do not have a state minimum wage or a minimum wage that is less than the federal minimum, we report the federal standards because most workers in these states are legally required to be paid the federal rate.

**Source:** Authors' analysis of U.S. Department of Labor (2014)

**TABLE A2**

### Wages and gender composition of predominantly tipped occupations

| Occupation | Employment | Share of tipped workers | Median wage | 10th percentile wage | Women | Women as a share of employment |
|---|---|---|---|---|---|---|
| *All workers, tipped and non-tipped occupations* | 127,063,149 | - | $16.48 | $8.45 | 61,377,151 | 48.3% |
| **Predominantly tipped occupations** | | | | | | |
| *Massage therapists* | 88,151 | 2.0% | $14.22 | $7.92 | 71,505 | 81.1% |
| *Bartenders* | 393,102 | 9.1% | $12.02 | $6.99 | 229,676 | 58.4% |
| *Waiters and waitresses* | 2,122,427 | 48.9% | $9.93 | $5.71 | 1,492,454 | 70.3% |
| *Dining room, cafeteria attendants, and bartender helpers in hospitality industries* | 244,953 | 5.6% | $8.79 | $6.46 | 72,763 | 29.7% |
| *Hosts and hostesses, restaurant, lounge, and coffee shop* | 283,677 | 6.5% | $8.64 | $ 6.87 | 242,305 | 85.4% |
| *Gaming service workers* | 106,252 | 2.4% | $14.69 | $7.93 | 51,478 | 48.4% |
| *Barbers* | 59,002 | 1.4% | $10.41 | $5.93 | 13,919 | 23.6% |
| *Hairdressers, hairstylists, and cosmetologists* | 483,312 | 11.1% | $11.90 | $7.10 | 455,006 | 94.1% |
| *Miscellaneous personal appearance workers* | 227,634 | 5.2% | $10.80 | $7.24 | 187,776 | 82.5% |
| *Personal care and service workers, all other* | 73,854 | 1.7% | $10.24 | $7.18 | 35,826 | 48.5% |
| *Taxi drivers and chauffeurs* | 260,901 | 6.0% | $11.95 | $7.52 | 38,207 | 14.6% |
| *Total predominantly tipped workers* | 4,343,264 | 100.0% | $10.22 | $6.49 | 2,890,915 | 66.6% |

**Note:** The tipped occupations listed here, and used in this report, are the same as those used in CBO (2014).

**Source:** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, pooled sample 2011–2013

# Endnotes

**1.** Legislation originally enacted in 1966 required that a worker had to customarily and regularly earn at least $20 a month in tips for their employers to qualify for the tip credit. This was raised to $30 a month in 1978. Adjusted for inflation, that $20 minimum would now be about $146.34 per month.

**2.** If a tipped employee's tips plus her base wage do not sum to at least the full minimum wage in any two-week period, the tipped worker's employer is required to make up the difference through a higher base wage; however, as explained in later sections, this intended safeguard is fraught with problems.

**3.** Authors' analysis of Current Population Survey Outgoing Rotation Group microdata, 2013

**4.** Bureau of Labor Statistics, Quarterly Census of Employment and Wages data, 1990Q1 to 2013Q1

**5.** Authors' analysis of Local Area Unemployment Statistics data from the Bureau of Labor Statistics

**6.** For more historical information, see Allegretto and Filion (2011).

**7.** The scenarios are always changing as federal and/or state wage polices are adopted; the map depicts the wage policies as of January 1, 2014. Some states have already legislated both regular and tipped-minimum-wage increases that will occur over the next several years.

**8.** There are variations within state policy. For example, Nevada, a no tip credit state, has a wage floor of $7.25 for workers with or $8.25 without employer-provided health insurance.

**9.** It is important to keep in mind that not all tipped workers have been identified because the Current Population Survey does not have a unique identifier for such a distinction. The CPS includes a variable that identifies persons who usually receive "overtime pay, tips or commissions." Likely tipped workers were identified using this variable along with additional analysis. There are other workers, especially in the restaurant industry or food service occupations (such as bussers, delivery workers, and runners) who may also be tipped workers—even though their tips may come indirectly from wait staff, instead of directly from customers.

**10.** In Allegretto and Filion (2011), we included slightly fewer occupational categories as predominantly tipped occupations. White House (2014) uses this slightly smaller set of predominantly tipped occupations as well; however, CBO (2014) employs the broader set of tipped occupations listed in Appendix Table A2. We analyzed demographic characteristics, wage rates, poverty rates, and public transfer receipt rates between the two sets of predominantly tipped occupations and found that they were not substantially different, and thus opted to use the set of occupations consistent with the CBO's definition of tipped workers.

**11.** All wage values in this report reflect total wages, i.e., base wages plus tips.

**12.** In 2013, the 30th percentile wage for U.S. workers was $12.00, according to data from the Current Population Survey.

**13.** These findings are similar to those in *Fast Food, Poverty Wages* by Allegretto et al. (2013a). In that paper, it was estimated that 25 percent of working families rely on public benefits (Medicaid, Children's Health Insurance Program [CHIP], federal EITC, SNAP, and Temporary Assistance for Needy Families [TANF]), while the share rises considerably to 52 percent among fast-food workers and their families. That study was restricted to workers who worked at least 27 weeks per year and at least 10 hours per week. Using the same data and methodology from the fast-food worker study, we estimate that 40 percent of tipped workers and their families, and 42 percent of waiters/bartenders and their families, receive public benefits to make ends meet—again compared with 24 percent of working families in general.

**14.** The industry sector of accommodation and food services captures many tipped workers but also non-tipped workers and staff such as managers who are likely to have higher wages and benefits. These data are from an unpublished NCS report on 2013 benefits (forthcoming in 2014).

**15.** We requested figures from the BLS for tipped workers and/or wait staff from the NCS, but sample sizes were too small for these populations by themselves.

**16.** See, e.g., 29 U.S.C. 206(a) in the FLSA (http://bit.ly/1qoLKwH).

**17.** Email correspondence with U.S. Department of Labor program analysts from the Wage and Hour Division

**18.** Authors' analysis of Local Area Unemployment Statistics (LAUS) data from the Bureau of Labor Statistics

**19.** We do not mean to imply any sort of causal relationship here, and looking at changes in specific industries within the leisure and hospitality sector or over different timeframes might yield different results. There are undoubtedly other factors correlated with state tipped-wage policies influencing employment growth between these groups of states. A more precise inquiry into the relationship between tipped-wage policies and employment that controls for these factors is beyond the scope of this paper. However, Allegretto (2014) examines this specific question with an appropriate set of controls and finds no significant effect on employment from higher tipped minimum wages. The relevant point here is that if paying the regular minimum wage to tipped workers were significantly harmful to these industries, we would expect these harmful effects to be readily apparent—and they are not.

**20.** For more information, see ROC United (2014).

# References

Allegretto, Sylvia A., and Kai Filion. 2011. *Waiting for Change: The $2.13 Federal Subminimum Wage*. Economic Policy Institute and Center for Wage and Employment Dynamics, Briefing Paper #297. http://www.epi.org/publication/waiting_for_change_the_213_federal_subminimum_wage/

Allegretto, Sylvia A. 2013. *Waiting for Change: Is It Time to Increase the $2.13 Subminimum Wage?* Institute for Research on Labor and Employment, Working Paper No. 155-13. http://irle.berkeley.edu/workingpapers/155-13.pdf

Allegretto, Sylvia A., Marc Doussard, Dave Graham-Squire, Ken Jacobs, Dan Thompson, and Jeremy Thompson. 2013a. *Fast Food, Poverty Wages: The Public Cost of Low-Wage Jobs in the Fast-Food Industry*. Center for Labor Research and Education. http://laborcenter.berkeley.edu/publiccosts/fastfoodpovertywages.shtml

Allegretto, Sylvia, Arindrajit Dube, Michael Reich, and Ben Zipperer. 2013b. *Credible Research Designs for Minimum Wage Studies*. IRLE Working Paper No. 148-13. http://irle.berkeley.edu/workingpapers/148-13.pdf

Bivens, Josh, Elise Gould, Lawrence Mishel, and Heidi Shierholz. 2014. *Raising America's Pay: Why It's Our Central Economic Policy Challenge*. Economic Policy Institute, Briefing Paper #378. http://www.epi.org/publication/raising-americas-pay/

Bureau of Labor Statistics. Various years. Local Area Unemployment Statistics. http://www.bls.gov/lau/ststdsadata.txt

Bureau of Labor Statistics. Various years. Quarterly Census of Employment and Wages. http://www.bls.gov/cew/

Bureau of Labor Statistics. 2014 [forthcoming]. *National Compensation Survey: Employee Benefits in the United States*. Unpublished data forthcoming summer 2014.

Congressional Budget Office (CBO). 2014. *The Effects of a Minimum-Wage Increase on Employment and Family Income*. http://www.cbo.gov/publication/44995

Current Population Survey Annual Social and Economic Supplement microdata. Various years. Survey conducted by the Bureau of the Census for the Bureau of Labor Statistics [machine-readable microdata file]. Washington, D.C.: U.S. Census Bureau. http://www.bls.census.gov/cps_ftp.html#cpsmarch

Current Population Survey Outgoing Rotation Group microdata. Various years. Survey conducted by the Bureau of the Census for the Bureau of Labor Statistics [machine-readable microdata file]. Washington, D.C.: U.S. Census Bureau. http://www.bls.census.gov/cps_ftp.html#cpsbasic

Dube, Arindrajit. 2013. *Minimum Wages and the Distribution of Family Incomes*. University of Massachusetts Amherst, Working Paper. https://dl.dropboxusercontent.com/u/15038936/Dube_MinimumWagesFamilyIncomes.pdf

International Monetary Fund (IMF). 2014. "Article IV Consultation with the United States of America Concluding Statement of the IMF Mission." Accessed June 19, 2014. http://www.imf.org/external/np/ms/2014/061614.htm

Jayaraman, Saru, and Eric Schlosser. 2013. *Behind the Kitchen Door*. Ithaca, N.Y.: ILR Press.

Lynn, M., M. Sturman, C. Ganley, E. Adams, M. Douglas, and J. McNeil. 2008. "Consumer Racial Discrimination in Tipping: A Replication and Extension." *Journal of Applied Social Psychology*, vol. 38, 1045–1060. http://onlinelibrary.wiley.com/doi/10.1111/j.1559-1816.2008.00338.x/full

National Conference of State Legislatures. 2014. "State Minimum Wages" [data table accessed June 18, 2014]. http://www.ncsl.org/research/labor-and-employment/state-minimum-wage-chart.aspx

National Restaurant Association. 2014. *2014 Restaurant Industry Forecast.*

Organization for Economic Cooperation and Development (OECD). 2014. *OECD Economic Surveys: United States 2014.* http://dx.doi.org/1.1781/econ_surveys-usa-2014-en

Pew Research Center. 2014. "Most See Inequality Growing, but Partisans Differ over Solutions." January 23. http://www.people-press.org/2014/01/23/most-see-inequality-growing-but-partisans-differ-over-solutions/

Restaurant Opportunities Centers (ROC) United. Various years. http://rocunited.org/research-resources/our-reports/.

Restaurant Opportunities Centers (ROC) United. 2014. "Recipe for Success: Abolish the Subminimum Wage to Strengthen the Restaurant Industry." http://rocunited.org/recipeforsuccess/

United States Department of Labor, Wage and Hour Division. Various years. "Fair Labor Standards Act." http://www.dol.gov/whd/flsa/

United States Department of Labor, Wage and Hour Division. 2014. "Minimum Wages for Tipped Employees" [web page], accessed June 1. http://www.dol.gov/whd/state/tipped.htm

White House. 2014. *The Impact of Raising the Minimum Wage on Women and the Importance of Ensuring a Robust Tipped Minimum Wage.* http://www.whitehouse.gov/sites/default/files/docs/20140325minimumwageandwomenreportfinal.pdf

Whittaker, William G. 2006. *The Tip Credit Provisions of the Fair Labor Standards Act.* Congressional Research Service Report for Congress.